Glenn Rothner (SBN 67353)
ROTHNER SEGALL & GREENSTONE
510 South Marengo Avenue
Pasadena, CA 91101
grothner@rsglabor.com
Telephone: (626) 796-7555
Facsimile: (626) 577-0124

Daniel A. Zibel (*pro hac vice forthcoming*)
Aaron S. Ament (*pro hac vice forthcoming*)
Robyn K. Bitner (*pro hac vice forthcoming*)
NATIONAL STUDENT LEGAL DEFENSE NETWORK
1015 15th Street N.W., Suite 600
Washington, D.C. 20005
dan@defendstudents.org
aaron@defendstudents.org
robyn@defendstudents.org
Telephone: (202) 734-7495

*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN FEDERATION OF TEACHERS, CALIFORNIA FEDERATION OF TEACHERS, ISAI BALTEZAR, & JULIE CHO,<br><br>        *Plaintiffs*,<br><br>vs.<br><br>ELISABETH DEVOS, *in her official capacity as Secretary of Education*, & UNITED STATES DEPARTMENT OF EDUCATION,<br><br>        *Defendants*. | Case No.: 5:20-cv-455<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF<br><br>[Administrative Procedure Act Case] |

# TABLE OF CONTENTS

Page

**INTRODUCTION** ...................................................................... 1

**JURISDICTION AND VENUE** ................................................ 4

**PARTIES** ................................................................................. 4

**FACTUAL ALLEGATIONS** ...................................................... 15

1.  The Higher Education Act ............................................... 15

2.  The 2011 Gainful Employment Rule ............................... 16

3.  Legal Challenges to the 2011 Gainful Employment Rule ... 18

4.  The 2014 Gainful Employment Rule ............................... 20

    4.1  The Gainful Employment Definition ...................... 21

    4.2  The Accountability Framework ............................. 25

        4.2.1  The Department Cited Substantial Support for the Eight Percent Annual Earnings Threshold ----------------------------- 28

        4.2.2  The Department Cited Substantial Support for the Twenty Percent Discretionary Income Threshold ------------------- 31

        4.2.3  The Department Considered Alternative Metrics ------------------- 31

        4.2.4  The Department Implemented an "Alternate Earnings Appeals" Process ------------------------------- 35

    4.3  The Transparency Framework ................................ 35

    4.4  The Department Directly Addressed Challenges to its Statutory Authority ............................................. 36

    4.5  The Department Carefully Considerd the Source of Data Underlying the Gainful Employment Rule ................ 37

5.  Numerous Courts Upheld the Gainful Employment Rule ... 38

6.  Pre-Repeal Developments ............................................... 40

    6.1  The Gainful Employment Rule was Working ............ 40

    6.2  The Gainful Employment Rule Covered Thousands of Programs Public, Non-Profit, and For-Profit ................ 43

    6.3  The Department Delayed the Enforcement and Operation of the Gainful Employment Rule ................ 43

1

**TABLE OF CONTENTS**
(continued)

2                                                                                    Page

3   7.    Delays Turned into Repeal ................................................................ 46

4        7.1   The Department Provided No Basis for its Repeal of the
              Accountability Framework and Failed to Consider Evidence
5              Before It ................................................................................... 49

6              7.1.1   The Department Ignored Judicial Precedent and Concluded
                       the Statute is No Longer Ambiguous ----------------------- 50
7
              7.1.2   The Department Disregarded the Statutory Scope and
8                      Claimed Disparate Impact on For-Profit Schools ------------ 52

9              7.1.3   The Department Misconstrued the Evidence Supporting the
                       Accountability Framework ----------------------------------- 55
10
                       7.1.3.1   Supposed Flaws with the Evidence Supporting the
11                                2014 Rule ........................................................ 56

12                     7.1.3.2   New "Analysis" and Research Insufficiently
                                  Supported the Repeal ...................................... 57
13
              7.1.4   The Department Concluded That the D/E Rates Measure is
14                     No Longer a Valid Metric ------------------------------------ 61

15             7.1.5   The Department Continued to Renege on its Prior
                       Justifications for the Accountability Framework --------------- 64
16
         7.2   The Department Failed to Consider Alternatives to the Repeal of
17             the Accountability Framework ...................................................... 67

18             7.2.1   Failure to Consider Alternatives to the Certification
                       Requirement ---------------------------------------------------- 68
19
              7.2.2   Failure to Consider Alternative Eligibility Metrics ----------- 69
20
              7.2.3   Failure to Consider Alternative Thresholds and Sanctions for
21                     Failing D/E Rates Measures --------------------------------- 72

22             7.2.4   Failure to Consider Alternatives to Issues with Tip-Based
                       Occupations ----------------------------------------------------- 75
23
         7.3   The Department Provided No Reasonable Justification for the
24             Repeal of the Transparency Framework .......................................... 80

25       7.4   The Department Failed to Consider Alternatives to Repealing the
              Disclosure Requirements .............................................................. 84
26
    8.    Post-Repeal Developments .............................................................. 87
27
    9.    The Department Continues to Rely on 2014 GE Data and the Eligibility
28        Metrics for Other Purposes ........................................................... 92

1

# TABLE OF CONTENTS
(continued)

2                                                                                              Page

3    **CAUSES OF ACTION** ................................................................. 95

4    **COUNT 1** ........................................................................................ 95

5    **COUNT 2** ........................................................................................ 98

6    **COUNT 3** ........................................................................................ 99

7    **COUNT 4** ...................................................................................... 101

8    **COUNT 5** ...................................................................................... 106

9    **COUNT 6** ...................................................................................... 108

10   **COUNT 7** ...................................................................................... 111

11   **COUNT 8** ...................................................................................... 113

12   **COUNT 9** ...................................................................................... 114

13   **COUNT 10** .................................................................................... 118

14   **COUNT 11** .................................................................................... 119

15   **REQUEST FOR RELIEF** ......................................................... 121

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## INTRODUCTION

2      1.      The United States is facing a growing student debt crisis. The cost of

3   college is rising. Student loan balances are rising. Student loan defaults are rising.

4   Newspapers report almost daily about systemic failures by the companies that

5   service student debt, mismanagement in the Public Service Loan Forgiveness

6   program, and fraud and deceptive practices by for-profit colleges.

7      2.      Since at least 1965, with the passage of the Higher Education Act

8   ("HEA"), the federal government has played a central role in our system of higher

9   education. Each year, under Title IV of the HEA, Defendant United States

10  Department of Education (the "Department") provides billions of dollars in federal

11  funding in the form of grants (*e.g.,* Pell Grants) and loans (*e.g.,* Federal Direct

12  Loans) to help students pay for and finance programs of postsecondary education.

13     3.      As it created and expanded the Title IV student aid programs over

14  time, Congress established numerous, common sense safeguards to ensure that

15  federal funding did not go to institutions or programs that offer students and society

16  minimal value. *See, e.g.*, *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d

17  427, 433–34 (D.C. Cir. 2012) ("[S]chools receive the benefit of accepting tuition

18  payments from students receiving federal financial aid, regardless of whether those

19  students are ultimately able to repay their loans. Therefore, Congress codified

20  statutory requirements in the HEA to ensure against abuse by schools."). Congress

21  also vested the Department with clear authority to promulgate regulations

22  governing Title IV programs. *See*, *e.g.*, 20 U.S.C. §§ 1221e-3, 3474.

23     4.      In 2014, the Department adopted regulations to implement one such

24  statutory requirement, *i.e.*, that certain postsecondary institutions can only

25  participate in Title IV programs (and serve as conduits for students to receive

26  federal student loans and grants) with respect to educational programs that

27  "prepare students for gainful employment in a recognized occupation." *See* Program

28  Integrity: Gainful Employment, 79 Fed. Reg. 64,890 (Oct. 31, 2014), *corrected by* 79

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 5:20-cv-455          1

1   Fed. Reg. 71,957 (Dec. 4, 2014) (collectively, the "Gainful Employment Rule"). *See*

2   *also infra* ¶ 70 (defining "gainful employment program").

3       5.     In 2015, the Gainful Employment Rule took effect and began

4   benefiting students and taxpayers alike. The Gainful Employment Rule required

5   institutions to certify compliance for all new gainful employment programs; the

6   Department began testing existing programs to determine whether they were in

7   compliance with the rule; and students began receiving disclosures required under

8   the Gainful Employment Rule, as well as warnings if their programs were at risk of

9   losing Title IV eligibility due to non-compliance with the rule. Critically, this meant

10  that prospective and enrolled students could assess if a particular program would

11  provide a reasonable return on investment (both financial and time).

12      6.     Despite abundant evidence that the Gainful Employment Rule was

13  benefitting prospective students, enrolled students, and taxpayers, on July 1, 2019,

14  the Department issued a final rule eliminating it entirely. *See generally* Program

15  Integrity: Gainful Employment, 84 Fed. Reg. 31,392 (July 1, 2019) (the "Repeal").

16      7.     The consequences of the Repeal are immense for prospective and

17  enrolled students. The Department has admitted that because of the Repeal, "some

18  students may choose sub-optimal programs" that "have demonstrated a lower

19  return on the student's investment, either through higher upfront costs, reduced

20  earnings, or both." 84 Fed. Reg. at 31,445. Similarly, as a direct result of the Repeal,

21  according to the Department, students could have "greater difficulty in repaying

22  loans, increasing the use of income-driven repayment plans or risking defaults and

23  the associated stress, increased costs, and reduced spending and investment on

24  other priorities." 84 Fed. Reg. at 31,445.

25      8.     The consequences are also immense for taxpayers. As the Department

26  stated in proposing the Repeal, the "estimated net budget impact from the [Repeal]

27  is $5.3 billion cost [due] . . . primarily [to] the elimination of the ineligibility

28  / / /

provision of the GE regulations." Program Integrity: Gainful Employment, 83 Fed. Reg. 40,167, 40,180 (Aug. 14, 2018) (the "2018 NPRM").

9.     In issuing the Repeal, the Department has acted arbitrarily, capriciously, and not in accordance with law, all in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. The Department has:

- Disregarded prior judicial holdings regarding the meaning of the HEA (Count 1);

- Conceded that it has no intention of implementing a statutory mandate (Count 2);

- Based the Repeal on its own view of higher education policy, which disregards the statutory requirements set by Congress regarding Title IV eligibility (Count 3);

- Failed to adequately explain its departure from prior factual assertions, consider obvious alternatives, and base the Repeal on substantial evidence (Counts 4–9);

- Taken positions that are undeniably inconsistent with positions it is taking in ongoing litigation in this District and in its approach to denying full debt relief to students who have been defrauded by predatory colleges (Count 10); *and*

- Failed to provide members of the public an adequate opportunity to comment on the proposed Repeal (Count 11).

10.     It is rare for a federal agency to publish a rule that is so replete with errors, makes so many unsubstantiated assertions, and takes so many unlawful shortcuts. For these reasons, Plaintiffs file this necessarily lengthy complaint to describe the Department's many failures in publishing the Repeal and seek a declaration that it violates the HEA and is arbitrary, capricious, and contrary to law. Plaintiffs also request an order vacating the Repeal in its entirety.

/ / /

1

## JURISDICTION AND VENUE

2

3

11.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 5 U.S.C. § 702 (the APA).

4

5

12.     An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a) and this Court may grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. § 706.

6

7

13.     INTRADISTRICT ASSIGNMENT: Pursuant to Civil Local Rule 3-2(c), assignment to the San Jose Division is appropriate because named plaintiff Isai Baltezar resides in Santa Cruz County, California and no exclusion to the rule applies.

8

9

10

11

## PARTIES

12

14.     Plaintiff American Federation of Teachers, AFL-CIO ("AFT") is a membership organization representing 1.7 million Pre-K through 12th grade teachers, early childhood educators, paraprofessionals, and other school-related personnel; higher education faculty and professional staff; federal, state, and local government employees; and nurses and other healthcare professionals. Among AFT's central purposes is to promote economic opportunity and education for students, their members, families, and communities.

13

14

15

16

17

18

19

15.     As part of its organizational mission, AFT has long taken a leading role in fighting for the financial rights of public service workers, particularly when it comes to the cost of higher education and student loan debt.

20

21

22

16.     For example, in 2016, AFT adopted a resolution highlighting the extent to which a "college education is one of the most important vehicles for economic and social mobility in the United States, for preparing students to fulfill their civic responsibilities, and for enabling students to achieve their dreams for themselves and their families." As part of that resolution, AFT resolved that it

23

24

25

26

27     / / /

28     / / /

1    would "continue to work . . . to hold for-profit educational institutions accountable

2    for poor educational outcomes, fraudulent practices, and high student debt."[1]

3           17.    In 2016, AFT also published a report entitled *Regulating Too Big to*

4    *Fail Education*, discussing the crisis in federal oversight of for-profit higher

5    education. Among the findings in that report, AFT highlighted the extent to which

6    more should be done to prevent mismanaged for-profit colleges from escaping the

7    Department's oversight.

8           18.    AFT has long and consistently focused its attention on the Gainful

9    Employment Rule.

10          19.    For example, AFT submitted comments during the Department's

11   rulemakings on the 2011 and 2014 Gainful Employment Rules. AFT has spoken out

12   publicly and to the media about the importance of the Gainful Employment Rule.[2]

13   Indeed, in its 2012–2014 "State of the Union," AFT referred to itself as a

14   "knowledgeable voice and advocate in the framing of policy around gainful

15   employment regulations that would protect students and veterans from the

16   predatory recruitment practices of for-profit institutions."

17          20.    On July 10, 2017, AFT President Randi Weingarten testified at a

18   public hearing at the Department, during which she highlighted, *inter alia*, the

19   importance of the Gainful Employment Rule to AFT and its members:

20              The gainful employment regulation is about two things, transparency,
                providing students information, and second, stopping federal funding
21              to programs that leave students with a mountain of debt and a
                worthless degree. AFT members teach in these programs that are
22              subject to the gainful employment standards, and our members want
                them enforced. Why? Because we know the difference between the real
23              educations that institutions provide and dead end make work [sic] that

24   _____

          [1]   AFT Resolution, The Fight Against Student Loan Debt and for Public
25   Investment in Higher Education (2016), https://www.aft.org/resolution/fight-
     against-student-loan-debt-and-public-investment-higher-education.
26

27        [2]   *See, e.g.*, Michael Stratford & Paul Fain, *Backed Into a Corner*, Inside Higher
     Educ. (May 7, 2014), https://www.insidehighered.com/news/2014/05/07/gainful-
28   employment-fight-profits-make-familiar-arguments-against-different-landscape.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 5:20-cv-455          5

bad actors in the sector do. Repealing the gainful employment regulation will cost the American people over $1.3 billion over ten years, so why does the Department of Education want to do away with a rule that protects students' and taxpayers' investments in higher education? . . . The Department should protect students and taxpayers by rigorously enforcing the . . . the gainful employment rule. Abandon, please abandon the plans to delay, weaken, or otherwise roll back these regulations.[3]

21.     AFT submitted comments in September 2018 in response to the proposed Repeal.

22.     AFT brings this suit in an organizational capacity and on behalf of its members who are enrolled at, or who will soon enroll at, programs of study that are covered by the Gainful Employment Rule.

23.     Plaintiff California Federation of Teachers ("CFT") is a union of professionals affiliated with AFT. CFT comprises California's 145 local unions chartered by the AFT. Through its local unions, CFT represents more than 120,000 employees at educational institutions working at every level of public and private education, from Head Start to the University of California. CFT is committed to promoting high-quality education and securing the conditions necessary to provide the best services to California's students.

24.     As part of its mission, CFT has taken a leading role in fighting for the financial rights of public service workers, including when it comes to the growing cost of higher education and student debt.

25.     CFT brings this suit on behalf of its members who are enrolled at, or will soon enroll at, programs of study that are covered by the Gainful Employment Rule.

---

[3]     *See* U.S. Dep't of Educ., *Transcript of Public Hearing on Intent to Establish Negotiated Rulemaking Committees* 1, 46–48 (July 10, 2017), *available at*: https://www2.ed.gov/policy/highered/reg/hearulemaking/2017/july10dchearingtranscript.docx.

26.     As a result of provisions in their collective bargaining contracts, AFT and CFT members may be eligible for salary or wage increases following the successful completion of higher education programs.

27.     Plaintiff Isai Baltezar is a full-time fifth grade teacher at De La Vega Elementary School in Santa Cruz, California. He is a member of both AFT and CFT. Mr. Baltezar is a natural person who resides in Santa Cruz, California.

28.     Mr. Baltezar is planning on applying to a certificate program in K-12 School Administration in order to boost his earnings potential and move into an administrative leadership position in either his, or another, school. Mr. Baltezar is currently researching programs to apply to and hopes to enroll in such a program during 2020. Because of the cost of such programs, Mr. Baltezar is considering programs that will allow him to receive loans from the Department in order to finance his attendance.

29.     Mr. Baltezar has researched numerous certificate programs offered by institutions of higher education in order to decide in which program to enroll. To assist him in comparing programs and making a decision, Mr. Baltezar is interested in reviewing and assessing information about the programs' completion and withdrawal dates; the programs' length; the number of clock or credit hours required by the various programs; the total number of students enrolled during the most recent award year; the loan repayment rate for students who enrolled, completed, and/or withdrew from the programs; the total cost of tuition and fees; the programs' job placement rates; the number of students receiving federal and private loans; the median loan debt for students who completed and/or withdrew from each program; the mean or median earnings for the same group within each program; annual earnings rates for each program; whether various programs meet professional licensure requirements in California; and whether each program is programmatically accredited.

/ / /

30.     In particular, and in order to assist him in choosing a program, Mr. Baltezar is interested in information that would enable to him to compare the amount of debt incurred by program enrollees or graduates with their post-graduation incomes. Mr. Baltezar is similarly interested in information that would enable him to compare debt and earnings information from similar programs across institutions in order to help him make an informed decision about which program to enroll in. Mr. Baltezar is looking for this information because he is concerned about his ability to pay back any federal loans he incurs to help finance his education.

31.     Mr. Baltezar is researching programs to apply to, and in which he may enroll, but he has been unable to locate any such information about the programs he is considering.

32.     Mr. Baltezar does not know whether the programs he is considering provide training to their students that lead to earnings sufficient to allow students to pay back their student loan debts.

33.     Mr. Baltezar does not know whether any program he is considering is at risk of losing eligibility to participate in the Title IV student loan programs because it is not providing a program of training that prepares students for gainful employment in a recognized occupation.

34.     If Mr. Baltezar had access to this information, he would carefully review it. His review of that information would affect his decision to enroll in a particular program.

35.     Plaintiff Julie Cho is a part-time university lecturer at the University of California at Irvine, where she teaches both Film and Media Studies and Asian American Studies. She is a member of both AFT and CFT. Ms. Cho is a natural person who resides in Irvine, California.

36.     Ms. Cho is currently assessing a career change into either disability services counseling or teaching students with special needs. To facilitate such a change, she is actively considering enrolling in one of a number of postsecondary

programs, including certificate programs in Special Education or Special Education Psychology. Ms. Cho is researching programs to apply to and hopes to enroll during 2020. Because of the cost of such programs, Ms. Cho is considering programs that will allow her to receive loans from the Department in order to finance her attendance.

37.     Ms. Cho has researched numerous certificate programs offered by institutions of higher education in order to decide where to enroll. To assist her in comparing programs and making a decision, Ms. Cho is interested in reviewing and assessing information about the programs' completion and withdrawal dates; the programs' length; the number of clock or credit hours required by the various programs; the total number of students enrolled during the most recent award year; the loan repayment rate for students who enrolled, completed, and/or withdrew from the programs; the total cost of tuition and fees; the programs' job placement rates; the number of students receiving federal and private loans; the median loan debt for students who completed and/or withdrew from each program; the mean or median earnings for the same group within each program; annual earnings rates for each program; whether various programs meet professional licensure requirements in California; and whether each program is programmatically accredited.

38.     In particular, and in order to assist her in choosing a program, Ms. Cho is interested in information that would enable to her to compare the amount of debt incurred by program enrollees or graduates with their post-graduation incomes. Ms. Cho is similarly interested in information that would enable her to compare debt and earnings information from similar programs across institutions in order to help her make an informed decision about which program to enroll in. Ms. Cho is looking for this information because she is concerned about her ability to pay back any federal loans she incurs to help finance her education.

/ / /

/ / /

39.    Ms. Cho is researching programs to apply to, and in which she may enroll, but she has been unable to locate any such information about the programs she is considering.

40.    Ms. Cho does not know whether the programs she is considering provide training to their students that lead to earnings sufficient to allow students to pay back their student loan debts.

41.    Ms. Cho does not know whether any program she is considering is at risk of losing eligibility to participate in the Title IV student loan programs because it is not providing a program of training that prepares students for gainful employment in a recognized occupation.

42.    If Ms. Cho had access to this information, she would carefully review it. Her review of such information would affect her decision to enroll in a particular program.

43.    Plaintiffs Baltezar and Cho will be referred to as the "Individual Plaintiffs."

44.    The Repeal has injured and will continue to injure AFT members, CFT members, and Individual Plaintiffs who are actively considering whether to enroll in, or continue their enrollment in, programs of higher education that, but for the Repeal, would be required to make certain disclosures under the Gainful Employment Rule. Because of the Repeal, AFT members, CFT members, and Individual Plaintiffs will no longer receive these mandated disclosures, including about gainful employment programs' completion rates, length, total cost, loan repayment rates, and job placement rates, as well as whether these programs satisfy certain state licensure or certification requirements.

45.    The disclosure of this information would help AFT members, CFT members, and Individual Plaintiffs identify programs that offer credentials that potential employers recognize and value. Repealing these disclosures will reduce market information that will assist prospective and enrolled students and their

1   families in making critical decisions about their educational investments and the

2   potential outcomes of those investments. Repealing these disclosures will also

3   impair market information about gainful employment programs, decreasing the

4   transparency of student outcomes for better decision making by prospective and

5   enrolled students and their families, thereby leading to a less competitive

6   marketplace that discourages self-improvement.

7       46.    With the elimination of these disclosures, AFT members, CFT

8   members, Individual Plaintiffs, and other interested members of the public

9   (including family members of AFT members, CFT members, and Individual

10  Plaintiffs) will have to seek out the information they need, and the information that

11  interests them, to make critical decisions about the programs they are considering,

12  rather than being provided the information they are entitled to receive under the

13  Gainful Employment Rule.

14      47.    The Gainful Employment Rule also includes eligibility sanctions that

15  make certain programs ineligible participants in Title IV programs. Because of the

16  elimination of these sanctions and the fact that non-passing programs remain

17  accessible, AFT members, CFT members, Individual Plaintiffs, and other interested

18  members of the public (including family members of AFT members, CFT members,

19  and Individual Plaintiffs) are at risk of attending programs that are "sub-optimal."

20  These sub-optimal programs have demonstrated a lower return on students'

21  investment, either through higher upfront costs, reduced earnings, or both.

22      48.    Because of the Repeal, AFT members, CFT members, and Individual

23  Plaintiffs are at higher risk of difficulty repaying loans and a higher risk of loan

24  default.

25      49.    Because of the Repeal, AFT members, CFT members, and Individual

26  Plaintiffs are also at risk of being forced to reduce spending and investment on

27  other priorities.

28  / / /

50.     Because of the Repeal, AFT members, CFT members, and Individual Plaintiffs will no longer receive required warnings that a gainful employment program is at risk of becoming ineligible to participate in Title IV programs during the next Title IV award year.

51.     Because of the Repeal, AFT members, CFT members, and Individual Plaintiffs have a greater likelihood of making poor educational investments and decisions.

52.     Because of the Repeal, AFT members, CFT members, and Individual Plaintiffs also face a substantial risk of incurring debt to attend programs of higher education without knowing that such programs fail to prepare students for gainful employment in a recognized occupation.

53.     AFT also brings this suit in its organizational capacity.

54.     The Department's issuance of the Repeal has caused AFT to divert its limited resources and alter its resource allocation from other mission-centric efforts toward increased outreach and education of its members. AFT's outreach and education focuses on members who are prospective and enrolled students in gainful employment programs who, but for the Department's Repeal, would be able to access critical information regarding these programs, including whether potential programs were failing to provide a program of training that prepares students for gainful employment in a recognized occupation.

55.     AFT has devoted substantial financial resources to developing, organizing, staffing, and promoting student debt clinics across the nation that provide its members, and their family members, with, *inter alia*, information on student debt management, including information on enrollment in income-driven student loan repayment plans and Public Service Loan Forgiveness. AFT has also partnered with a social enterprise company called "Summer," which helps student loan borrowers navigate the loan repayment process by partnering with colleges

/ / /

1  and employers to help borrowers track their loans and enroll in the optimal

2  repayment plan.

3      56.    Prior to the Repeal, AFT's efforts regarding student debt focused

4  largely on helping its members navigate the complicated loan repayment and

5  forgiveness systems in order to manage their student debt effectively.

6      57.    Because the Repeal leaves AFT members, including Individual

7  Plaintiffs, at a substantially higher risk of incurring debt that they will be unable to

8  repay, AFT has been forced to divert and devote its resources to activities that

9  guard against the likely increase in members in need of counseling to remedy

10  student debt-related problems. Part of AFT's response to counteract the effects of

11  the Repeal has been to launch its #doyourhomework campaign (the "Campaign").

12      58.    As part of the Campaign, AFT has developed and promoted a website

13  that addresses the loss of information provided to prospective and enrolled students

14  because of the Repeal. This website, http://www.aftcontinuinged.org, provides

15  information relevant to choosing programs of higher education that are likely to

16  lead to earnings that bear a relationship to the cost of the program and the amount

17  of debt that students are likely to incur in order to pay for the program.

18      59.    AFT has promoted this website to its members and staff on social

19  media and through other electronic sources.

20      60.    AFT has hosted webinars for its members and staff to learn more

21  about the Campaign.

22      61.    To develop the original content for this website and promote it to AFT

23  members, AFT has diverted resources—including staff time and AFT funds—from

24  other mission-centric activities that AFT undertakes for its members, including,

25  without limitation, resources that otherwise would have been put towards activities

26  to help its members navigate the complicated loan repayment and forgiveness

27  systems in order to manage their student debt effectively. But for the Repeal, the

28  / / /

1  costs that AFT devoted to the Campaign would have been spent on these other

2  activities.

3       62.    As part of the Campaign, AFT has also developed content for its local

4  affiliates, including CFT, to use in webinars and other materials in order to educate

5  their members on making quality choices regarding higher education programs.

6  That content addresses how prospective and enrolled students can obtain

7  information about programmatic costs, the amount of debt that students are likely

8  to incur, and programmatic outcomes.

9       63.    AFT has also encouraged its affiliates to consider collective bargaining

10  proposals that require school districts to provide assistance to employees on how to

11  choose the best programs of continuing education. AFT has similarly encouraged its

12  affiliates to consider collective bargaining proposals that require school districts to

13  provide additional training and resources for high school students and their families

14  on the financial aid system in higher education.

15       64.    Through these and other efforts, and because of the Repeal, AFT has

16  diverted resources, including both financial resources and time of its staff, towards:

17  (i) helping its members identify programs that—although granted eligibility by the

18  Department—are not actually preparing students for gainful employment in a

19  recognized occupation; (ii) promoting awareness among its members of the fact that

20  certain programs of higher education may not prepare students for gainful

21  employment in a recognized occupation; *and* (iii) helping members choose

22  institutions and programs of higher education that lead to post-graduation or post-

23  completion earnings that are commensurate with the cost of the program and/or the

24  amount of debt incurred to attend.

25       65.    Defendant Elisabeth (Betsy) DeVos is the Secretary of the United

26  States Department of Education and is being sued in her official capacity. Her

27  official address is 400 Maryland Avenue, S.W., Washington, D.C. 20202.

28  / / /

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** – 5:20-cv-455       14

66.     Defendant United States Department of Education is an executive agency of the United States government and an agency of the United States within the meaning of the APA. The Department's principal address is 400 Maryland Avenue, S.W., Washington, D.C. 20202.

67.     Defendant DeVos and Defendant United States Department of Education shall be collectively referred to as the "Defendants" or the "Department."

## FACTUAL ALLEGATIONS

### 1.  The Higher Education Act

68.     Each year, under Title IV of the HEA, the Department provides billions of dollars in federal funding in the form of grants and loans to help students pay for and finance programs of postsecondary education. *See generally* 20 U.S.C. § 1001 *et seq.*

69.     Title IV funding does not flow directly to students. Rather, under the HEA, funding goes from the Department to an eligible institution of higher education, which must meet an array of statutory and regulatory requirements. For purposes of determining eligibility to participate in Title IV programs, institutions are classified into three categories: (i) "public or other nonprofit" institutions; (ii) proprietary institutions, which are private, for-profit institutions; and (iii) postsecondary vocational institutions, which may be either public or private, non-profit institutions. *See* HEA §§ 101–102, 20 U.S.C. §§ 1001–1002.

70.     By definition, in order to be an eligible participant in Title IV programs, both a proprietary institution and a postsecondary vocational institution must provide "an eligible program of training to prepare students for gainful employment in a recognized occupation" (a "gainful employment program"). HEA § 102(b)(1)(A)(i), (c)(1)(A), 20 U.S.C. § 1002(b)(1)(A)(i), (c)(1)(A). By definition, in order to be an eligible participant in Title IV programs, public and private non-profit institutions that are not reliant on being a postsecondary vocational institution must provide either: (i) an associate, bachelor's, graduate, or professional

1   degree; (2) at least a two-year program that is acceptable for full credit toward a

2   bachelor's degree; or (3) at least a one-year training program that leads to a degree

3   or certificate (or other recognized educational credential) and is a gainful

4   employment program. HEA § 101(a)–(b), 20 U.S.C. § 1001(a)–(b). Taken together,

5   these provisions establish the criteria for determining which programs (*i.e.*, "gainful

6   employment programs" or "GE programs") must "prepare students for gainful

7   employment in a recognized occupation" in order for students who attend those

8   programs to be the beneficiaries of federal student loans and grants. *See also* 34

9   C.F.R. § 668(c)–(d) (defining eligible programs).[4]

10  **2.   The 2011 Gainful Employment Rule**

11         71.    For decades, the Department left the statutory phrase "prepare

12  students for gainful employment in a recognized occupation" undefined, thereby

13  leaving undefined what it means to be a "gainful employment program."

14         72.    By 2011, however, the Department recognized "growing concerns about

15  unaffordable levels of loan debt for students" who attended gainful employment

16  programs. *See, e.g.*, Program Integrity: Gainful Employment, 75 Fed. Reg. 43,616,

17  43,619 (July 26, 2010); Program Integrity: Gainful Employment–Debt Measures, 76

18  Fed. Reg. 34,386, 34,392 (June 13, 2011) (recognizing in 2011 that the rules

19  "address harms to students that were identified by the [Government Accountability

20  Office] and were identified in the public hearings and in comments submitted in

21  response to the program regulations"). At that same time, the Department also

22  recognized that "significant advances in electronic reporting and analysis . . .

23  allow[ed] [it] to collect accurate and timely data that could not have been utilized in

24  the past." 76 Fed. Reg. at 34,392–93. This, the Department reasoned, created a new

25

26         [4]    This provision of the Department's regulations, 34 C.F.R. § 668.8(c)–(d),
    predates the adoption of the Gainful Employment Rule and took effect in 1994. *See*
27  58 Fed. Reg. 22,348–01, 1994 WL 155008 (Apr. 29, 1994).
         In addition, except as specifically alleged, all references to the Code of
28  Federal Regulations are to the version effective July 1, 2019.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** – 5:20-cv-455          16

1     ability to "provide the Department, students, and the institutions offering these

2     programs with information about how well the programs are performing under the

3     measures," 76 Fed. Reg. at 34,392–93, and thus enabled the Department to create a

4     metrics-based approach to define what it means for a program to prepare students

5     for gainful employment in a recognized occupation.

6         73.     On May 26, 2009, the Department announced it would convene a

7     negotiated rulemaking committee, as required by 20 U.S.C. § 1098a, to develop

8     regulations regarding program integrity in Title IV programs, including regulations

9     regarding preparing students for gainful employment in a recognized occupation.

10    Negotiated Rulemaking Committees; Establishment, 74 Fed. Reg. 24,728 (May 26,

11    2009). On September 9, 2009, the Department established that committee. Office of

12    Postsecondary Education; Notice of Negotiated Rulemaking for Programs

13    Authorized Under Title IV of the Higher Education Act of 1965, as Amended, 74

14    Fed. Reg. 46,399 (Sept. 9, 2009). After that committee failed to reach consensus on

15    proposed rules, the Department published its own proposal. *See* Program Integrity

16    Issues, 75 Fed. Reg. 34,806 (June 18, 2010) (proposing reporting and disclosure

17    regulations); Program Integrity: Gainful Employment, 75 Fed. Reg. 43,616 (July 26,

18    2010) (proposing measures for determining whether certain postsecondary

19    educational programs lead to gainful employment in recognized occupations and the

20    conditions under which these educational programs remain eligible for the student

21    financial assistance programs authorized under Title IV of the HEA).

22        74.     In final rules published in 2010 and 2011, the Department established

23    a series of reporting and disclosure requirements for gainful employment programs,

24    a "program approval" rule whereby a school must notify the Secretary at least

25    ninety days before the first day of class when it intends to add an educational

26    program that prepares students for gainful employment in a recognized occupation,

27    and a framework to assess whether a program provides training that leads to

28    gainful employment in a recognized occupation, as measured by factors consisting of

1  debt-to-earnings ratios of a program's graduates and the loan repayment rates for
2  students who attended a program. *See* Program Integrity: Gainful Employment—
3  New Programs, 75 Fed. Reg. 66,665 (Oct. 29, 2010); Program Integrity Issues, 75
4  Fed. Reg. 66,832 (Oct. 29, 2010); Program Integrity: Gainful Employment—Debt
5  Measures, 76 Fed. Reg. 34,386 (June 13, 2011) (collectively, the "2011 GE Rule"). At
6  that time, the Department stated that "[a]dopting a definition now gives meaning to
7  an undefined statutory term, thereby fulfilling the Department's duty to enforce the
8  provisions of the HEA in a clear and meaningful way." 76 Fed. Reg. at 34,393.

9      75.    Under the 2011 GE Rule, an educational program was "considered to
10 provide training that leads to gainful employment in a recognized occupation" if the
11 relevant cohort of students met certain eligibility metrics, namely: (i) a loan
12 repayment rate of at least thirty-five percent; or (ii) the program's annual loan
13 payment was less than or equal to thirty percent of discretionary income *or* twelve
14 percent of annual earnings; or (iii) the data needed to make these determinations
15 was not available. *See* 76 Fed. Reg. at 34,448 (codified at 34 C.F.R. § 668.7(a)).

16     76.    The 2011 GE Rule set consequences for programs that did not meet the
17 eligibility metrics, including requiring institutions to issue warnings to enrolled and
18 prospective students for programs that fail once, 76 Fed. Reg. at 34,452 (codified at
19 34 C.F.R. § 668.7(j)(1)), or that fail two consecutive years or two out of three
20 consecutive years, 76 Fed Reg. at 34,452 (codified at 34 C.F.R. § 668.7(h)(2)). Under
21 the 2011 GE Rule, a failing program would become ineligible if it did not meet any
22 of the minimum eligibility requirements for three out of the four most recent fiscal
23 years. 76 Fed. Reg. at 34,452 (codified at 34 C.F.R. § 668.7(i)).

24 **3.  Legal Challenges to the 2011 Gainful Employment Rule**

25     77.    After the 2011 GE Rule was published, the Association of Private
26 Sector Colleges and Universities ("APSCU") filed suit under the APA, advancing a
27 number of arguments as to why the 2011 GE Rule was unlawful. *See generally*
28 Compl., *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 870 F. Supp. 2d. 133

1   (D.D.C. 2012) (No. 1:11-cv-01314-RC) ("*APSCU I*"). Some of those arguments are

2   relevant to whether the rationales that the Department has advanced to justify the

3   Repeal do, in fact, satisfy the APA.

4       78.    APSCU first argued that the eligibility metrics exceeded the

5   Department's statutory authority under the *Chevron* framework. In this regard,

6   APSCU asserted that the term "gainful employment" meant "a job that pays" and

7   that "the Department's attempt to define the phrase in terms of debt and income . . .

8   exceed[ed] its statutory authority." *APSCU I*, 870 F. Supp. 2d at 145. In response,

9   the Department asserted that "Congress did not provide a precise definition of what

10  it means to 'prepare students for gainful employment in a recognized occupation.'"

11  *Id.* The Department also argued that "the operative statutory phrase [wa]s not

12  simply 'gainful employment[,]' but rather 'gainful employment in a recognized

13  occupation.'" *Id.* at 145–46. The Department further stated that the phrase "gainful

14  employment in a recognized occupation" was "ambiguous." *Id.* at 146.

15      79.    In *APSCU I*, the District Court upheld aspects of the 2011 GE Rule

16  and vacated others. In doing so, the District Court held: (1) "the relevant statutory

17  command is that a given program 'prepare students for gainful employment in a

18  recognized occupation,'" *id.* at 146; (2) that phrase is ambiguous insofar as "[t]he

19  means of determining whether a program 'prepare[s] students for gainful

20  employment in a recognized occupation' is a considerable gap, which the

21  Department has promulgated rules to fill," *id.* at 146; (3) the 2011 GE regulations

22  "are a reasonable interpretation of an ambiguous statutory command," *id.* at 149;

23  (4) both the disclosure requirements and the debt-to-earnings component of the

24  eligibility metrics were lawfully promulgated and supported, *id.* at 154–56; and

25  (5) the Department had not provided a reasonable explanation for the repayment

26  rate component of the eligibility metrics, thus acting arbitrarily and capriciously, *id.*

27  at 153–54.

28  / / /

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 5:20-cv-455          19

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

80.     In *APSCU I*, because the repayment rate metric could "not be severed from the other debt metrics," which, in turn, could not be severed from the reporting requirements, the District Court vacated the eligibility metrics in their entirety, along with the associated reporting requirements. *Id.* at 154–57.

81.     The Department subsequently moved to amend the holding of *APSCU I* with respect to the reporting requirements and portions of the debt measures. That motion was denied. *See generally Ass'n of Private Sector Colls. & Univs. v. Duncan*, 930 F. Supp. 2d 210 (D.D.C. 2013) ("*APSCU II*").

### 4.  The 2014 Gainful Employment Rule

82.     Following the decisions in *APSCU I* and *APSCU II*, the Department restarted the regulatory process.

83.     On March 25, 2014, the Department issued a notice of proposed rulemaking that noted, *inter alia*, "growing concerns about educational programs that, as a condition of eligibility for [T]itle IV, HEA program funds, are required by statute to provide training that prepares students for gainful employment in a recognized occupation (GE programs), but instead are leaving students with unaffordable levels of loan debt in relation to their earnings, or leading to default." Program Integrity: Gainful Employment, 79 Fed. Reg. 16,426 (Mar. 25, 2014) (the "2014 NPRM").

84.     Following a period of public comment, the Department published the Gainful Employment Rule on October 31, 2014. At that time, the Department stated that it was "concerned that a number of GE programs: (1) do not train students in the skills they need to obtain and maintain jobs in the occupation for which the program purports to provide training, (2) provide training for an occupation for which low wages do not justify program costs, and (3) are experiencing a high number of withdrawals or 'churn' because relatively large numbers of students enroll but few, or none, complete the program, which can often lead to default." 79 Fed. Reg. at 64,890. The Department further stated that it was "also concerned

1    about the growing evidence, from Federal and State investigations and *qui tam*

2    lawsuits, that many GE programs are engaging in aggressive and deceptive

3    marketing and recruiting practices. As a result of these practices, prospective

4    students and their families are potentially being pressured and misled into critical

5    decisions regarding their educational investments that are against their interests."

6    79 Fed. Reg. at 64,890.

7        85.    To address these and other concerns, the Gainful Employment Rule

8    defined what it means to "prepare students for gainful employment in a recognized

9    occupation," and, in doing so, established two key "frameworks:" an "Accountability

10   Framework" and a "Transparency Framework." 79 Fed. Reg. at 64,890.

11   **4.1   The Gainful Employment Definition**

12       86.    The Gainful Employment Rule provides that a "program provides

13   training that prepares students for gainful employment in a recognized occupation

14   if the program" satisfies applicable certification requirements and "is not an

15   ineligible program" under an aspect of the Accountability Framework known as the

16   "D/E Rates Measure." 34 C.F.R. § 668.403(a); *see also infra* ¶¶ 101–110 (describing

17   the D/E Rates Measure).

18       87.    The Gainful Employment Rule defined a "gainful employment

19   program" as an educational program offered by an institution under 34 C.F.R.

20   § 668.8(c)(3) or (d) and identified by a combination of: (i) the institution's six-digit

21   Office of Postsecondary Education ID ("OPEID") number; (ii) the program's six-digit

22   CIP code, *see infra* ¶¶ 91–96, as assigned by the institution or determined by the

23   Secretary; and (iii) the program's credential level. 34 C.F.R. § 668.402.

24       88.    The Department's regulations at 34 C.F.R. § 668.8(c)(3) provide that

25   one type of program offered by non-profit and public universities that is eligible to

26   participate in Title IV is "a one-academic year [or more] training program that leads

27   to a certificate, or other nondegree recognized credential, and *prepares students for*

28   *gainful employment in a recognized occupation.*" *Id.* (emphasis added).

89.     The Department's regulations at 34 C.F.R. § 668.8(d) provide that to be eligible for Title IV, with a limited exception, *see id.* § 668.8(d)(4), a "program provided by a proprietary institution of higher education or postsecondary vocational institution" must provide "training that *prepares a student for gainful employment in a recognized occupation.*" *Id.* (emphasis added).

90.     The regulatory distinction in 34 C.F.R. § 668.8—between non-profit and public schools in subsection (c) and proprietary (or for-profit) schools in subsection (d)—reflects distinctions in the HEA. *See supra* at ¶ 70.

91.     The six-digit CIP code is a "taxonomy of instructional program classifications and descriptions developed by the U.S. Department of Education's National Center for Education Statistics [("NCES")]." 34 C.F.R. § 668.402 (defining "[c]lassification of instructional program (CIP) code").

92.     CIP codes can be two, four, or six digits. As described by NCES, the six-digit CIP code is the "most detailed" classification of postsecondary programs and "represent[s] specific instructional programs." Nat'l Ctr. For Educ. Statistics, *Introduction to the Classification of Instructional Programs: 2010 Edition (CIP-2010)* 1, 2 (2010), https://nces.ed.gov/ipeds/cipcode/Files/Introduction_CIP2010.pdf.

93.     NCES has also described the six-digit CIP code as the "basic unit of analysis used by NCES and institutions in tracking and reporting program completions and fields of study data." *Id.* In contrast, four-digit CIP codes represent only "intermediate groupings" of similar programs. *Id.*

94.     By way of example only, the four-digit CIP code 13.04 corresponds to programs that are for "Educational Administration and Supervision." Within that category, however, the six-digit CIP codes further classify[5] programs into fourteen subcategories at a more granular level of specialty:

---

[5]     Nat'l Ctr. for Educ. Statistics, *IPEDS Detail for CIP Code 13.04*, https://nces.ed.gov/ipeds/cipcode/cipdetail.aspx?y=56&cipid=90415.

| 13.0401 | Educational Leadership and Administration, General |
| 13.0402 | Administration of Special Education |
| 13.0403 | Adult and Continuing Education Administration |
| 13.0404 | Educational, Instructional, and Curriculum Supervision |
| 13.0406 | Higher Education/Higher Education Administration |
| 13.0407 | Community College Administration |
| 13.0408 | Elementary and Middle School Administration/Principalship |
| 13.0409 | Secondary School Administration/Principalship |
| 13.0410 | Urban Education and Leadership |
| 13.0411 | Superintendency and Educational System Administration |
| 13.0412 | International School Administration/Leadership |
| 13.0413 | Education Entrepreneurship |
| 13.0414 | Early Childhood Program Administration |
| 13.0499 | Educational Administration and Supervision, Other |

95.     Similarly, the four-digit CIP code 13.13 corresponds to programs that are for "Teacher Education and Professional Development, Specific Subject Areas." Within that category, however, the six-digit CIP codes further classify[6] programs into forty subcategories at a more granular level of specialty:

| 13.1301 | Agricultural Teacher Education |
| 13.1302 | Art Teacher Education |
| 13.1303 | Business and Innovation/Entrepreneurship Teacher Education |
| 13.1304 | Driver and Safety Teacher Education |
| 13.1305 | English/Language Arts Teacher Education |
| 13.1306 | Foreign Language Teacher Education |
| 13.1307 | Health Teacher Education |
| 13.1308 | Family and Consumer Sciences/Home Economics Teacher Education |
| 13.1309 | Technology Teacher Education/Industrial Arts Teacher Education |
| 13.1310 | Sales and Marketing Operations/Marketing and Distribution Teacher Education |
| 13.1311 | Mathematics Teacher Education |
| 13.1312 | Music Teacher Education |
| 13.1314 | Physical Education Teaching and Coaching |
| 13.1315 | Reading Teacher Education |

[6]     Nat'l Ctr. for Educ. Statistics, *IPEDS Detail for CIP Code 13.13*, https://nces.ed.gov/ipeds/cipcode/cipdetail.aspx?y=56&cipid=90457.

| 13.1316 | Science Teacher Education/General Science Teacher Education |
| 13.1317 | Social Science Teacher Education |
| 13.1318 | Social Studies Teacher Education |
| 13.1319 | Technical Teacher Education |
| 13.1320 | Trade and Industrial Teacher Education |
| 13.1321 | Computer Teacher Education |
| 13.1322 | Biology Teacher Education |
| 13.1323 | Chemistry Teacher Education |
| 13.1324 | Drama and Dance Teacher Education |
| 13.1325 | French Language Teacher Education |
| 13.1326 | German Language Teacher Education |
| 13.1327 | Health Occupations Teacher Education |
| 13.1328 | History Teacher Education |
| 13.1329 | Physics Teacher Education |
| 13.1330 | Spanish Language Teacher Education |
| 13.1331 | Speech Teacher Education |
| 13.1332 | Geography Teacher Education |
| 13.1333 | Latin Teacher Education |
| 13.1334 | School Librarian/School Library Media Specialist |
| 13.1335 | Psychology Teacher Education |
| 13.1337 | Earth Science Teacher Education |
| 13.1338 | Environmental Teacher Education |
| 13.1339 | Communication Arts and Literature Teacher Education |
| 13.1399 | Teacher Education and Professional Development, Specific Subject Areas, Other. |

96.     In 2014, the Department recognized that using a six-digit CIP code to define "gainful employment programs" would yield a different result than if the Department used a four-digit CIP code. For example, the Department stated that "about 32 percent of students in in-person zone and failing programs will not have nearby transfer options to an in-person program with the same six-digit CIP code and credential level. This decreases to about 10 percent when in-person programs in the same four-digit CIP code are included." 79 Fed. Reg. at 65,074. Understanding the difference—and the result of the difference—between defining programs at a six-digit level, as opposed to a four-digit level, the Department chose to define what constitutes a "gainful employment program" at the six-digit CIP code level.

///

1

### 4.2   The Accountability Framework

2   97.   The Accountability Framework created a process by which an

3   institution establishes a gainful employment program's initial eligibility for Title IV

4   participation (the "Certification Requirement"), as well as a process by which the

5   Department determines whether a program can remain eligible to participate (the

6   "Eligibility Metrics").

7   98.   The Certification Requirement mandates that an institution establish

8   the eligibility of a GE program by certifying, among other things, that the program

9   is included in the institution's accreditation, satisfies applicable state or federal

10   program-level accrediting requirements, and satisfies any state licensing or

11   certification requirements for the occupations for which the program is designed to

12   prepare students to enter. *See* 34 C.F.R. § 668.414. With respect to institutions

13   offering programs that were already in existence, the Department established a

14   "[t]ransitional certification," whereby institutions had to provide certifications of

15   compliance to the Department as to each of the programs currently considered

16   eligible. *Id.* § 668.414(a).

17   99.   The Department noted in 2014 that the Certification Requirement, in

18   addition to requiring institutions to provide certain information to the Department,

19   "creat[ed] an enforcement mechanism for the Department to take action if a

20   required approval [was] lost, or if a certification that was provided was false." 79

21   Fed. Reg. at 64,989. The Department also noted that these requirements had

22   "minimal" burden on institutions and that "any burden [wa]s outweighed by the

23   benefits of the requirements[,] which . . . will help ensure that programs meet

24   minimum standards for students to obtain employment in the occupations for which

25   they receive training." 79 Fed. Reg. at 64,989.

26   100.   The Department referred to the Certification Requirement as an

27   "independent pillar of the accountability framework . . . that complement[s] the

28   metrics-based standards." 79 Fed. Reg. at 64,990.

1    101.   In 2014, the Department also established the Eligibility Metrics to tie

2    the continued eligibility of a GE program to the amount of debt students who

3    completed the program incurred to attend that program in comparison to those

4    same students' discretionary and annual earnings after completion.

5    102.   The Eligibility Metrics establish thresholds that a program has to meet

6    in order to remain eligible to participate in Title IV programs.  The thresholds are

7    premised on the debt-to-earnings rate or "D/E rates measure," which establishes a

8    formula for calculating both the "annual earnings rate" and the "discretionary

9    income rate."

10   103.   The annual earnings rate was calculated as follows: "annual loan

11   payment / the higher of the mean or median annual earnings." 34 C.F.R.

12   § 668.404(a)(2).

13   104.   The discretionary income rate was calculated as follows: "annual loan

14   payment / (the higher of the mean or median annual earnings − (1.5 x Poverty

15   Guideline[s])). 34 C.F.R. § 668.404(a)(1).

16   105.   The "annual loan payment" is a component of both the discretionary

17   income rate and the annual earnings rate calculations, the precise determination of

18   which is subject to a methodology set forth in 34 C.F.R. § 668.404(b). That section

19   sets out a process by which the median loan debt for a program is amortized over a

20   period of time, the length of which is set in coordination with the type of program

21   for which the debt was incurred (*i.e.*, ten years for a program that leads to certain

22   certificates or associate degrees, fifteen years for programs that lead to bachelor's or

23   master's degrees, and twenty years for programs that lead to a doctoral or first

24   professional degree). 34 C.F.R. § 668.404(b)(2)(i).

25   106.   The amortization of the median loan debt uses an interest rate that is

26   the average of the annual statutory interest rates on federal Direct unsubsidized

27   loans in effect during a specific period of time. 34 C.F.R. § 404(b)(2)(ii). The length

28   of this period is set in coordination with the type of program for which the debt was

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 5:20-cv-455          26

1   incurred (*i.e.*, three years for a program that leads to certain certificates, an

2   associate degree, or a master's degree and six years for programs that lead to a

3   bachelor's, doctoral, or first professional degree). The interest rate also depends on

4   whether the loans were incurred with respect to graduate or undergraduate

5   education.

6       107.   Under the Eligibility Metrics, a program is considered passing if: (i) its

7   annual earnings rate is less than or equal to eight percent; *or* (ii) its discretionary

8   income rate is less than or equal to twenty percent. 34 C.F.R. § 668.403(c)(1).

9       108.   Under the Eligibility Metrics, a program is considered failing if: (i) its

10  annual earnings rate is greater than twelve percent or the denominator of the

11  annual earnings rate is zero; *and* (ii) its discretionary income rate is greater than

12  thirty percent (or the "income for the denominator of the [discretionary earnings

13  rate] is negative or zero"). 34 C.F.R. § 668.403(c)(2).

14      109.   Under the Eligibility Metrics, a program is considered "in the zone" if

15  it is not a passing program and: (i) its annual earnings rate is greater than eight

16  percent, but less than or equal to twelve percent; *or* (ii) its discretionary income rate

17  is greater than twenty percent, but less than or equal to thirty percent. 34 C.F.R.

18  § 668.403(c)(3).

19      110.   Under the Accountability Framework, a GE program becomes

20  ineligible if either: (i) it fails the Eligibility Metrics for two out of three consecutive

21  years for which the program's D/E rates are calculated; *or* (ii) has a combination of

22  in the zone and failing D/E rates for four consecutive award years for which the

23  program's D/E rates are calculated. 34 C.F.R. § 668.403(c)(4).

24      111.   Except as provided elsewhere in the Department's regulations, "an

25  institution may not disburse [T]itle IV, HEA program funds to students enrolled in

26  an ineligible program." 34 C.F.R. § 668.410(b)(1).

27      112.   The Department "engaged in a thorough rulemaking process before

28  promulgating its debt-to-earnings regulations" and the "final rule is replete with

1    explanations for the chosen metrics." *Ass'n of Private Sector Colls. & Univs. v.*

2    *Duncan*, 110 F. Supp. 3d 176, 190–91 (D.D.C. 2015) ("*APSCU III*").

3        113.    As part of the Accountability Framework, an institution is required to

4    provide a warning to enrolled and prospective students if the Secretary notifies that

5    institution that one of its GE programs could become ineligible during the following

6    award year, based on its final D/E rates measure. 34 C.F.R. § 668.410(a). The

7    regulations include provisions regarding the content of these warnings, the

8    language (*i.e.*, alternatives to English) to use in making these warnings, and the

9    means of delivery to both prospective and enrolled students. 34 C.F.R.

10   § 668.410(a)(2)–(6).

11       114.    In 2014, the Department stated that such a warning was "essential"

12   for students and would provide "currently enrolled students with important

13   information about program outcomes and the potential effect of those outcomes on

14   the program's future eligibility for [T]itle IV, HEA program funds." 79 Fed. Reg. at

15   64,964. The Department further highlighted how the "warnings will provide

16   consumers with information of the kind that Congress has already determined

17   necessary to make an 'informed judgment about the educational benefits available

18   at a given institution.'" 79 Fed. Reg. at 64,967 (quoting Student Right-To-Know and

19   Campus Security Act, Pub. L. No. 101-542, § 102, 104 Stat. 2381 (1990)).

20   **4.2.1  The Department Cited Substantial Support for the Eight Percent Annual
     Earnings Threshold**

21

22       115.    The Department noted in the Gainful Employment Rule that the eight

23   percent threshold in the Eligibility Metrics "has long been referred to as a limit for

24   student debt burden" and that "[s]everal studies of student debt have accepted the 8

25   percent standard." 79 Fed. Reg. at 64,919. Specifically, the Department cited to the

26   following sources:

27       •    Keith Greiner, *How Much Student Loan Debt Is Too Much?*, 26 J. of

28            Student Fin. Aid 1, 7–19 (1996) (cited at 79 Fed. Reg. at 64,919 n.100);

- Patricia M. Scherschel, *Student Indebtedness: Are Borrowers Pushing the Limits?,* USA Group Found. (Nov. 1998) (cited at 79 Fed. Reg. at 64,919 n.101);

- Steven A. Harrast, *Undergraduate Borrowing: A Study of Debtor Students and their Ability to Retire Undergraduate Loans*, 34 J. of Student Fin. Aid 1, 21–37 (2004) (cited at 79 Fed. Reg. at 64,919 n.102); *and*

- Tracey King & Ivan Frishberg, *Big Loans, Bigger Problems: A Report on the Sticker Shock of Student Loans*, The State PIRG's Higher Education Project (Mar. 2001), *available at:* www.pirg.org/highered/highered.asp?id2=7973 (cited at 79 Fed. Reg. at 64,919 n.103).

116. The Department also cited to the fact that, in 1986, the National Association of Student Financial Aid Administrators identified eight percent of gross income as a limit for excessive debt burden. 79 Fed. Reg. at 64,919 n.104 & accompanying text.

117. In addition, the Department cited a study by Sandy Baum and Marie O'Malley that determined that borrowers typically feel overburdened when the debt-to-earnings ratio is in excess of eight percent. 79 Fed. Reg. at 64,919 n.105 & accompanying text.

118. The Department also responded to comments suggesting that "the paper by [Sandy] Baum and [Saul] Schwartz that [the Department] rel[ies] on for support of the 20 percent discretionary income rate threshold rejects the 8 percent annual earnings rate threshold and that for this reason, a higher threshold for the annual earnings rate is more appropriate." 79 Fed. Reg. at 64,919 n.106 & accompanying text. The Department considered this comment and noted that Baum and Schwartz "specifically acknowledge the widespread acceptance of the 8 percent standard and conclude that, although it is not as precise as a standard based on a

function of discretionary earnings, it is 'not . . . unreasonable.'" 79 Fed. Reg. at 64,919 n.107 & accompanying text (ellipses in original). The Department also noted that Baum and Schwartz "recommend[ed] a sliding scale limit for debt-to-earnings, based on the level of discretionary earnings, that results in a 'maximum Debt-Service Ratio' standard generally stricter than 8 percent." 79 Fed. Reg. at 64,919.

119.   In adopting the eight percent annual earnings threshold, the Department likewise looked to guidance from financial regulators regarding the size of debt service payments for non-mortgage debt, specifically noting that the Federal Housing Administration's underwritings standards set total debt at an amount not exceeding forty-three percent of annual income. The Department further noted that, with housing debt comprising thirty-one percent of total income, twelve percent would be left for all other debt, including student loan debt, car loans, and other consumer debt. 79 Fed. Reg. at 64,919 n.109 & accompanying text. The Department then highlighted how eight percent was an appropriate standard because it fell "reasonably within the 12 percent of gross income attributable to non-housing debt under current lending standards, as well as the 9.75 percent of gross income attributable to non-credit card debt." 79 Fed. Reg. at 64,919 n.109 & accompanying text.

120.   The Department's reliance on these studies vis-à-vis the eight percent threshold were also consistent with the characterization of that figure by Baum and Schwartz, who, in their paper cited by the Department, noted that "[a] number of other studies have also accepted the 8 percent rule, either explicitly or implicitly." Sandy Baum & Saul Schwartz, *How Much Debt is Too Much? Defining Benchmarks for Managing Student Debt,* College Board 1, 2 (2006), *available at*: https://files.eric.ed.gov/fulltext/ED562688.pdf.

/ / /

/ / /

/ / /

1
2

### 4.2.2 The Department Cited Substantial Support for the Twenty Percent Discretionary Income Threshold

3

121.   The Department based its support for the twenty percent discretionary

4

income threshold on a 2006 study in which Baum and Schwartz proposed a

5

benchmark for a manageable debt level of not more than twenty percent of

6

discretionary income. 79 Fed. Reg. at 64,919 (highlighting that Baum and Schwartz

7

"proposed that borrowers have no repayment obligations that exceed 20 percent of

8

their income, a level they found to be unreasonable under virtually all

9

circumstances").

10

122.   The Department had previously relied upon the Baum and Schwartz

11

study in promulgating the 2011 GE Rule, when it increased the twenty-percent

12

measure by fifty percent (from twenty to thirty percent) in order to make certain

13

that a program's debt levels were not excessive. In *APSCU I*, the District Court held

14

that the discretionary income threshold from the 2011 GE Rule was "based upon

15

expert studies and industry practice—objective criteria upon which the Department

16

could reasonably rely." 870 F. Supp. 2d at 153.

17

123.   In 2014, the Department eliminated that fifty-percent buffer and

18

instead created a "three-tier pass, zone, fail construction" to "make it unnecessary

19

to create [a] buffer by raising the passing thresholds." 79 Fed. Reg. at 64,920.

20

### 4.2.3 The Department Considered Alternative Metrics

21

124.   The Department considered numerous alternative eligibility metrics in

22

2014. *See* 79 Fed. Reg. at 64,912 (including a section entitled "Alternative Metrics").

23

125.   In the 2014 NPRM, the Department proposed to include an eligibility

24

metric *in addition* to the D/E rates measure—the "pCDR measure" or the program-

25

level cohort default rate—"which examines the rate at which borrowers who

26

previously enrolled in the program default" on their federal student loans. 79 Fed.

27

Reg. at 16,540. Unlike the D/E rates measure, the pCDR measure was designed to

28

"evaluate the default rate of former students enrolled in a GE program, regardless

1    of whether they completed the program." 79 Fed. Reg. at 16,540. As the Department

2    stated in 2014, the pCDR measure applied to "those programs that have relatively

3    high enrollments but no or few completions such that students are left with debt

4    they cannot repay." 79 Fed. Reg. at 16,442.

5         126.   The 2014 NPRM proposed that, in order for a GE program to remain

6    eligible for purposes of Title IV, it would have to pass *both* the D/E rates measure

7    *and* the pCDR measure.

8         127.   In response to comments, the Department reaffirmed its view about

9    the "importance of holding GE programs accountable for the outcomes of students

10   who do not complete a program and ensuring that institutions make strong efforts

11   to increase completion rates." 79 Fed. Reg. at 64,915. At the same time, based on

12   the "wealth of feedback" submitted during the comment period, the Department

13   determined that "further study is necessary before we adopt pCDR or another

14   accountability metric that would take into account the outcomes of students who do

15   not complete a program." 79 Fed. Reg. at 64,915.

16        128.   The Department considered numerous other alternatives in response

17   to comments. For example, as noted in the Gainful Employment Rule, commenters

18   proposed—and the Department considered—alternative metrics "closely linked to

19   student academic achievement, loan repayment behavior, or employment outcomes

20   like job placement rates." 79 Fed. Reg. at 64,912. Commenters suggested, and the

21   Department considered, metrics that accounted for local labor market conditions.

22   *Id.* Still other commenters suggested that metrics should be tailored to measure

23   student outcomes in specific occupational fields, such as cosmetology or medical

24   professions, or use licensure exam pass rates. Still other alternatives were

25   suggested and considered. *See, e.g.*, 79 Fed. Reg. at 65,091 ("As part of the

26   development of these regulations, the Department engaged in a negotiated

27   rulemaking process in which we received comments and proposals from non-Federal

28   negotiators representing institutions, consumer advocates, students, financial aid

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 5:20-cv-455          32

1    administrators, accreditors, and State Attorneys General. The non-Federal

2    negotiators submitted a variety of proposals relating to placement rates, protections

3    for students in failing programs, exemptions for programs with low borrowing or

4    default rates, rigorous approval requirements for existing and new programs, as

5    well as other issues. . . . In addition to the proposals from the non-Federal

6    negotiators and the public, the Department considered alternatives to the

7    regulations based on its own analysis, including alternative provisions for the D/E

8    rates measure, as well as alternative metrics.").

9         129.   In addition to considering alternative eligibility metrics, in 2014 the

10   Department contemplated alternative methods for calculating the D/E rates

11   measure. For example, the Department looked at alternatives to the "n-size," which

12   represents the minimum number of students that completed a program during a

13   four-year period in order for the Department to issue D/E rates with respect to a

14   program. *See* 34 C.F.R. § 668.404(f)(1). In 2014, the Department considered the

15   implications of using an "n-size of 10" for two-year cohort periods, and "although the

16   Department believe[d]," in 2014, that "an n-size of 10 would be reasonable for the

17   D/E rates measure, [it] elected to retain the n-size of 30 and to include those who

18   completed over a four-year period if needed to achieve a 30-student cohort for a

19   given program." 79 Fed. Reg. at 65,092.

20        130.   The Department also considered several options for the interest rate to

21   apply to the "annual loan payment" component of the D/E rates measure

22   calculation. In the 2014 NPRM, the Department used the average interest rate over

23   the six years prior to the end of the applicable cohort period on federal Direct

24   unsubsidized loans. This proposal was designed to approximate the interest rate

25   that a large percentage of students in the calculation received, even those students

26   who attended four-year programs, and to mitigate against year-to-year fluctuations

27   in interest rates that could lead to volatility in the D/E rates measure results. After

28   receiving comments suggesting the use of a sliding scale, whereby interest rates

1    would be averaged over a number of years that corresponded to program length, the

2    Department changed its position in the final rule. 79 Fed. Reg. at 65,092–93.

3         131.   The Department likewise considered several options regarding the

4    amortization period for the annual loan payment component of the D/E rates

5    measure. For example, in the 2014 NPRM, the Department invited comment on

6    using a 10-year amortization for all programs, which it believed to be a "reasonable

7    assumption," as well as a 20-year amortization period for all programs. 79 Fed. Reg.

8    at 65,093. As the Department stated:

> Although the prevalence of the standard 10-year repayment plan and
> data related to older cohorts could support a 10-year amortization
> period for all credential levels, the Department has retained the split
> amortization approach in the regulation. Growth in loan balances, the
> introduction of plans with longer repayment periods than were
> available when those older cohorts were in repayment, and some
> differentiation in repayment periods by credential level in more recent
> cohorts contributed to this decision.

14   79 Fed. Reg. at 65,093; *see also* 79 Fed. Reg. at 65,094–95 (including tables

15   demonstrating the Department's analysis of amortization periods).

16        132.   The Department also conducted an extensive analysis of student

17   demographics. Although it acknowledged that student characteristics could play a

18   role in postsecondary outcomes, "based on . . . regression and descriptive analyses,"

19   the Department could not "conclude that the D/E rates measure is unfair towards

20   programs that graduate high percentages of students who are minorities, low-

21   income, female, or nontraditional or that demographic characteristics are largely

22   determinative of results." 79 Fed. Reg. at 65,057. Instead, in 2014, the Department

23   concluded that:

> [There was] a negative association between the proportion of low-
> income students and the annual earnings rate when controlling for
> other demographic and non-demographic factors, similar passing rates
> across all quartiles of low-income variables, and similar demographic
> profiles in passing, zone, and failing programs for almost all of the
> variables examined. These and other results of our analyses suggest
> that the regulation is not primarily measuring student demographics.

28   79 Fed. Reg. at 65,057.

1

### 4.2.4   The Department Implemented an "Alternate Earnings Appeals" Process

2      133.    The Gainful Employment Rule also included a process (the "Alternate

3  Earnings Appeals" process) for an institution to appeal the Department's

4  calculation of its D/E rates, which allowed an institution to use "alternate earnings"

5  data from "institutional survey[s]" or a state-sponsored data system to recalculate a

6  program's final D/E rates and appeal a "zone" or "failing" determination. *See*

7  *generally* 34 C.F.R. § 668.406.

8  ### 4.3   The Transparency Framework

9      134.    The second component of the Gainful Employment Rule, the

10  Transparency Framework, was designed to "increase the quality and availability of

11  information about the outcomes of students enrolled in GE programs," which the

12  Department believed would benefit "[s]tudents, prospective students, and their

13  families, as they make critical decisions about their educational investments; the

14  public, taxpayers, and the Government, by providing information that will enable

15  better protection of the Federal investment in these programs; and institutions, by

16  providing them with meaningful information that they can use to help improve

17  student outcomes in their programs." 79 Fed. Reg. at 64,890.

18      135.    To accomplish this goal, the Department established both reporting

19  and disclosure requirements. *See* 34 C.F.R. § 668.411 (detailing the "Reporting

20  Requirements"); *id.* § 668.412 (detailing the "Disclosure Requirements").

21  Accordingly, the Gainful Employment Rule "establishes the rules and procedures

22  under which . . . [a]n institution reports information about the program to the

23  Secretary" and "[a]n institution discloses information about the program to students

24  and prospective students." *Id.* § 668.401(b)–(c).

25      136.    Under the Reporting Requirements, in accordance with procedures

26  established by the Secretary, institutions were required to report information to the

27  Department, including student-level information regarding GE programs,

28  / / /

1    programmatic job placement rates, and "any other information the Secretary

2    requires the institution to report." 34 C.F.R. § 668.411.

3         137.   Under the Disclosure Requirements, institutions were required to post

4    or provide a copy of a "disclosure template provided by the Secretary" on certain

5    program webpages, in certain promotional materials, and, in certain circumstances,

6    directly to prospective students through procedures set forth via regulation. This

7    information included, but was not limited to: (i) the primary occupations that the

8    program prepares students to enter; (ii) the programmatic completion rates (as

9    calculated by the Department); (iii) the length of the program; (iv) the number of

10   clock or credit hours required; (v) the number of individuals enrolled in the program

11   in the most recent year; (vi) the loan repayment rate, as calculated by the Secretary

12   for various cohorts; (vii) information on the cost of tuition, books, fees, etc.; (viii) job

13   placement rates; (ix) the percentage of students receiving Title IV funds; (x) median

14   loan debt for certain groups; (xi) median earnings of certain groups; (xii) the most

15   recent program-level cohort default rate; (xiii) the most recent annual earnings rate;

16   (xiv) information regarding licensure requirements; (xv) information regarding

17   accreditation; and (xvi) a link to the Department's College Navigator website, its

18   successor, or other similar federal resource. *See* 34 C.F.R. § 668.412.

19        138.   Because gainful employment programs are defined at the six-digit CIP

20   code level, *see* 34. C.F.R. § 668.402, institutions had to make any required

21   disclosures regarding those programs at the six-digit CIP code level, rather than at

22   the four-digit CIP code level. *See supra* ¶¶ 91–95.

**4.4   The Department Directly Addressed Challenges to its Statutory Authority**

24        139.   After proposing the Gainful Employment Rule, the Department

25   received comments from the public asserting that the Department was exceeding its

26   statutory authority. *See* 79 Fed. Reg. at 64,892 (describing comments asserting, for

27   example, that the HEA does not support the Department's action to define gainful

28   employment and that Congress did not intend for the Department to measure

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** – 5:20-cv-455          36

1   whether a program leads to gainful employment based on debt and earnings). In

2   response, the Department asserted that the statutory authority for the rule derived

3   from three sources, namely provisions of the HEA, the General Education

4   Provisions Act, and the Department of Education Organization Act. 79 Fed. Reg. at

5   64,892. The Department also asserted that *APSCU I* and *APSCU II* had "confirmed"

6   its authority to regulate. With regard to those lawsuits, the Department noted

7   "[s]pecifically" that *APSCU I* "concluded that the phrase 'gainful employment in a

8   recognized occupation' is ambiguous" and that "Congress delegated interpretive

9   authority to the Department." 79 Fed. Reg. at 64,892–93; *see also* 79 Fed. Reg. at

10  64,891 ("The Department's authority for the regulations is also informed by the

11  legislative history of the provisions of the HEA . . . as well as the rulings of the U.S.

12  District Court for the District of Columbia in [*APSCU I & II*].").

13        140.   In proposing the Gainful Employment Rule, the Department also

14  received comments questioning the Department's differential treatment of for-profit

15  institutions and public institutions. In response, the Department affirmed that the

16  coverage lines in the Gainful Employment Rule were drawn "by statute" and that it

17  "d[id] not have the authority to exclude" certain programs from the regulations. 79

18  Fed. Reg. at 64,897. The Department also stated that the fact that "similar

19  programs offered by for-profit institutions and public institutions" were treated

20  differently under the regulations "reflects the treatment of these programs under

21  the HEA and a policy decision made by Congress." 79 Fed. Reg. at 64,898.

22  **4.5   The Department Carefully Considered the Source of Data Underlying the**
23       **Gainful Employment Rule**

24        141.   In proposing the Gainful Employment Rule, the Department received

25  comments regarding the reliance on data from the Social Security Administration

26  Master Earnings File ("SSA earnings data") and, more specifically, comments

27  questioning whether the rule should be based on a different data source, such as

28  data from the Bureau of Labor Statistics ("BLS"). 79 Fed. Reg. at 64,941. In

1   response, the Department considered BLS data as well as other sources of earnings

2   data that commenters had not even proposed, but found no sources superior to the

3   SSA earnings data. *See* 79 Fed. Reg. at 64,941–42 (explaining why the Department

4   declined to use data from the BLS); 79 Fed. Reg. at 64,956 (noting that the

5   Department conferred with SSA, but it did not have data superior to the SSA

6   earnings data).

7   **5.  Numerous Courts Upheld the Gainful Employment Rule**

8       142.   After the Gainful Employment Rule was published, the Association of

9   Proprietary Colleges ("APC") filed suit to challenge the regulations under the APA.

10  *See Ass'n of Proprietary Colls. v. Duncan*, 107 F. Supp. 3d 332 (S.D.N.Y. 2015)

11  ("*APC v. Duncan*"). APSCU also filed suit again to challenge the Gainful

12  Employment Rule. *See APSCU III*, 110 F. Supp. 3d 176 (D.D.C. 2015).

13      143.   In *APC v. Duncan*, APC asserted three arguments: (1) the Gainful

14  Employment Rule violated the Due Process Clause of the United States

15  Constitution; (2) the regulation exceeded the Department's authority under the

16  HEA; and (3) the regulation constituted arbitrary and capricious decision making

17  under the APA. *APC v. Duncan*, 107 F. Supp. 3d at 345.

18      144.   After rejecting APC's constitutional arguments, the District Court

19  turned to APC's argument that the statutory phrase at issue (*i.e.*, the "gainful

20  employment" phrase) was unambiguous, and even if ambiguous, the Department's

21  interpretation of that phrase was unreasonable and contrary to legislative intent.

22  107 F. Supp. 3d at 358. With respect to the question of statutory ambiguity, the

23  District Court found the *APSCU I* analysis regarding the meaning of that phrase to

24  be "thorough," "faithful to Supreme Court precedent," and with "persuasive" logic

25  and reasoning. *Id.* at 359.

26      145.   As a result, the District Court held the phrase "prepares students for

27  gainful employment in a recognized occupation" to be the "relevant statutory

28  command" left ambiguous by Congress. *Id.* at 359–60. The District Court concluded

1    that the Gainful Employment Rule was "a reasonable interpretation of [that]

2    ambiguous statutory command." *Id.* at 363.

3        146.    In *APSCU III*, the District Court first considered whether the term

4    "prepare students for gainful employment in a recognized occupation" had a "plain

5    meaning that the Department (and the Court) must simply implement," or whether

6    the "language was ambiguous such that the Court should accept the Department's

7    interpretation—assuming, of course, that its interpretation is a reasonable one."

8    110 F. Supp. 3d at 184. The District Court agreed with the Department, *APSCU I*,

9    and *APC v. Duncan*, holding that the phrase was "ambiguous" and "leaves a policy

10   gap" for the Department to fill. 110 F. Supp. 3d at 186. The District Court also held

11   that the Department's interpretation of that statutory phrase was reasonable under

12   step two of the *Chevron* framework.

13       147.    In *APSCU III*, the District Court next considered whether the Gainful

14   Employment Rule was arbitrary and capricious under the APA. The Court

15   considered and rejected APSCU's thirteen separate arguments that the Gainful

16   Employment Rule was arbitrary and capricious. 110 F. Supp. 3d at 190–98. The

17   Court likewise rejected a host of arguments that the Department's reporting,

18   disclosure, and certification requirements were arbitrary and capricious. *Id.* at 198–

19   204.

20       148.    In *APSCU III*, the District Court also considered the Department's use

21   of the SSA earnings data, holding that the Department had determined that no

22   better data existed and had done so "only after rejecting other possible sources of

23   data as inadequate." *Id.* at 195 (citing to the Department's description of "problems

24   with alternative data from the [BLS]").

25       149.    The *APSCU III* decision was upheld in its entirety by the United

26   States Court of Appeals for the D.C. Circuit. *APSCU v. Duncan*, 640 Fed. App'x 5

27   (D.C. Cir. 2016) ("*APSCU Appeal*").

28   / / /

1

2

**6.  Pre-Repeal Developments**

**6.1  The Gainful Employment Rule Was Working**

3

4

5

6

7

8

150.    On January 9, 2017, the Department released the first set of D/E rates measures for GE programs participating in Title IV. At the time, the Department noted that "[t]he data show that, while many postsecondary programs offer value to students, there are a significant number of career training programs—specifically for-profit programs—that do not provide their graduates with a reasonable return on investment."[7]

9

10

11

12

13

14

15

16

17

151.    The 2017 data release further indicated "that over 800 programs serving hundreds of thousands students fail the Department's accountability standards with an annual loan payment that is at least greater than 30 percent of discretionary income and greater than 12 percent of total earnings."[8] The Department also noted that "[n]inety-eight percent of these failing GE programs are offered by for-profit institutions."[9] Moreover, the Department highlighted that "[a]n additional 1,239 programs received a 'zone' rate, with an annual loan payment that is between 20 and 30 percent of discretionary income or between 8 and 12 percent of total earnings."[10]

18

19

152.    The January 2017 data release established that the Gainful Employment Rule was working as intended.

20

21

153.    When the Department proposed to rescind the Gainful Employment Rule, Steve Gunderson, the President of Career Education Colleges and

22

23

24

25

[7]    *See* Press Release, U.S. Dep't of Educ., *Education Department Releases Final Debt-to-Earnings Rates for Gainful Employment Programs* (Jan. 9, 2017), https://www.ed.gov/news/press-releases/education-department-releases-final-debt-earnings-rates-gainful-employment-programs.

26

[8]    *Id.*

27

[9]    *Id.*

28

[10]   *Id.*

1    Universities, formerly known as APSCU, reportedly stated: "The reality is every

2    school that has a program that was failing gainful employment metrics—and they

3    knew it couldn't be fixed—they've already closed. **The sector today is so much**

4    **better.**"[11]

5         154.    Other data available to the Department provides further evidence that

6    the Gainful Employment Rule was working as intended. For example, in 2012—

7    after the publication of the 2011 GE Rule—ITT Technical Institute noted in a

8    Securities and Exchange Commission annual filing that "[t]he GE Requirements

9    have and will continue to put downward pressure on tuition prices, so that students

10   do not incur debt that exceeds the levels required for a program to remain eligible

11   under Title IV Programs."[12] A study by New America, provided to the Department

12   during the 2018 comment period, established that sixty-five percent of failing

13   programs in the first cohort of GE data were no longer enrolling students as of

14   August 2018.[13]

15

16   _____

17   [11]   *See* Erica Green, Devos Ends Obama-Era Safeguards Aimed at Abuses by
     For-Profit Colleges, N.Y. Times (Aug. 18, 2018),
     https://www.nytimes.com/2018/08/10/us/politics/betsy-devos-for-profit-colleges.html

18   (emphasis added); *see also* Comment from Hon. Raja Krishnamoorthi, Member of
     Congress, to U.S. Dep't of Educ., Docket No. ED-2018-OPE-0042 1, 2 & n.9 (Sept.

19   10, 2018), *available at*: https://www.regulations.gov/document?D=ED-2018-OPE-
     0042-12124 (highlighting Mr. Gunderson's remark in a comment to the

20   Department).

21   [12]   ITT Technical Servs., Inc., Annual Report (Form 10-K) (Dec. 31, 2011),
     *quoted in* Comment from Inst. for Coll. Access & Success, to U.S. Dep't of Educ.,

22   Docket No. ED-2018-OPE-0042 1, 7 n.26 (Sept. 13, 2018), *available at*:
     https://www.regulations.gov/contentStreamer?documentId=ED-2018-OPE-0042-

23   13819&attachmentNumber=1&contentType=pdf.

24   [13]   Comment from New Am. Found., to U.S. Dep't of Educ., Docket No. ED-2018-
     OPE-0042 1, 16 (Sept. 14, 2018), *available at*:

25   https://www.regulations.gov/contentStreamer?documentId=ED-2018-OPE-0042-

26   13659&attachmentNumber=1&contentType=pdf. *See also, e.g.,* Kevin Carey, *Door
     Opens for Predatory Colleges*, N.Y. Times, July 1 , 2017, at A11 (noting that the

27   Gainful Employment rule has "prove[n] more effective at shutting down bad college

28   programs than even the most optimistic backers could have hoped").

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 5:20-cv-455                    41

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

155.    Evidence that post-dates the Repeal is consistent with evidence establishing that the Gainful Employment Rule was working. For example, in November 2019, Robert Kelchen, an associate professor at Seton Hall University, and Zhuoyao Liu, a Ph.D. candidate at the same university, released a paper showing that for-profit college programs that passed gainful employment metrics were associated with a lower likelihood of closing. As Professor Kelchen stated, "for-profit colleges, possibly encouraged by accrediting agencies and/or state authorizing agencies, closed lower-performing programs and focused their resources on their best-performing programs."[14]

156.    On December 17, 2019, Jonathan Kaplan, former President of for-profit Walden University, wrote a paper highlighting how the Gainful Employment Rule had been "achieving one of its stated policy goals," *i.e.*, "encouraging for-profits to examine with more intention the financial return of their programs for students."[15] As Mr. Kaplan stated:

> I believe the gainful-employment regulation imposed reasonable constraints and accountability standards on proprietary institutions, notwithstanding the fact that I led a for-profit university for years. While its debt-to-earnings metric was an imperfect proxy for academic quality, in my view, the rule's repeal by the Trump administration is misguided.[16]

---

[14]    *See* Madeline St. Armour, *Study: Gainful Employment Associated with Closures*, Inside Higher Educ.(Nov. 12, 2019), https://www.insidehighered.com/quicktakes/2019/11/12/study-gainful-employment-associated-closures (discussing Robert Kelchen & Zhuoyao Liu, *Did Gainful Employment Regulations Result in College and Program* Closures? *An Empirical Analysis* (Nov. 2019), *available at:* https://kelchenoneducation.files.wordpress.com/2019/11/kelchen_liu_nov19.pdf).

[15]    Jonathan Kaplan, *The Misguided Repeal of Gainful Employment*, Inside Higher Educ. (Dec. 17, 2019), https://www.insidehighered.com/views/2019/12/17/repealing-gainful-employment-regulation-mistake-it-was-imperfect-good-policy.

[16]    *Id.*

## 6.2 The Gainful Employment Rule Covered Thousands of Programs: Public, Non-Profit, and For-Profit

157. According to a chart the Department published in April 2018, the Gainful Employment Rule covered the following numbers of programs in 2015, broken down by type of program:

| Type of Institution | Number of GE Programs |
| --- | ---: |
| Private, Non-Profit <2 Years | 78 |
| Private, Non-Profit 2–3 Years | 173 |
| Private, Non-Profit 4+ Years | 212 |
| **Total Private, Non-Profit** | **463** |
| Private, For-Profit <2 Years | 1,460 |
| Private, For-Profit 2–3 Years | 2,042 |
| Private, For-Profit 4+ Years | 2,174 |
| **Total Private, For-Profit** | **5,676** |
| Public, <2 Years | 293 |
| Public, 2–3 Years | 1,898 |
| Public, 4+ Years | 302 |
| **Total Public** | **2,493** |
| **Total Foreign Schools** | **5** |

## 6.3 The Department Delayed the Enforcement and Operation of the Gainful Employment Rule

158. Following President Trump's inauguration, and the nomination and confirmation of Defendant Secretary DeVos, the Department took a number of steps to delay the enforcement and operation of the Gainful Employment Rule.

159. For example, in March 2017, the Department published a notice in the *Federal Register* announcing that it would allow additional time—until July 1, 2017—for institutions to submit an alternate earnings appeal and comply with the Disclosure Requirements. *See* Program Integrity: Gainful Employment, 82 Fed. Reg. 13,227 (Mar. 10, 2017).

160. In May 2017, the Department's "Regulatory Reform Task Force," which it convened following the February 24, 2017, issuance of Executive Order 13,777, announced that the Department had already identified the Gainful

/ / /

1  Employment Rule to consider for "repeal, replacement, or modification" and that

2  aspects of the rule had been "delay[ed]."[17]

3       161.   In July 2017, the Department published a notice in the *Federal*

4  *Register* announcing that it would further delay—until July 1, 2018—the time for

5  institutions to comply with certain Disclosure Requirements in the Gainful

6  Employment Rule. Program Integrity: Gainful Employment, 82 Fed. Reg. 30,975,

7  30,976 (July 5, 2017). The Department also extended the time for institutions to

8  submit alternate earnings appeals again. 82 Fed. Reg. at 30,976. The Department's

9  justification regarding the alternate earnings appeals delay was premised on a

10  ruling in *American Association of Cosmetology Schools v. DeVos*, which ordered the

11  Department not to enforce aspects of the alternate earnings appeals process against

12  institutions that were members of the American Association of Cosmetology

13  Schools. 258 F. Supp. 3d 50, 56, 76 (D.D.C. 2017) (noting twice that the limited

14  relief would "avoid[] upending the entire" GE regulatory scheme and would

15  narrowly provide greater flexibility to AACS members schools to challenge the D/E

16  rates).

17       162.   Except as to alternate earnings appeals for AACS member schools,

18  *AACS* did not invalidate the Certification Requirements, Eligibility Metrics,

19  Reporting Requirements, or Disclosure Requirements.

20       163.   Despite the limited applicability of *AACS*, the Department's July 2017

21  extension, *see supra* ¶ 161, applied to *all* programs governed by the Gainful

22  Employment Rule.

23       164.   In August 2017, the Department published a notice in the *Federal*

24  *Register* establishing October 6, 2017, as the deadline for institutions to submit a

---

[17]   U.S. Dep't of Educ., *Regulatory Reform Task Force Progress Report* 1, 4, 48 (May 2017), *available at*: https://www2.ed.gov/documents/press-releases/regulatory-reform-task-force-progress-report.pdf.

notice of intent to file an alternate earnings appeal. The Department also
established February 1, 2018, as the deadline to actually file such an appeal.
Program Integrity: Gainful Employment, 82 Fed. Reg. 39,362, 39,363 (Aug. 18,
2017).

165.    In the August 2017 notice, the Department announced new
requirements for the substance of alternate earnings appeals, designed expressly
"[t]o comply with the Court Order" in *AACS*. 82 Fed. Reg. at 39,363.

166.    A coalition of eighteen state attorneys general filed suit to challenge
the Department's constructive revocation of the Gainful Employment Rule without
engaging in the processes required by the APA. *See generally* Compl., *Maryland v.
U.S. Dep't of Educ.*, No. 1:17-cv-02139 (D.D.C. Oct. 17, 2017). That action remains
pending.

167.    In June 2018, the Department published a notice in the *Federal
Register* announcing that it would allow additional time for institutions to comply
with the Disclosure Requirements in 34 C.F.R. § 668.412(d)–(e). Program Integrity:
Gainful Employment, 83 Fed. Reg. 28,177, 28,178 (June 18, 2018). The Department
also announced that the "requirements in 34 C.F.R. § 668.412(a), (b), and (c) that
schools post disclosures on their program websites using the approved disclosure
template provided by the Department and that those disclosures be updated
annually remain in effect." 83 Fed. Reg. at 28,178.

168.    In May 2019, just two months before the Repeal was announced, the
Department released the 2019 disclosure template, which it asserted would
"provid[e] the data that we believe are especially meaningful to students while
reducing administrative burden for schools."[18]

---

[18]    U.S. Dep't of Educ., Fed. Student Aid, *Gainful Employment Electronic
Announcement No. 119 – Release of the 2019 GE Disclosure Template* (May 9,
2019), https://ifap.ed.gov/eannouncements/050919GEAnnounce119Release2019GE
DisclosureTemplate.html.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 7. Delays Turned into Repeal

169.   After giving poor-performing institutions the benefit of these delays, *supra* ¶¶ 158–168, the Department has now taken a final action (*i.e.*, the Repeal) to eliminate the Gainful Employment Rule in its entirety, asserting that the rule would "penaliz[e] programs" and "create an approach to institutional accountability that could potentially be used to manipulate the higher education marketplace." 84 Fed. Reg. at 31,410–11.

170.   Section 492 of the HEA, 20 U.S.C. § 1098a, requires the Secretary to involve the public in the development of proposed regulations affecting Title IV, HEA programs. The statute requires the Secretary to subject regulatory proposals to a negotiated rulemaking process, subject to exceptions inapplicable here.

171.   On August 30, 2017, the Department announced its intention to establish two negotiated rulemaking committees to prepare proposed Title IV regulations. One such committee (the "Committee") would consider specific changes to the Gainful Employment Rule. *See* Negotiated Rulemaking Committees; Negotiator Nominations and Schedule of Committee Meetings-Borrower Defenses, Financial Responsibility, and Gainful Employment, 82 Fed. Reg. 41,194 (Aug. 30, 2017).

172.   Under the HEA, if negotiators reach consensus on proposed regulations, the Department agrees to publish those regulations without alteration, unless the Secretary reopens the process or provides a written explanation to the participants stating why the Secretary has decided to depart from the agreement reached during negotiations. *See* HEA § 492(b), 20 U.S.C. § 1098a(b).

173.   Regardless of whether consensus is reached, any proposed rules are subject to the standard "notice and comment" rulemaking procedures set forth in § 553 of the APA.

174.   The Committee met to consider and develop proposed regulations on December 4–7, 2017, February 5–8, 2018, and March 12–15, 2018.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 5:20-cv-455          46

175.    During its meetings, the Committee considered many proposals, including the Department's draft regulatory language, and Committee members' alternative language and suggestions.

176.    At the final meeting, on March 15, 2018, the Committee did not reach consensus on proposed regulations.

177.    On August 14, 2018, the Department published the 2018 NPRM in the *Federal Register*, *see supra* ¶ 8, in which it proposed to rescind the Gainful Employment Rule in its entirety. 83 Fed. Reg. at 40,167.

178.    In connection with the 2018 NPRM, the Department required interested parties to provide comments within thirty days—by September 13, 2018—instead of employing the standard 60-day period contemplated by Executive Order 12,866. *See* Exec. Order No. 12,866, § 6(a)(1), 58 Fed. Reg. 51,735 (Oct. 4, 1993) (publishing the Executive Order dated Sept. 30, 1993). This 30-day period was shorter than the 45-day period used in either 2014 or 2011.

179.    The Department received 13,966 comments in response to the 2018 NPRM.

180.    After the 2018 NPRM, but before the Repeal was published, the Department's Office of the Inspector General ("OIG") described the proposed repeal as a "Significant Management Decision[ ] with Which the OIG Disagreed."

181.    In a November 2018 report to Congress, OIG stated that it "notified the Department [in May 2018] of our disagreement with its proposal to eliminate the Gainful Employment regulations without an adequate replacement to ensure accountability." U.S. Dep't of Educ., Office of the Inspector Gen., *Semiannual Report to Congress, No. 77* 1, 65 (Nov. 2018), *available at*: https://www2.ed.gov/about/offices/list/oig/semiann/sar77.pdf. The OIG also highlighted how:

> [She] and her predecessors have testified before Congress on issues involving proprietary schools over the years, and the sector continues to be a high-risk area for the Department. OIG resources devoted to

1
2
3
4

> postsecondary school investigations continue to be disproportionately
> devoted to fraud and abuse in the proprietary sector. The sector also
> represents a disproportionate share of student loan defaults. In
> addition, findings of misrepresentation of job placement rates and
> guaranteed employment by Corinthian Colleges and other schools
> provide a clear demonstration of the need for particular accountability.

5    *Id.*

6    182.    The Department's findings with respect to Corinthian Colleges related

7    to its misrepresentation of job placement statistics that were required to be

8    disclosed because of the 2011 GE Rule.

9    183.    Rather than respond meaningfully to the extensive opposition to the

10    2018 NPRM and abandon its proposal to rescind the Gainful Employment Rule, the

11    Department made no changes to the proposed rule. Instead, on July 1, 2019—291

12    days after the conclusion of an abbreviated comment period—the Department took

13    a final agency action to rescind the Gainful Employment Rule in its entirety by

14    publishing the Repeal in the *Federal Register*.

15    184.    After the Repeal was issued, OIG stated that it "disagreed with the

16    [Repeal] without including an adequate replacement to ensure accountability and

17    compliance with the requirements of the HEA." U.S. Dep't of Educ., Office of the

18    Inspector Gen., *Semiannual Report to Congress, No. 79* 1, 68 (Nov. 2019), *available*

19    *at:* https://www2.ed.gov/about/offices/list/oig/semiann/sar79.pdf.

20    185.    The effective date of the Repeal is July 1, 2020, due to the statutory

21    requirement known as the "Master Calendar Rule." The Master Calendar Rule

22    provides that regulations affecting Title IV programs must be published in final

23    form by November 1, prior to the start of the July 1 award year in which they

24    become effective. *See* HEA § 482(c), 20 U.S.C. § 1089(c). Nevertheless, in publishing

25    the Repeal, the Secretary exercised her authority to designate certain parts of the

26    Repeal for "early implementation" at the discretion of each institution. 84 Fed. Reg.

27    at 31,395–96.

28    / / /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

186.   The Department acknowledged that the Repeal would harm prospective and enrolled students. The Department admitted that, "[t]o the extent non-passing programs remain accessible with the rescission of the 2014 Rule, some students may choose sub-optimal programs" that "have demonstrated a lower return on the student's investment, either through higher upfront costs, reduced earnings, or both." 84 Fed. Reg. at 31,445. The Department further acknowledged that "this could lead to greater difficulty in repaying loans, increasing the use of income-driven repayment plans or risking defaults and the associated stress, increased costs, and reduced spending and investment on other priorities." 84 Fed. Reg. at 31,445.

187.   As described below, the Repeal is arbitrary, capricious, and contrary to law because it departs, without consideration, from settled judicial precedent on the issue of whether the phrase in the HEA "prepare students for gainful employment in a recognized occupation" is ambiguous and requires interpretation by the agency; fails to consider obvious known alternatives; fails to provide a reasoned (or in some cases, any) support for the changes; relies on factors Congress did not intend for the Department to consider; demonstrates inconsistencies with other agency positions; fails to consider important aspects of the problem the Gainful Employment Rule was intended to address; rests on explanations that run counter to the evidence before the Department; and relies on explanations so implausible that they could not be ascribed to a difference of view or the product of agency expertise. Moreover, in adopting the Repeal, the Department—due to certain failures alleged herein—deprived members of the public of an adequate opportunity to comment on the Repeal and the substantive bases on which it relied.

## 7.1   The Department Provided No Basis for its Repeal of the Accountability Framework and Failed to Consider Evidence Before It

188.   None of the Department's justifications is sufficient to satisfy the requirements of the APA.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 5:20-cv-455          49

1
2

### 7.1.1   The Department Ignored Judicial Precedent and Concluded the Statute is No Longer Ambiguous

3

189.   The Department asserted that it did "not need[] to define the term

4

'gainful employment' beyond what appears in the statute" and that, through the

5

Repeal, it was "confirm[ing] that it, in fact, *is* enforcing the law as written and as

6

intended." 84 Fed. Reg. at 31,401 (emphasis in original). Yet, in making this

7

determination, the Department failed to consider or acknowledge the holdings of

8

*APSCU I*, *APSCU III*, *APSCU Appeal* (affirming *APSCU III*), and *APC v. Duncan*,

9

all of which held that the relevant statutory phrase is ambiguous, leaving a

10

substantial gap for the Department to fill.

11

190.   In fact, prior to the issuance of the Repeal, the Department agreed—

12

repeatedly and consistently in *Federal Register* notices and court filings alike—that

13

the statutory language ("prepare students for gainful employment in a recognized

14

occupation") was ambiguous. As alleged *supra*, in each of *APSCU I*, *APSCU III*,

15

*APSCU Appeal* (affirming *APSCU III*), and *APC v. Duncan*, federal courts agreed

16

with the Department that the language was ambiguous.

17

191.   In the Repeal, however, the Department reversed course, asserting

18

that it previously "incorrectly described legislative intent." 84 Fed. Reg. at 31,402.

19

As the only contemporaneous examples of Congressional intent regarding the scope

20

of the HEA, the Department asserted that, "in 1972[,] when the National Vocational

21

Student Loan Insurance Act (NVSLIA) was passed, Congress decided to incorporate

22

vocational education programs into the HEA, by allowing their participation in the

23

Educational Opportunity Grants as well as the student loan programs." 84 Fed.

24

Reg. at 31,401. According to the Department, the "House conference report" for the

25

1972 passage also lent credence to the Department's view that the inclusion of

26

proprietary schools in the HEA was an "important step toward achieving the goals

27

of providing equitable access to postsecondary education, for all students, regardless

28

/ / /

1    of whether their interests were in the traditional trades or vocations, or in typical

2    degree programs." 84 Fed. Reg. at 31,401.

3        192.   The Department's recitation of Congressional intent in the Repeal is

4    riddled with inaccuracies and non sequiturs. *First*, despite the reference to the

5    "House conference report," the ascribed quotation is actually to a statement from a

6    single member discussing the 1972 legislation. *See* 84 Fed. Reg. at 31,401 n.52 &

7    accompanying text (quoting the statement of Representative Ogden Reid, while

8    erroneously describing that statement as the "House conference report"). *Second*,

9    the NVSLI did not *pass* in 1972, but was *amended* that year (after it passed in

10   1965). *Third*, and perhaps most egregiously, the Department does not provide any

11   explanation of how or why the 1972 amendments or the quoted text impacts the

12   limitation that, as a condition of participation in Title IV, certain programs must

13   "prepare students for gainful employment in a recognized occupation." Although the

14   Department cites the 1972 inclusion of proprietary schools in Title IV grant

15   programs as a step toward achieving the goals of providing additional access, it does

16   not address the limitation that such programs need to provide programs that

17   "prepare students for gainful employment in a recognized occupation."

18       193.   The Department's other rationalizations regarding legislative intent

19   are similarly misguided because they do not actually demonstrate the intent of

20   Congress. For example, a 2011 letter from 113 members of Congress (*i.e.*, a minority

21   of members of one chamber), which the Department cited, is not a reasonable source

22   of legislative intent. Nor is the introduction—and subsequent failed passage—of

23   legislation that would have prohibited the implementation of the 2011 GE Rule. 84

24   Fed. Reg. at 31,402. Nevertheless, the Department relied on these events to justify

25   its purportedly new reading of legislative intent.

26   / / /

27   / / /

28   / / /

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 5:20-cv-455            51

### 7.1.2   The Department Disregarded the Statutory Scope and Claimed Disparate Impact on For-Profit Schools

194.    A primary rationale for the Repeal is the extent to which the Gainful Employment Rule disproportionately impacts for-profit or proprietary institutions. For example, the Department asserted that "the GE regulations have a disparate impact on proprietary institutions and the students these institutions serve." 84 Fed. Reg. at 31,392. Similarly, the Department noted how "[t]he GE regulations failed to equitably hold *all* institutions accountable [for] student outcomes, such as student loan repayment." 84 Fed. Reg. at 31,394 (emphasis added). The Department also "agree[d] with commenters who expressed concern that the GE regulations established policies that unfairly target career and technical education programs." 84 Fed. Reg. at 31,397; *see also* 84 Fed. Reg. at 31,392 (asserting that the GE Rule "wrongfully targets some academic programs and institutions while ignoring other programs").

195.    The Department also noted that the Gainful Employment Rule created an "uneven playing field," given that public institutions of higher education "benefit from direct appropriations" from states in the form of "taxpayer subsidies." 84 Fed. Reg. at 31,397 & n.23. The Department went on to argue that taxpayer subsidization of public institutions "may fool students into enrolling in a program that has passing D/E rates without realizing that the earnings generated by the program do not justify the direct, indirect, or opportunity costs of obtaining that education." 84 Fed. Reg. at 31,397.

196.    The Department also asserted that the Repeal was necessary because the scope of the Gainful Employment Rule was underinclusive insofar as there was "ample evidence that any transparency and accountability framework must be expanded to include all [T]itle IV programs since student loan repayment rates are unacceptably low across all sectors of higher education and because a student may

/ / /

1    unknowingly select a non-GE program with poor outcomes because no data are

2    available. " 84 Fed. Reg. at 31,400.

3         197.   The Department also stated that its "review of student loan repayment

4    rates makes it clear that the problem of students borrowing more than they can

5    repay through a standard repayment period is not limited to students who attend

6    proprietary institutions or who participate in [career and technical education]." 84

7    Fed. Reg. at 31,398.

8         198.   None of the asserted differences in how the Gainful Employment Rule

9    affects for-profit schools in comparison to non-profits and public institutions

10   provides a basis for the Repeal. The Gainful Employment Rule does not

11   discriminate between for-profit and other schools—it applies the *same standards* to

12   gainful employment programs at all types of institutions. Any disparate impact

13   results from *statutory* distinctions, created by Congress, for Title IV eligibility

14   between types of schools and types of programs.

15        199.   The Department acknowledged in the Repeal that it "could not simply

16   expand the GE regulations to include all [T]itle IV programs since the term 'gainful

17   employment' is found only in section 102 of the HEA." 84 Fed. Reg. at 31,394; *see*

18   *also* 84 Fed. Reg. at 31,394 ("[W]ithout a statutory change, there was no way to

19   expand the GE regulations to apply to all institutions."); 84 Fed. Reg. at 31,400

20   ("Since the GE regulations cannot be expanded to include all institutions, and since

21   negotiators could not come to consensus on a GE-like accountability and

22   transparency framework that was substantiated by research and applicable to all

23   [T]itle IV programs, the Department decided to take another approach."). But the

24   Department's "[]other approach" was to repeal the Gainful Employment Rule in an

25   attempt to treat *similarly* institutions and programs that Congress had sought to

26   treat *differently*.

27        200.   The Department's position in the Repeal—without acknowledgment or

28   justification—is squarely at odds with a position it took in 2015. In its briefing in

1    *APC v. Duncan*, the Department rejected the notion that the Gainful Employment

2    Rule was arbitrary because it disproportionally affected vocationally oriented

3    programs:

> As to plaintiff's opinion that the rules are arbitrary because many
> traditional colleges would have low D/E rates, *see* Pl.'s Opp'n at 32,
> plaintiff overlooks Congress' determination that a vocational student is
> "not like . . . the typical college liberal arts student," S. Rep. No. 89-
> 758 at 4. In contrast to liberal arts students, vocational students "feel
> the primary reason they are in school is for purposes of acquiring job
> skills which will allow them to enter and compete successfully in our
> increasingly complex occupational society." *Id.*[] Congress accordingly
> *intended* vocational programs to face eligibility criteria above and
> beyond the criteria affecting non-vocational programs. *See, e.g.*, 20
> U.S.C. § 1002(b)(1)(A)(i). It is not arbitrary for the Department to hold
> vocational programs to statutory requirements [when] Congress
> intended to reach only those programs.

11    Defs.' Reply in Supp. of Their Cross Mtn. for Summ. J. at 27–28, *APC v. Duncan*,

12    107 F. Supp. 3d (S.D.N.Y. 2015 ) (1:14-cv-08838-LAK).

13        201.    Moreover, to the extent the Gainful Employment Rule affected gainful

14    employment programs differently at for-profit schools than non-profit schools, that

15    was a product of their performance, not the rule. Analysis that was part of the

16    public record—and submitted to the Department during the comment period—

17    established that, "[b]ased on data on student earnings and debt outcomes released

18    by the Department of Education in 2017, among certificate programs where all

19    programs are subject to the rule regardless of institutional control, 779 of the 869

20    programs that did not pass the debt-to-earning standard . . . were operated by for-

21    profit colleges."[19] The same analysis also noted (again, in a comment provided to the

22    Department) that "98 percent of the students enrolled in programs that did not

23    meet this standard were in for-profit programs."[20]

---

[19]    *See* Comment from Sandra E. Black, *et al.*, to U.S. Dep't of Educ., Docket No.
ED-2018-OPE-0042 1, 7 (Sept. 12, 2018), *available at:*
https://www.regulations.gov/contentStreamer?documentId=ED-2018-OPE-0042-
13499&attachmentNumber=1&contentType=pdf.

[20]    *Id.*

202.   Even further, the Department relied on a report that found that graduates of certificate programs at for-profit institutions have both higher net tuition and lower earnings, on average, than public institutions' graduates. This same report concluded that "even if the median debt burdens across both types of institutions were equalized"—taking into consideration the Department's view that tuition subsidies at public institutions unfairly improve D/E rates measures for public institutions—"a disparity would still remain in GE pass rates" between proprietary and public institutions.[21]

203.   To the extent the Department's rationale was based on the purported fact that "the term 'gainful employment' is found only in section 102 of the HEA," the Department erred in failing to recognize the numerous other references in Title IV that use the "gainful employment" language. *See, e.g.*, HEA § 101(b)(1), 20 U.S.C. § 1001(b)(1) (referring, in the context of public and nonprofit institutions, to programs that "prepare students for gainful employment in a recognized occupation"); HEA § 481(b)(1)(A)(i), 20 U.S.C. § 1088(b)(1)(A)(i) (referring to programs of training that "prepare students for gainful employment in a recognized profession").

### 7.1.3   The Department Misconstrued the Evidence Supporting the Accountability Framework

204.   The Department highlighted its view that there was insufficient evidentiary support—at the time of adoption and at present—for the Accountability Framework, both in its entirety and with respect to certain components. But in this regard, the Department both: (i) erroneously took issue with evidence considered in

---

[21]   Preston Cooper & Jason D. Delisle, *Measuring Quality or Subsidy? How State Appropriations Rig the Gainful Employment Test*, American Enterprise Institute 1, 10 (Mar. 2017), http://www.aei.org/wp-content/uploads/2017/03/Measurning-Quality-or-Subsidy.pdf (cited at 84 Fed. Reg. at 31,397, 31,402, 31,430–31).

1    2014; and (ii) simultaneously relied on new materials that were insufficient to

2    justify and substantiate the Repeal.

3    **7.1.3.1  Supposed Flaws with the Evidence Supporting the 2014 Rule**

4    205.   In numerous places in the Repeal, the Department attempted to

5    debunk evidentiary findings that it once relied on to support the Gainful

6    Employment Rule. For example, the Department asserted that its reliance in 2014

7    on studies comparing costs and debt levels among students who enrolled at

8    community colleges with those who enrolled at proprietary institutions was

9    "illegitimate" because "research published by the Brown Center in 2016 shows that

10   there are considerable differences between the characteristics of students who

11   enroll at proprietary institutions and those who enroll at two-year public

12   institutions." 84 Fed. Reg. at 31,393 (citing Stephanie Riegg Cellini & Rajeev

13   Darolia, *Different degrees of debt: Student borrowing in the for-profit, nonprofit,*

14   *and public sectors*, Brown Center on Education Policy at Brookings (June 2016) (the

15   "Cellini & Darolia Paper")).

16   206.   The Department asserted that the Cellini & Darolia Paper supports

17   the Repeal because it shows that "differences in characteristics" (*e.g.*, financial

18   independence, minority group status, single-parent status) "may explain disparities

19   in student outcomes, including higher borrowing levels and student loan defaults

20   among students who enroll at proprietary institutions." 84 Fed. Reg. at 31,393. But

21   the Cellini & Darolia Paper does the *opposite*, stating and showing that "the

22   relatively high *for-profit cost (mostly tuition) is by far the largest predictor* of this

23   explained variation" in borrowing rates between for-profit and public two-year

24   colleges. *See* Cellini & Darolia Paper at 11 (emphasis added); *see also id.* ("Costs

25   continue to explain the vast majority of variation between the for-profit sector and

26   community colleges, with every other factor remaining small and in the opposite

27   direction. These results suggest that observable demographics, academics, location,

28   / / /

1   and even student resources contribute much less to differences in borrowing

2   between sectors when compared to the net costs of attendance.").

3   **7.1.3.2  New "Analysis" and Research Insufficiently Supported the Repeal**

4       207.   The Repeal is not based on enough factual support or relevant evidence

5   for a reasonable mind to accept it as adequate to support a conclusion.

6       208.   For example, the Department asserted that there was "research

7   published in 2014[,] . . . but not considered during the Department's development of

8   the 2014 Rule," that undercut part of the Department's 2014 rationale for the

9   Gainful Employment Rule. 84 Fed. Reg. at 31,393. But the Department's lone

10  citation in this regard is to a non-final "working paper" of the National Bureau of

11  Economic Research by Lance Lochner and Alexander Monge-Naranjo (the "Lochner

12  Paper") that was not subject to peer review and has never been published

13  elsewhere, despite the fact that it was released by the authors nearly six years

14  ago.[22] Moreover, the data cited in the Lochner Paper was over twenty-five years old,

15  was from a period when the proprietary sector was remarkably different (*i.e.*, there

16  were no online institutions and few large corporate chains), and included only

17  students who completed bachelor's degrees (and not graduate programs, certificate

18  programs, or associate programs). As one group of commenters pointed out, citing to

19  data from the Department, between 2000 and 2010, "fall enrollments at for-profit

20  institutions more than tripled, compared to a growth of about [twenty-eight percent]

21  among all institutions."[23]

22

23

---

24      [22]   Lance Lochner & Alexander Monge-Naranjo, *Default and Repayment Among*
25  *Baccalaureate Degree Earners*, (Nat'l Bureau of Econ. Research, Working Paper No.
    19,882, 2014), *available at:* https://www.nber.org/papers/w19882.pdf.

26      [23]   Comment from Sandra E. Black, *et al.*, to U.S. Dep't of Educ., Docket No. ED-
27  2018-OPE-0042 1, 6 (Sept. 12, 2018), *available at:*
    https://www.regulations.gov/contentStreamer?documentId=ED-2018-OPE-0042-
28  13499&attachmentNumber=1&contentType=pdf.

1

209.   Moreover, the Lochner Paper explicitly acknowledged deficiencies with

2  its sample size (consisting of only thirty-three students from for-profit schools) that

3  led the authors to conclude that "we cannot statistically distinguish" between

4  graduates of proprietary institutions and non-profit institutions. Lochner Paper at

5  12.

6

210.   Elsewhere in the Repeal, the Department asserts that "many of the

7  studies" provided by commenters have "serious limitations that, in some cases,

8  reduce the validity and reliability of their conclusions." 84 Fed. Reg. at 31,405. But

9  again, the Department only points to a single study. 84 Fed. Reg. at 31,405 nn.75–

10  76 & accompanying text (citing Stephanie Cellini & Nicolas Turner, *Gainfully*

11  *Employed? Assessing the Employment and Earnings of For-Profit College Students*

12  *Using Administrative Data* (Nat'l Bureau of Econ. Research, Working Paper No.

13  22,287, 2018)) (the "Cellini & Turner Working Paper").

14

211.   The Department criticizes the Cellini & Turner Working Paper, for

15  example, on the ground that it was "not available for full peer review."

16  Notwithstanding the fact that the Department simultaneously relied upon the

17  Lochner Paper that *expressly* acknowledges that it was not peer-reviewed, the

18  Department cites only to the January 2018 "working draft" version of Cellini and

19  Turner's analysis, entirely disregarding the fact that the final paper *was* peer-

20  reviewed and published in the Journal of Human Resources. *See* Stephanie Cellini

21  & Nicolas Turner, *Gainfully Employed? Assessing the Employment and Earnings of*

22  *For-Profit College Students Using Administrative Data*, 54 J. of Human Res. 342

23  (2019) (the "Cellini & Turner Study"). Citations to both the working paper and the

24  final, peer-reviewed paper were provided to the Department during the comment

25  period.

26

212.   Following its publication in the Journal of Human Resources, an

27  Associate Professor at the University of Michigan's Gerald Ford School of Public

28  / / /

1    Policy referred to the Cellini & Turner Study as "the definitive study" on for-profit

2    colleges.[24]

3        213.    In contrast to the Lochner Paper's sample size of thirty-three students

4    from for-profit colleges, the Cellini & Turner Study relied on a sample size of

5    566,571 individual students from for-profit colleges. Cellini & Turner Study at 353

6    (Table 1, Column 1).

7        214.    The Department asserts that the Cellini & Turner Study "was

8    comparing what employees earn in fields that may pay very different prevailing

9    wages." 84 Fed. Reg. at 31,405. In reality, that study compared students in the

10   *same fields* attending similar certificate programs at for-profit and community

11   colleges. Cellini & Turner Study at 351.

12       215.    The Department also asserts that the Cellini & Turner Study "admits

13   that [the] methodology for creating demographically matched comparison groups

14   relied on the use of zip codes and birthdates, but every one of the same age in the

15   same zip code is not otherwise socioeconomically and demographically matched." 84

16   Fed. Reg. at 31,405. But the Cellini & Turner Study matched students using

17   earnings and other demographics, including zip code and age. *See* Cellini & Turner

18   Study at 351 (describing how the research "generate[d] propensity scores based on

19   up to seven years of prior earnings and demographic characteristics (for example,

20   married, number of children, male, and years prior to enrollment)" and noting that

21   they "identify a matched control for each for-profit student within gender-age-CIP-

22   zip cells[, *i.e.,*] each for-profit student is matched with one public sector student

23   with similar prior earnings and demographics in the same cell").

24       216.    Compounding the substantive errors, the Repeal is also premised on

25   additional, vague citations to "analysis" or unnamed research. In one example, the

---

[24]   Kevin Stange (@kevin_stange), Twitter (Oct. 1, 2019, 10:09 PM),
https://twitter.com/kevin_stange/status/1179216891145080833?s=20.

1   Department asserted in the 2018 NPRM that "[r]esearch published subsequent to

2   the promulgation of the GE regulations adds to the Department's concern about the

3   validity of using D/E rates . . . to determine whether or not a program should be

4   allowed to continue to participate in [T]itle IV programs." 83 Fed. Reg. at 40,171.

5   When challenged under the Information Quality Act to provide a source for this

6   point, the Department failed to do so, instead claiming that it "has used well-

7   respected, peer-reviewed references to substantiate its reasons throughout these

8   final regulations for believing that D/E rates could be influenced by a number of

9   factors other than program quality." 84 Fed. Reg. at 31,427.

10        217.   In other places, the Department cites to its own "analysis" without

11   additional information or description. For example, the Department cites data it

12   claims came from "analysis provided by Federal Student Aid," with a footnote that

13   simply says "Federal Student Aid, 2018." 84 Fed. Reg. at 31,398 & n.27. Moreover,

14   although the Department acknowledges in the Repeal that it received a

15   "bibliography" of papers that it "agree[d]" concluded that "students who attend

16   proprietary institutions, in many instances, have outcomes that are inferior to

17   students who attend other institutions," 84 Fed. Reg. at 31,405, it countered that its

18   "analysis of the outstanding student loan portfolio demonstrates that poor outcomes

19   are not limited to these institutions or the small number, relative to total

20   postsecondary enrollment, of students who attend them." 84 Fed. Reg. at 31,405.

21   But the Department never discloses or describes this "analysis," nor did it subject

22   this "analysis" to public comment.

23        218.   Still further, the Department asserted in the 2018 NPRM that "[o]ther

24   research findings suggest that D/E rates-based eligibility creates unnecessary

25   barriers for institutions or programs that serve larger proportions of women and

26   minority students," 79 Fed. Reg. at 40,171, but failed to identify such findings.

27   Although the Department included a reference to a 2016 study from the College

28   Board in the 2018 NPRM, the Department concedes in the Repeal that the cited

1    research "did not address GE programs specifically," 84 Fed. Reg. at 31,427, and

2    therefore could not have been about D/E rates-based eligibility.

3    **7.1.4  The Department Concluded That the D/E Rates Measure is No Longer a
     Valid Metric**

4

5          219.    The Department asserted that the "D/E rates measure is *scientifically*

6    *invalid* because it fails to control or account for the confounding variables that could

7    influence the relationship between the independent (program quality) and

8    dependent variable (D/E rates) or render the relationship between the independent

9    and dependent variables as merely correlative, not causal." 84 Fed. Reg. at 31,427

10   (emphasis added).

11         220.    In this same vein, the Department also asserted that it "has not been

12   able to develop a methodology to accurately control for or repress confounding

13   variables, such as student demographic characteristics, to isolate the impact of

14   institutional quality on student outcomes, [or to] more accurately attribute student

15   outcomes to a single variable, such as institutional quality." 84 Fed. Reg. at 31,435.

16   The Department further asserted that, "[i]n the past, the Department has

17   performed single variant analysis to identify non-traditional student characteristics

18   that increase the risk of non-completion or student loan defaults. However, the

19   Department has not performed multi-variant analysis to develop an algorithm that

20   would allow it to isolate independent variables and examine causal relationships

21   between those variables and student outcomes." 84 Fed. Reg. at 31,435.

22         221.    Although the Department is correct that the Gainful Employment Rule

23   does not "control" for "confounding variables" such as student demographics *within*

24   the D/E rates measure, the Department did—in 2014—conduct extensive

25   multivariate regression analysis to consider whether the demographic composition

26   of a program influenced the ultimate outcomes under the D/E rates measure and

27   Eligibility Metrics. *See, e.g.*, 79 Fed. Reg. at 65,042 (showing, in Table 2.2, the

28   results of "[t]he second regression [that] used percent zero EFC, female, and above

age 24 as independent variables in addition to percent Pell and percent minority");
79 Fed. Reg. at 65,052–54 (showing, in Tables 2.12 & 2.13, a "regression model with
annual earnings rate as the dependent variable and *multiple* independent variables
that are indicators of student, program, and institutional characteristics")
(emphasis added).

222.   After considering the results of the demographic analysis in 2014, the
Department determined that "student characteristics of programs do not overly
influence the performance of programs on the D/E rates measure." *See, e.g.*, 79 Fed.
Reg. at 64,910; *see also, e.g.*, 79 Fed. Reg. at 64,923 ("[T]he Department has
examined the effects of student demographic characteristics on results under the
annual earnings rate measure and does not find evidence to indicate that the
composition of a GE program's students is determinative of outcomes."); 79 Fed.
Reg. at 64,908 ("[W]e do not expect student demographics to overly influence the
performance of programs on the D/E rates measure."). As the Department stated in
summary:

> [T]he Department cannot conclude . . . that demographic
> characteristics are largely determinative of results. . . . Instead, we
> find a negative association between the proportion of low-income
> students and the annual earnings rate when controlling for other
> demographic and non-demographic factors, similar passing rates
> across all quartiles of low-income variables, and similar demographic
> profiles in passing, zone, and failing programs for almost all of the
> variables examined. These and other results of our analyses suggest
> that the regulation is not primarily measuring student demographics.

79 Fed. Reg. at 65,057.

223.   As the District Court held in *APSCU III*, "[t]he Department therefore
made extensive efforts [in 2014] to get to the bottom of this criticism [regarding the
impact of demographics], and this Court cannot fairly say that the agency acted
arbitrarily in the face of it." *APSCU III*, 110 F. Supp. 3d at 192.

224.   Although the Department, in the Repeal, "acknowledge[d]" this prior
analysis, it also claimed that it was an "incomplete analysis of the data available to
the Department." 84 Fed. Reg. at 31,414. However, the Department pointed to only

1  a single example of "data available to the Department" that was not fully analyzed

2  in 2014, *i.e.*, a 1994 analysis by the National Center for Education Statistics

3  ("NCES Analysis"), which the Department asserted "confirm[s] the impact of

4  student characteristics on student outcomes," 84 Fed. Reg. at 31,414, and which the

5  Department erred by not considering in 2014.

6       225.   The 1994 NCES Analysis is based on data from 1989–1990. Although

7  the 1994 NCES Analysis discusses factors that influence the likelihood of

8  graduation, it does not specifically address student loan borrowers who graduated,

9  nor is it specific to gainful employment programs. As a result of these limitations,

10  the 1994 NCES Analysis is not a reliable source for the Department to use in order

11  to contradict its 2014 conclusion, *see, e.g.*, *supra* ¶ 222, that student demographics

12  and characteristics would not overly influence the performance of gainful

13  employment programs on the D/E rates measure.

14       226.   The Gainful Employment Rule, in contrast, only considers the

15  outcomes of student loan borrowers who graduated from a GE program. Moreover,

16  the Department's multivariate regression analysis in 2014 was based on data it

17  gathered in connection with institutional compliance with the 2011 GE Rule.

18       227.   In promulgating the Repeal, the Department "[did] not analyze[] the

19  racial or ethnic demographics of students served by programs that failed the 2015

20  D/E calculations." 84 Fed. Reg. at 31,414. With respect to gender disparities, the

21  Department asserts—without citing to any non-anecdotal evidence—that "it seems

22  clear" that women and low-income students will be impacted more significantly

23  than other students by program closures due to the Gainful Employment Rule. 84

24  Fed. Reg. at 31,414–15.

25       228.   The Department asserted as a basis for the Repeal that the

26  performance of programs on the D/E rates measure can, but should not, be impacted

27  by factors other than "program quality." *See* 84 Fed. Reg. at 31,427 ("The

28  Department has used well-respected, peer-reviewed references to substantiate its

1   reasons throughout these final regulations for believing that D/E rates could be

2   influenced by a number of factors other than 'program quality.'"); 84 Fed. Reg. at

3   31,396 (agreeing that the "D/E rates measure is a fundamentally flawed and

4   unreliable *quality indicator*") (emphasis added). According to the Department,

5   because the D/E rates measure fails to take into account factors other than program

6   quality, the D/E rates measure is an invalid indicator. 84 Fed. Reg. at 31,396.

7       229.   With respect to all purported justifications for the Repeal, the

8   Department failed to provide relevant evidence a reasonable mind might accept as

9   adequate to support the conclusions drawn. The Department's decision to Repeal

10  the Gainful Employment Rule was therefore arbitrary and capricious under the

11  APA.

**7.1.5  The Department Continued to Renege on its Prior Justifications for the Accountability Framework**

12

13

14      230.   In the Repeal, the Department reversed course on both the thresholds

15  for the Eligibility Metrics and the D/E rates measures (*i.e.*, the discretionary income

16  rate and the annual earnings rate). *See, e.g.*, 84 Fed. Reg. at 31,427 (referring to the

17  D/E rates measure as "scientifically invalid").

18      231.   With respect to the thresholds, the Department claimed that there is

19  "no empirical basis for the 8 percent" D/E rates measure threshold for the annual

20  earnings rate. 84 Fed. Reg. at 31,407. The Department also asserted that, in 2014,

21  it "failed to provide a sufficient, objective, and reliable basis for the 20 percent

22  [discretionary income] threshold." 84 Fed. Reg. at 31,407. The Department also

23  stated that rulemaking subsequent to the Gainful Employment Rule rendered the

24  twenty percent standard "obsolete" because "no borrower would ever be required to

25  pay more than 10 percent of their discretionary income." 84 Fed. Reg. at 31,407.

26      232.   With respect to the D/E rates measure calculations, the Department

27  expressed its concern with the use of an amortization rate that differs from the

28  amortization terms "made available" to borrowers under the law and the

1   Department's REPAYE regulations. 84 Fed. Reg. at 31,409. Yet there was an

2   obvious alternative amortization rate to address this concern, *see supra* ¶ 131,

3   which the Department presented to the Committee but subsequently failed to

4   address in the Repeal.

5      233.   The Department also expressed concerns with the fact that the use of

6   SSA earnings data to calculate D/E rates was inaccurate because that data excluded

7   "unreported tip income and some self-employment earnings" and would "[p]enaliz[e]

8   programs," even where asserted data-related problems were "not the fault of

9   institutions of higher education." 84 Fed. Reg. at 31,409–10.

10     234.   The Department also disagreed with its prior conclusion that the D/E

11  rates measure "sufficiently control[]" for the impact of recessions." 84 Fed. Reg. at

12  31,411. Yet as the Department suggested in a footnote, albeit with selective

13  quotations, 84 Fed. Reg. at 31,411 n.99 (asserting that *APC v. Duncan* stated that

14  Plaintiff's argument that the Gainful Employment Rule "failed to adjust for

15  economic cycles was 'just a red herring'"), *APC v. Duncan* examined this exact issue

16  and concluded that the argument that the Gainful Employment Rule failed to

17  sufficiently adjust for economic cycles was "*not just* a red herring," (emphasis

18  added) but "also untrue." 107 F. Supp. 3d at 368.

19     235.   The Department's rejection of its prior position regarding economic

20  cycles appears to be grounded in the fact that the "Great Recession lasted eighteen

21  months," 84 Fed. Reg. at 31,411 n.99, while the Department repeatedly asserted in

22  2014 that "recessions have, on average, lasted, 11.1 months," 79 Fed. Reg. at 64,920.

23  But in the 2018 NPRM, the Department asserted something different, namely that

24  "the Great Recession lasted for well over two years." 83 Fed. Reg. at 40,172.

25     236.   Regardless of the length of the Great Recession, the Department

26  acknowledged in the Gainful Employment Rule that the Great Recession was an

27  "outlier event[]." 84 Fed. Reg. at 31,411.

28  / / /

237.   In addition, the Department stated in the Repeal that unemployment data regarding the aftermath of the Great Recession established that the "three-year window afforded to institutions in the 2014 Rule would come up desperately short of a jobless recovery that lasted eight years." 84 Fed. Reg. at 31,411 n.99.

238.   In the Repeal, the Department did not consider whether the four-year "zone" window would ameliorate its concerns about the Gainful Employment Rule not controlling for the impact of recessions. Under the Gainful Employment Rule, a program becomes ineligible if it *either* fails the D/E rates measure for two out of three consecutive years *or* has a combination of zone and failing D/E rates for four consecutive years. *See* 34 C.F.R. § 668.403(c)(4).

239.   In the Repeal, the Department failed to consider the extent to which, as it stated in 2014:

> Sensitivity to temporary economic fluctuations outside of an institution's control is also reduced by calculating the D/E rates based on two-year and four-year cohorts of students, rather than a single-year cohort, and calculating a program's annual earnings as means and medians. Calculating D/E rates based on students who completed over multiple years reduces the impact of short term fluctuations in the economy that may affect a particular cohort of graduates but not others. Similarly, means and medians mitigate the effects of economic cycles by measuring central tendency and reducing the influence of students who may have been most impacted by a downturn.

79 Fed. Reg. at 64,926. Nor did the Department explain why this position is no longer accurate or justified.

240.   The Department failed, in the Repeal to consider the extent to which, as it stated in 2014, "[t]he zone protects passing programs from losing their eligibility for [T]itle IV, HEA program funds where their increase in D/E rates was attributable to temporary fluctuations in local labor market conditions." 79 Fed. Reg. at 64,926. Nor did the Department explain why this position is no longer accurate or justified.

241.   In the Repeal, the Department did not consider available debt-to-earnings data for multiple cohorts of students across numerous years, even though,

as one commentator explained, "the Department has in its possession debt-to-earnings data for multiple cohorts of students across several years" and "student roster information from 2008–09 through 2013–14 that have not been sent to the Social Security Administration to generate earnings data."[25] The commenter also noted that, in order to determine the potential effects of broader national conditions, the Department could "cross the data by program with information on national, regional, and local economic conditions to see if in fact there is a connection."[26] The Department failed to do this or respond to this comment.

242. With respect to all of its justifications, the Department failed to provide relevant evidence that a reasonable mind might accept as adequate to support the conclusions drawn.

## 7.2 The Department Failed to Consider Alternatives to the Repeal of the Accountability Framework

243. An agency not only has a duty to consider reasonable alternatives to its chosen policy, but also must provide a reasoned explanation for its rejection of those alternatives.

244. The Department was aware of myriad alternatives to the Gainful Employment Rule, as a whole and with respect to its component pieces.

245. Although the Department stated in the Repeal that it "reviewed and considered various changes to the final regulations," and that "changes made in response to comments [were] described in the *Analysis of Comments and Changes* section of [the] preamble," 84 Fed. Reg. at 31,448, no changes were actually made.

---

[25] *See* Comment from Ben Miller *et al.*, to U.S. Dep't of Educ., Docket No. ED-2018-OPE-0042 1, 11–12 (Sept. 13, 2018) ("Miller Comment"), *available at:* https://www.regulations.gov/contentStreamer?documentId=ED-2018-OPE-0042-13794&attachmentNumber=1&contentType=pdf.

[26] *Id.*

1

### 7.2.1   Failure to Consider Alternatives to the Certification Requirement

2    246.   The Department did not consider any reasonable alternatives to the

3    Certification Requirement that determines initial eligibility. *See* 34 C.F.R.

4    § 668.414. To the extent the Department did consider such alternatives, the

5    Department failed to identify those alternatives in either the 2018 NPRM or the

6    Repeal and failed to give a reasoned explanation for its rejection of those

7    alternatives.

8    247.   With respect to the elimination of the Certification Requirement, the

9    Department stated only that it "considered disclosures related to licensure and

10   certification, as well as accreditation, as part of its Accreditation and Innovation

11   negotiated rulemaking package and, therefore, will not include regulations related

12   to disclosures of this information in this rulemaking." 84 Fed. Reg. at 31,424.

13   248.   The Department did not consider *any* alternative to the Certification

14   Requirement, despite the fact that there were obvious alternatives that were known

15   and common. For example, in developing the Gainful Employment Rule, the

16   Department heard from commenters that "the certification requirements should

17   expanded." 79 Fed. Reg. at 64,990. At the time, the Department dismissed this

18   consideration because it was "unnecessary in light of the requirements already

19   provided by the regulation." 79 Fed. Reg. at 64,990.

20   249.   Moreover, members of the Negotiated Rulemaking Committee received

21   and presented alternative certification requirements. For example, one committee

22   member submitted a memorandum to the Department containing proposed

23   amendments to 34 C.F.R. § 668.414 that would have strengthened the certification

24   requirements.[27]

25

26   [27]   *See* Memorandum from Laura Metune, Vice Chancellor of External Affairs,
     California Cmty. Colls. Chancellor's Office, to U.S. Dep't of Educ., *Gainful*

27   *Employment Negotiated Rulemaking Committee* (Jan. 30, 2018), *available at*:
     https://www2.ed.gov/policy/highered/reg/hearulemaking/2017/gememoissue8metune

28   .pdf.

250. Prior to the second and third negotiated rulemaking sessions, the Department also released issue papers that proposed revisions to 34 C.F.R. § 668.414. The Department did not consider these alternatives when publishing the Repeal. If they were considered, the Department did not give a reasoned explanation for its rejection of these alternatives.

251. With respect to initial certification requirements generally, the Department's issue papers also show that it was aware of a potential alternative rule requiring "any Title IV eligible education program that prepares students for employment in an occupation for which the State or Federal government has requirements for certification/licensure" to "certify in its [Program Participation Agreement with the Department] that the program is approved by a recognized accrediting agency and meets the State or Federal requirements," which would include the requirements regarding gainful employment.[28]

### 7.2.2  Failure to Consider Alternative Eligibility Metrics

252. The Department did not consider any reasonable alternative to the Eligibility Metrics. To the extent the Department did consider such alternatives, the Department failed to identify those alternatives in either the 2018 NPRM or the Repeal and failed to give a reasoned explanation for its rejection of those alternatives.

253. The Department was aware of numerous alternative metrics. For example, during Day 2 of Session 1 of negotiated rulemaking, Greg Martin, the

---

[28] *See* U.S. Dep't of Educ., *Certification Requirements,* First Amended Issue Paper No. 8, 2017–2018 Negotiated Rulemaking (Session No. 2, Feb. 5–8, 2018), *available at:* https://www2.ed.gov/policy/highered/reg/hearulemaking/2017/issuepaper8certificationrequirements.pdf**Error! Hyperlink reference not valid.***see also* U.S. Dep't of Educ., *Certification Requirements,* Second Amended Issue Paper No. 8, 2017–2018 Negotiating Rulemaking (Session No. 3, Mar. 12–15, 2018), *available at:* https://www2.ed.gov/policy/highered/reg/hearulemaking/2017/session3issuepaper8certificationrequirements.pdf**Error! Hyperlink reference not valid.**

Department's representative, acknowledged that "there have been other metrics considered in previous negotiations."[29] In the Repeal, however, the Department did not consider any of those metrics.

254.    In 2014, for example, the Department considered and proposed using pCDR (*i.e.*, the program-level cohort default rate, "which examines the rate at which borrowers who previously enrolled in the program default," *see supra* ¶ 125, as part of the Eligibility Metrics. Using the pCDR metric would have been an obvious alternative to Repeal because the Department proposed using the pCDR metric in its 2014 NPRM. But the Department did not consider using pCDR in the Repeal.

255.    In the preamble to the Repeal, the Department stated that during the negotiated rulemaking session, there was a "proposal from one negotiator to use a one-to-one ratio to report debt-to-earnings," but there was "no consensus" around that proposal. 84 Fed. Reg. at 31,408. The Department did not consider that "one-to-one ratio" proposal in developing the Repeal and, to the extent it did, it failed to give a reasoned explanation for the rejection of that alternative.

256.    In the preamble to the Repeal, the Department also stated that one commenter "offered alternative D/E rates and thresholds for consideration, including using a 10% debt-to-income threshold with a 10-year repayment term or a 15% or 20% debt-to-income thresholds [sic]." 84 Fed. Reg. at 31,407. Although it noted that comment in the discussion, the Department does not appear to have considered that proposal in developing the Repeal and, to the extent it did, it failed to give a reasoned explanation for the rejection of that alternative.

---

[29]   U.S. Dep't of Educ., *Transcript of Gainful Employment Negotiated Rulemaking Committee 2017–2018* 1, 12 (Session No. 1, Dec. 5, 2017), *available at:* https://www2.ed.gov/policy/highered/reg/hearulemaking/2017/tuesdaydecemeber5transcript.docx.

1
2
3
4
5

257.   The Department also evinced its knowledge of obvious alternatives through the proposals the agency itself made during negotiated rulemaking. For example, prior to Negotiated Rulemaking Session 2, the Department released a version of Issue Paper #3, that suggested numerous alternatives to the formula for calculating the D/E rates measure.[30]

6
7
8
9
10
11
12

258.   Issue Paper #3 (Session 2) proposed numerous additional alternatives, including amending the "Annual Loan Payment" component of both the annual earnings and discretionary income threshold formula to use: (i) an amortization period of fifteen years, regardless of program length; (ii) the statutory interest rate on federal Direct unsubsidized loans during the last award year of the cohort period, rather than the average rate over the last three years; and (iii) a "loan debt" that no longer included private educational loans or institutional loans.

13
14
15
16
17
18
19

259.   Issue Paper #3 (Session 2) also proposed to "no longer exclude from the numerator and the denominator of the D/E rates calculation students who have one or more [T]itle IV loans in a military related deferment status" and to "require that a student be enrolled for at least 60 days for that individual to be counted as an exclusion to the D/E rate calculations." The Department likewise noted in Issue Paper #3 (Session 2) that it "propose[d] to use a single two-year cohort period in calculating D/E rates and remove the four-year cohort rate."

20
21

260.   Prior to Negotiated Rulemaking Session 3, the Department released another new version of Issue Paper #3, which suggested additional alternatives to

22
23
24
25
26
27
28

---

[30]   *See* U.S. Dep't of Educ., *Debt Calculations*, First Amended Issue Paper No. 3, 2017–2018 Negotiated Rulemaking (Session No. 2, Feb. 5–7, 2018), *available at:* https://www2.ed.gov/policy/highered/reg/hearulemaking/2017/issuepaper3debt calculations.pdf.

the formula for calculating the Eligibility Metrics.[31] This paper summarized the proposed alternatives to the Eligibility Metrics "[s]ince Session 2" as follows:

> [W]e propose to amortize debt over a ten-year period for undergraduate certificates, post-baccalaureate certificates, and associate's [sic] degrees. We also propose to amortize debt over a fifteen-year period for bachelor's degrees. In conforming with our previous proposal to limit these regulations to undergraduate programs, we removed the amortization of debt for Master's [sic] level programs or higher. We also propose moving the calculation of a loan repayment rate to § 668.406.

261.   In issuing the 2018 NPRM and the Repeal, the Department did not consider any of these, or other, reasonable alternatives to the Eligibility Metrics. To the extent the Department did consider such alternatives, the Department failed to identify those alternatives in either the 2018 NPRM or the Repeal and failed to give a reasoned explanation for its rejection of any considered alternatives.

### 7.2.3  Failure to Consider Alternative Thresholds and Sanctions for Failing D/E Rates Measures

262.   The Department did not consider alternative sanctions for GE programs that fail to meet certain minimum threshold D/E rates measures that were less drastic than the chosen policy of complete repeal. Nor did the Department consider alternative thresholds. To the extent the Department did consider such alternatives, including during negotiated rulemaking, the Department failed to identify those alternatives or give a reasoned explanation for the rejection of those alternatives.

263.   The Department was aware of numerous alternative thresholds and sanctions, insofar as it had considered various alternatives in 2011. For example, in 2011, the Department set a discretionary income rate threshold of thirty percent

---

[31]   *See* U.S. Dep't of Educ., *Debt Calculations*, Second Amended Issue Paper No. 3, 2017–2018 Negotiated Rulemaking (Session No. 3, Mar. 12–15, 2018), *available at:* https://www2.ed.gov/policy/highered/reg/hearulemaking/2017/session3issuepaper3ratecalculations.pdf.

1   and an annual earnings threshold of twelve percent. In the Gainful Employment

2   Rule, the Department set a passing discretionary income rate threshold at twenty

3   percent, with a "zone" between twenty percent and thirty percent, and a failing rate

4   at thirty percent. Similarly, with respect to annual earnings, the Gainful

5   Employment Rule established a passing rate of eight percent, a failing rate of

6   twelve percent, and a "zone" between those two marks.

7        264.   The Department also demonstrated its knowledge of obvious

8   alternative thresholds and sanctions through proposals it made during the

9   negotiated rulemaking process. For example, in Issue Paper #2 (Session 2), the

10  Department proposed to amend the framework so that programs were no longer

11  considered "passing" or "failing" based on D/E rates.[32] Instead, the Department

12  proposed to refer to GE programs as "acceptable" if they met established standards

13  and "low-performing" if they did not meet the established standards. The

14  Department also proposed to "remove the concept of a 'zone' from regulations."

15       265.   The Department further evinced its knowledge of obvious alternative

16  thresholds in Issue Paper #2 (Session 3) when it proposed "to add a loan repayment

17  rate into the framework for undergraduate educational programs" and to "refer to a

18  program as one that 'meets benchmarks' if it meets the established standards and a

19  program as one that 'does not meet benchmarks' if it does not meet established

20  standards."[33]

21

22

23  ───────────────

24  [32]  *See* U.S. Dep't of Educ., *D/E Rates*, Amended Issue Paper No. 2, 2017–2018
    Negotiated Rulemaking (Session No. 2, Feb. 5–8, 2018), *available at:*
25  https://www2.ed.gov/policy/highered/reg/hearulemaking/2017/issuepaper2debttoear
    ningsrates.pdf.

26  [33]  *See* U.S. Dep't of Educ., *D/E Rates*, Second Amended Issue Paper No. 2,
    2017–2018 Negotiated Rulemaking (Session No. 3, Mar. 12–15, 2018), *available at:*
27  https://www2.ed.gov/policy/highered/reg/hearulemaking/2017/session3issuepaper2d
    erates.pdf.
28

266.   With respect to sanctions, prior to Session 2, the Department proposed in Issue Paper #4 to eliminate the loss of eligibility as a sanction for failing to meet the D/E rates measure thresholds.[34] But in that same Issue Paper, the Department did *not* propose to eliminate entirely the warnings and notifications that would be provided for programs that were deemed "low-performing" due to their D/E rates measures.

267.   The Department further demonstrated its knowledge of obvious alternative sanctions in Issue Paper #4 (Session 3), in which it proposed to "tie sanctions for poor performance under the D/E rates and loan repayment rate measures to standards of administrative capability."[35] The Department further proposed "potential sanctions" that included "limitations on an institution's ability to expand programs by more than 10 percent for programs that do not meet benchmarks, or to start new programs in similar occupations to the programs that do not meet benchmarks without prior approval of the Department or a program review conducted by the Department."

268.   In Issue Paper #4 (Session 3), the Department further illustrated its knowledge of obvious sanctions, in which it proposed "some clarifications on when notifications" should be made to students in languages other than English as a result of a GE program's failure to meet D/E rates measure thresholds.

---

[34]   *See* U.S. Dep't of Educ., *Sanctions for Programs Based on D/E Rates*, Amended Issue Paper No. 4, 2017–2018 Negotiated Rulemaking (Session No. 2, Feb. 5–8, 2018), *available at:* https://www2.ed.gov/policy/highered/reg/hearulemaking/2017/issuepaper4sanctions.pdf.

[35]   *See* U.S. Dep't of Educ., *Sanctions for Programs Based on D/E Rates*, Second Amended Issue Paper No. 4, 2017–2018 Negotiated Rulemaking (Session No. 3, Mar. 12–15, 2018), *available at:* https://www2.ed.gov/policy/highered/reg/hearulemaking/2017/session3issuepaper4sanctions.pdf.

269.   To the extent the Department had concerns with the specific Eligibility Metrics established in the Gainful Employment Rule, the Department failed to consider other obvious alternatives. For example, in light of the fact that the 2018 NPRM expressed no concern with the substantive basis for the twenty percent discretionary income rate threshold, the Department could have considered the obvious alternative of removing only the eight percent annual earnings rate, as commenters suggested.

270.   In issuing the Repeal, the Department did not consider any of these, or other, reasonable alternatives to the thresholds or sanctions for failing to meet the Eligibility Metrics. To the extent the Department did consider such alternatives, the Department failed to identify those alternatives in either the 2018 NPRM or the Repeal and failed to give a reasoned explanation for its rejection of those alternatives. The Department's actions in this regard were arbitrary, capricious, and not in accordance with law.

### 7.2.4  Failure to Consider Alternatives to Issues with Tip-Based Occupations

271.   In 2014, the Department received comments contending that the Department's earnings assessment process for the D/E rates measure was flawed with regard to information on self-employed individuals because the ultimate source of data on their earnings is the individual, who may fail to report or significantly underreport earnings or who may have relatively significant business expenses that offset even substantial income. *See* 79 Fed. Reg. at 64,955. Commenters also noted that many individuals in careers with substantial tip-income components tend to underreport tips.

272.   In response to this and other concerns, the Department included in the Gainful Employment Rule the Alternate Earnings Appeals process, *see supra* ¶ 133, whereby institutions could submit an alternative means of calculating the D/E rates measure.

/ / /

273.   In the Repeal, the Department made two general assertions regarding the alternate earnings appeal process that are relevant here. First, the Department claimed that—in light of the *AACS* decision, *see supra* ¶¶ 161–163—the "standard for such appeals was inappropriately high." 84 Fed. Reg. at 31,410. Second, the Department claimed that "[t]he administrative burden and complexity of accounting for underreported income for the purpose of the D/E rates measure is another factor that supports the [Repeal]." 84 Fed. Reg. at 31,410.

274.   Although the Department repeatedly referred to the ruling in the *AACS* case as a decision of the United States Court of Appeals for the D.C. Circuit, *see* 84 Fed. Reg. at 31,410, the *AACS* decision is a decision of the United States District Court for the District of Columbia.

275.   In the *AACS* litigation, plaintiffs challenged the Gainful Employment Rule on a number of grounds related to the underreporting of income derived from tips by graduates of cosmetology programs and the resulting impact on the D/E rates measure calculation.

276.   As an initial matter, *AACS* noted that the Department "had discretion to use SSA [earnings] data as the presumptive measure of average income for GE programs." 258 F. Supp. 3d at 73. The District Court stated that it "had no reason to believe that SSA [earnings] data is anything but precise with respect to *reported* income," and that although "incomplete" because it measures reported income rather than total income, the Department "has discretion to sacrifice some measure of fit for the sake of administrability." *Id.* (emphasis in original)..

277.   Ultimately, however, the District Court concluded that the alternate earnings appeals process was insufficient for the AACS member schools and ordered the Department not to require these schools to adhere to certain restrictions regarding the sample size used for alternate earnings appeals. *Id.* at 76–77.

278.   In all other regards, *AACS* upheld the Gainful Employment Rule.

/ / /

1    279.    In response to the *AACS* ruling, the Department established a new

2    date for institutions to file both a notice of intent to file an alternate earnings

3    appeal and the appeal itself. *See* 82 Fed. Reg. at 39,363; *supra* ¶ 165. In addition,

4    the Department modified the alternate earnings appeals process for all institutions

5    (*i.e.*, AACS *and* non-AACS institutions). The Department stated that, in response to

6    the *AACS* litigation, it would not enforce certain aspects of the regulations related

7    to the alternate earnings appeals. Instead, the Department asserted that, with

8    respect to appeals relying on survey information, it would "consider the response

9    rate, the nonresponse bias analysis, and any other information requested by the

10   Secretary that indicates that the responses are a reliable measure of the program

11   graduates' true earnings." 82 Fed. Reg. at 39,363. With respect to appeals "based on

12   data from State-sponsored data systems," the Department stated that it would

13   "consider the[ir] validity . . . on a case-by-case basis, taking into account the

14   response rate and other information requested by the Secretary." 82 Fed. Reg. at

15   39,363.

16       280.    This alternative to the alternate earnings appeal process was made "to

17   reduce the burden on institutions in conducting these appeals while still ensuring

18   that institutions provide enough information for the Department to determine

19   whether the program graduates for whom alternate earnings data [we]re provided

20   are a valid representation of the overall cohort." 82 Fed. Reg. at 39,363.

21       281.    In the *Federal Register* notice, the Department also invited public

22   comment and stated that it would "consider these comments in determining

23   whether to take any future action in connection with the upcoming negotiated

24   rulemaking." 82 Fed. Reg. at 39,363.

25       282.    Although the Department concluded that this alternative to the

26   alternate earnings appeals process satisfied the *AACS* ruling, the Department

27   failed to consider this alternative when issuing the Repeal.

28   / / /

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 5:20-cv-455          77

283.    In the Repeal, the Department also failed to consider the extent to which issues surrounding reporting of tip income are a real problem. The Department put forth no data on the extent to which tip income is underreported and failed to consider a comment describing how the IRS "works with employers who may have a lot of tipped employees to create Tip Reporting Alternative Commitments (TRACs)," which include "promises from businesses to distribute materials and educate employees about the importance of reporting tips." Miller Comment at 23. Nor did the Department consider the impact of "Tip Rate Determination Agreements," *i.e.*, a voluntary compliance agreement that the IRS describes as "designed to enhance tax compliance among tipped employees,"[36] or the increasing extent to which tips are paid by credit card, which are more likely to be reported. Miller Comment at 23. The Department also did not consider the "role of institutions in encouraging proper tip reporting" and whether "cosmetology programs include in their delivered curriculum ethics lectures on the importance of reporting." *Id.* The Department failed to respond to comments on these topics.

284.    The Department asserted in the 2018 NPRM that the "process for developing . . . an [alternate earnings] appeal has proven to be more difficult to navigate than the Department had originally planned." 83 Fed. Reg. at 40,174. The Department further asserted in the 2018 NPRM that it "reviewed earnings appeal submissions for completeness and considered response rates on a case-by-case basis . . . . Through this process, the Department has corroborated claims from institutions that the survey response requirements of the earnings appeals methodology are burdensome given that program graduates are not required to

---

[36]    *See generally* U.S. Internal Revenue Serv., *Voluntary Compliance Agreements – Restaurant Tax Tips*, https://www.irs.gov/businesses/small-businesses-self-employed/voluntary-compliance-agreements-restaurant-tax-tips (last updated Nov. 9, 2018).

1  report their earnings to their institution or to the Department . . . ." 83 Fed. Reg. at
2  40,174.

3  285.  In the Repeal, the Department reiterated this conclusion, asserting
4  that "[a]dministering the GE regulations, particularly alternate earnings appeals,
5  has also turned out to be much more burdensome to the Department than was
6  originally anticipated." 84 Fed. Reg. at 31,419.

7  286.  The Department did not make relevant information available to the
8  public to adequately comment on this justification.

9  287.  On March 5, 2018, the National Student Legal Defense Network
10  ("Student Defense"), counsel to Plaintiffs in this litigation, requested documents
11  related to alternate earnings appeals under the Freedom of Information Act
12  ("FOIA").

13  288.  Student Defense requested: (i) all documents constituting notices of
14  intent to file alternate earnings appeals by institutions of higher education; (ii) all
15  documents constituting those alternate earnings appeals; and (iii) all documents
16  constituting or reflecting communications with any institutions about their
17  alternate earnings appeals.

18  289.  The Department failed to produce the documents under the timeline
19  required by the FOIA.

20  290.  By the time the comment period closed, Student Defense had not
21  received the relevant information requested.

22  291.  It is Student Defense's general practice to publish documents received
23  from the government under the FOIA on its website, so that members of the public
24  can review them.

25  292.  In its comment submitted in response to the 2018 NPRM, Student
26  Defense highlighted that it could not effectively comment on the Department's
27  assertions about the alternative earnings appeals process because the requested
28  information was not provided.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 5:20-cv-455        79

1

2

### 7.3   The Department Provided No Reasonable Justification for the Repeal of the Transparency Framework

3

4       293.   In the Repeal, the Department openly admitted that repealing the

5   Transparency Framework would harm students. The Department asserted "that[,]

6   by rescinding the 2014 Rule[,] some students would be more likely to make poor

7   educational investments." 84 Fed. Reg. at 31,394. The Department further stated

8   that "[w]ith the elimination of the disclosures and the ineligibility sanction that

9   would have removed students' program choices, students, their parents, and other

10   interested members of the public will have to seek out the information that

11   interests them about programs they are considering." 84 Fed. Reg. at 31,444–45.

12       294.   In repealing the Reporting Requirements, the Department's sole

13   justification was that it would reduce cost and burden on institutions that offer

14   gainful employment programs. *See, e.g.*, 84 Fed. Reg. at 31,418.

15       295.   In repealing the Disclosure Requirements, the Department asserted in

16   the 2018 NPRM that it "underestimated" the "burden" that the regulations would

17   have on institutions. *See, e.g.*, 83 Fed. Reg. at 40,173 ("The Department also

18   believes that it underestimated the burden associated with distributing the

19   disclosures directly to prospective students."); 83 Fed. Reg. at 40,177 ("Furthermore,

20   when developing the GE regulations, the Department, as noted in feedback received

21   from multiple institutions, underestimated the burden on institutions associated

22   with the use of a standardized disclosure template in publishing program outcomes

23   and distributing notifications directly to prospective and current students.").

24       296.   The Department produced no data demonstrating the extent to which

25   the administrative burden associated with the Gainful Employment Rule differed

26   from its expectations when it passed the rule.

27       297.   The only "evidence" the Department offered to support its view were

28   anecdotal comments of one individual who was a member of the 2017–2018

Negotiated Rulemaking Committee.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 5:20-cv-455          80

298.    During negotiated rulemaking, a Department representative, when asked for estimates of the Gainful Employment Rule's administrative burden, stated "we don't currently have anything right now."[37]

299.    In the Gainful Employment Rule, the Department estimated the total "burden hours"—*i.e.*, the number of hours of "burden" created by the rule to students and institutions—to be 6,925,627. *See* 79 Fed. Reg. at 65,005.

300.    Given what the Department stated about how it had underestimated the burden attributable to the Gainful Employment Rule in 2014, it would logically follow that repealing the Rule would result in an estimated burden decrease that was *larger* than the 2014 estimated increase. In the 2018 NPRM and Repeal, however, the Department states that the total "burden hours" reduced by the proposed repeal would be 6,925,628, a one hour difference (or one ten-millionth of a percent difference) from the estimated burden of the Gainful Employment Rule. *See* 83 Fed. Reg. at 40,182; 84 Fed. Reg. at 31,452. Functionally, this is the exact same burden that the Department estimated in 2014.

301.    In repealing the Disclosure Requirements, the Department also asserted that "disclosures required by the GE regulations include some data, such as job placement rates, that are highly unreliable and may not provide the information that students and families need to make informed decisions about higher education options." 84 Fed. Reg. at 31,392. But to "address" this concern, the Department "describe[d] in [the Repeal] our preliminary plans for the expansion of the College Scorecard." 84 Fed. Reg. at 31,394.

302.    The College Scorecard is a Departmental website, launched in 2013 and available at http://collegescorecard.ed.gov, that provides information to the public regarding institutions of higher education.

---

[37]    U.S. Dep't of Educ., *Transcript of Gainful Employment Negotiated Rulemaking Committee 2017–2018* 1, 23 (Session No. 2, Feb. 8, 2018), *available at*: https://www2.ed.gov/policy/highered/reg/hearulemaking/2017/day4getranscript.pdf.

1

2

3

4

5

6

303.    Appendix A to the Repeal includes a comparison of information that was "made available to students and parents through the 2017 GE disclosure template with the information" that the Department claims "will be provided through the expanded College Scorecard or other consumer information tools, such as College Navigator." 84 Fed. Reg. at 31,395; *see also* 84 Fed. Reg. at 31,435–37 (Appendix A).

7

8

9

10

11

12

13

14

15

16

304.    The Department did not explain why job placement rates are "highly unreliable" or why the Department was wrong to include these rates as part of the Reporting and Disclosure Requirements in 2014. Nor did the Department explain why, in the Repeal, it stated that job placement rates are "highly unreliable and may not provide the information that students and families need to make informed decisions about higher education options," 84 Fed. Reg. at 31,392, but also stated, as recently as July 2018, that it could propose to "develop[] a single definition for purposes of measuring and reporting job placement rates" as part of a different rulemaking proceeding. *See* Negotiated Rulemaking Committee; Public Hearings, 83 Fed. Reg. 36,814, 35,815 (July 31, 2018).

17

18

19

20

21

22

23

305.    The Department did not explain why it no longer believes, as it asserted in 2014, that the "direct delivery" of information to students makes it more likely that students will receive and review disclosed information. 79 Fed. Reg. at 64,969. Nor did the Department explain why it no longer considers direct distribution of information to prospective and enrolled students to be preferable to making information available via College Scorecard or elsewhere on the Department's website. *See* 79 Fed. Reg. at 64,978.

24

25

26

306.    Non-binding plans to expand the Department's College Scorecard do not mitigate the fact that students will be "more likely to make poor educational investments" as a result of the Repeal.

27

28

307.    The Department failed to conside r that, as a commenter pointed out, during August 2018, the College Scorecard received approximately 63,000 visitors,

1  which is a small fraction of both the number of students enrolled in GE programs

2  and the number of students enrolled in failing programs.

3      308.   The Repeal does not maintain or add any regulations that require

4  disclosure of *any* information to enrolled or prospective students. Rather, the

5  Department stated that it "encourages all institutions to post links to the Scorecard

6  on their institutional websites." 84 Fed. Reg. at 31,423. In contrast, the Gainful

7  Employment Rule required institutions to post the required disclosures on

8  programmatic websites with a link that is "prominent, readily accessible, clear,

9  conspicuous, and direct." 34 C.F.R. § 668.412(c). In addition, the Gainful

10  Employment Rule required institutions to include, in a "prominent manner," the

11  disclosures in all promotional materials (including catalogs, invitations, flyers,

12  billboards and advertising on or though radio, television, print media, the Internet,

13  and social media), or, if "space or airtime constraints . . . preclude[d]" this, the

14  institution was required to include a link that was "prominent, readily accessible,

15  clear, conspicuous, and direct" and identified as "Important Information about the

16  educational debt, earnings, and completion rates of students who attended this

17  program." 34 C.F.R. § 668.412(d).

18      309.   The Repeal also does not maintain or add any regulations that require

19  disclosure of information to students, in the form of warnings, when a program is at

20  risk of being determined *not* to prepare students for gainful employment in a

21  recognized occupation.

22      310.   The lack of any requirement that schools warn students about a

23  potential loss of Title IV eligibility suggests either that the Department does not

24  intend for a GE program to ever lose Title IV eligibility because it fails to prepare

25  students for gainful employment in a recognized occupation or that warning of such

26  a determination is no longer "essential" or "necessary" for students.

27  / / /

28  / / /

1

2

### 7.4  The Department Failed to Consider Alternatives to Repealing the Disclosure Requirements

3

4

311.   The Department stated in the Repeal that it "considered multiple

5

options regarding which metrics to disclose, which entity bears the burden of

6

computing them, and how to disseminate them to students and the public." 84 Fed. Reg. at 31,449.

7

312.   With respect to disclosures, the Department stated that it was "not

8

convinced that the GE disclosures are useful to students." 84 Fed. Reg. at 31,419. At

9

the same time, it acknowledged that information regarding "[a]ffordability and

10

earnings associated with institutions and programs continues to be an area of

11

interest" for students and their families. 84 Fed. Reg. at 31,445. And, as noted

12

*supra* ¶ 168, the Department declared in May 2019 that the 2019 disclosure

13

template would provide information that was "especially meaningful to students."

14

313.   The Department suggested numerous alternatives during negotiated

15

rulemaking. For example, in Issue Paper #6 provided before the second session, the

16

Department proposed requiring certain programs to disclose, on specific

17

programmatic websites, information about the primary occupation that the program

18

prepares students to enter, programmatic completion rates, program length,

19

enrollment numbers, the loan repayment rate, cost information, the job placement

20

rate, the percentage of Title IV recipients, median loan debt, completion rates,

21

earnings information, professional licensure information, accreditation status, and a

22

link to the College Navigator and College Scorecard websites.[38]

23

314.   By the third negotiated rulemaking session, the Department proposed

24

to narrow the information required to be disclosed, but nevertheless continued to

25

26

[38]  U.S. Dep't of Educ., *Program Disclosures*, First Amended Issue Paper No. 6, 2017–2018 Negotiated Rulemaking (Session No. 2, Feb. 5–8, 2018), *available at*: https://www2.ed.gov/policy/highered/reg/hearulemaking/2017/issuepaper6program informationdislcosures.pdf.

27

28

1  propose many of the same disclosure requirements included in the Gainful

2  Employment Rule.[39]

3      315.   In issuing the Repeal, the Department failed to provide any non-

4  conclusory explanations for rejecting an obvious alternative to complete repeal of

5  the Disclosure Requirements.

6      316.   The Department's failures are particularly troubling in light of its

7  reliance on a focus group report to support complete repeal of the Disclosure

8  Requirements, despite that report identifying an approach for disclosures that was

9  found to be both "helpful and important." Holly Bozeman *et al.*, *Summary Report*

10  *for the 2017 Gainful Employment Focus Groups*, Westat 1-1, 5-2 (Mar. 2017)

11  ("Focus Group Report").[40] Indeed, with respect to the "warning language that would

12  be added to a webpage if a program fails to meet U.S. Department of Education

13  standards," participants in the focus group found the "visual display" to be "very

14  effective." *Id.* at 5-6.

15      317.   The Department claimed in the Repeal that the Focus Group Report

16  showed that "students mostly want to know how students like them have done in

17  the program," 84 Fed. Reg. at 31,419, when in reality the report states:

18    **Prospective and current students looked for and valued a variety of**
      **types of information in their search for a college or program of study.**

19    Prospective students were asked what type of information has been
      most important for them in their search process; students were evenly

20    split between tuition costs, accreditation, and length of program.
      Current students were asked what type of information they had looked

21    for when considering a program, and similarly, tuition costs were most
      important, followed by schedule. In contrast to the prevailing opinion

22    that cost was a determining factor, one current student countered that
      it was "[n]ot about the money [spent], it's about the job that will last

23

24

25    [39]  *See, e.g.*, U.S. Dep't of Educ., *Program Disclosures*, Second Amended Issue
      Paper No. 6, 2017–2018 Negotiated Rulemaking (Session No. 3, Mar. 12–15, 2018),

26    *available at*: https://www2.ed.gov/policy/highered/reg/hearulemaking/2017/
      session3issuepapers6disclosures.pdf.

27
      [40]  The Focus Group Report is available online at:
28    https://www2.ed.gov/about/offices/list/ope/summaryrpt2017gefocus317.pdf.

1     the longest . . . . [I] don't want to waste time on something [if] I'm not
2     going to get anything out of it."

3     Focus Group Report at 2-1 (emphasis in original).

4         318.    Insofar as the Department asserted that the Gainful Employment Rule
5     had a disparate impact on proprietary institutions and that, "[w]ithout a statutory
6     change, there was no way to expand the GE regulations to apply to all institutions,"
7     84 Fed. Reg. at 31,394, the Department failed to consider that, even though it did
8     not have the authority to expand the Accountability Framework beyond those
9     programs that prepare students for gainful employment in a recognized occupation,
10    it did have the authority to expand the Transparency Framework to cover
11    additional institutions. *See, e.g.*, 79 Fed. Reg. at 64,890 (discussing how the
12    Department's authorities under 20 U.S.C. § 1221e-3 and 20 U.S.C. § 3474 "include
13    promulgating regulations that . . . require institutions to report information about
14    the program to the Secretary" and "require . . . institution[s] to disclose information
15    about the[ir] program[s] to students, prospective students, and their families, the
16    public, taxpayers, and the Government, and institutions"); 79 Fed. Reg. at 64,891
17    (describing how section 431 of the Department of Education Organization Act, 20
18    U.S.C. § 1231a, provides authority for the Transparency Framework insofar as that
19    provision permits the Secretary to "inform the public regarding federally supported
20    education programs; and collect data and information on applicable programs for
21    the purpose of obtaining objective measurements of the effectiveness of such
22    programs in achieving the intended purposes of such programs").

23        319.    Although the Department has purportedly tried to cure the harms
24    created by repealing the Disclosure Requirements through non-binding assertions
25    about its plans to update the College Scorecard (which, at the time of the
26    publication of the Repeal, it was "still developing," 84 Fed. Reg. at 31,424), the
27    Department never considered whether providing debt and earnings metrics on a
28    Departmental website is an adequate substitute for the Disclosure Requirements,

1    which are provided on institutional and programmatic websites, in marketing

2    materials, and via direct distribution to prospective and enrolled students.

3        320.    To the extent the Department had concerns with job placement rate

4    disclosures, the Department failed to consider the obvious alternative of adding an

5    explanation about how the rates are calculated to make clear to prospective

6    students whether they can make an apples-to-apples comparison across programs.

7    Nor did the Department consider the obvious alternative of developing a single

8    methodology for measuring and reporting job placement rates, despite the fact that

9    this was a known alternative to repeal. *See* 83 Fed. Reg. at 35,815 (convening, in a

10   different rulemaking proceeding, a negotiated rulemaking committee to consider,

11   *inter alia*, "[d]eveloping a single definition for purposes of measuring and reporting

12   job placement rates").

13   **8.  Post-Repeal Developments**

14       321.    On June 28, 2019, the Department issued Electronic Announcement

15   #122 ("EA122") regarding the "Early Implementation of the Rescission of the

16   Gainful Employment Rule."

17       322.    In EA122, the Department recognized that the Master Calendar Rule

18   requires that regulations affecting Title IV programs be published in final form by

19   November 1, prior to the start of the July 1 award year in which they become

20   effective. At the same time, the Department noted that the HEA permits the

21   Secretary to designate a regulation for early implementation, which allows those

22   subject to its terms to comply sooner if they wish to do so. *See* HEA § 482(c)(2), 20

23   U.S.C. § 1089(c)(2).

24       323.    In EA122, the Department stated that "[i]nstitutions that early

25   implement the rescission of the GE rule will not be required to report GE data . . .

26   for the 2018–2019 award year," which would otherwise be due on October 1, 2019.

27   In addition, "those institutions that early implement will not be required to comply

28   with the current requirements in 34 C.F.R. § 668.412(d) and (e) that require

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 5:20-cv-455          87

institutions to include the disclosure template, or a link thereto, in their GE program promotional materials and directly distribute the disclosure template to prospective students, which will be required starting on July 1, 2019."

324. In EA122, the Department also stated that "[i]nstitutions that early implement will no longer be required to post the GE Disclosure Template and may remove the template and any other GE disclosures that are required under 34 C.F.R. [§] 668.412 from their web pages. Finally, an institution that early implements will not be required to comply with the certification requirements for GE programs under 34 C.F.R. [§] 668.414."

325. On or about September 13, 2019, the Department issued Electronic Announcement #123 ("EA123"), which, like EA122, provides that institutions that "choose to early implement" will not be required to report GE data for the 2018–19 award year. The Department made clear in EA123 that institutions "that do not early implement the rule are still expected to comply with the 2014 rule until the rescission becomes effective on July 1, 2020."

326. By choosing to early implement the Repeal, the Department relieved institutions of their regulatory obligations to comply with the Certification, Reporting, and Disclosure Requirements. The Department does not track which institutions have chosen to early implement.

327. Since publication of the Repeal, the Department also released a "redesign" of the College Scorecard website, which it asserts provides "customized, accessible, and relevant data on potential debt and earnings based on field of study (including for 2-year programs, 4-year degrees, certificate programs, and some graduate programs), graduation rates, and even apprenticeships."[41]

---

[41] Press Release, U.S. Dep't of Educ., *Secretary DeVos Delivers on Promise to Provide Students Relevant, Actionable Information Needed to Make Personalized Education Decisions* (Nov. 20, 2019), *available at:* https://www.ed.gov/news/press-

328.   The information provided by the updated College Scorecard is not a substitute for the information required to be reported and disclosed under the Gainful Employment Rule.

329.   For example, the Gainful Employment Rule required that institutions provide the required disclosures on: (i) "any Web page containing academic cost, financial aid, or admissions information;" (ii) in "all promotional materials made available by or on behalf of an institution;" and (iii) by "direct distribution" to prospective students, either by email or hand-delivery. *See* 34 C.F.R. § 668.412(c)–(e). By contrast, interested parties must visit the College Scorecard website to review information about an institution's offerings. Further, while the Gainful Employment Rule required an "institution that offers a GE program in more than one program length" to publish a "separate disclosure template for each length of the program," 34 C.F.R. § 668.412(f), the College Scorecard does not separate GE programs by length.

330.   Still further, although the Gainful Employment Rule defined covered programs in terms of a six-digit CIP code, the "[College] Scorecard uses the first four digits of the CIP code in its calculations."[42] As a result, the updated College Scorecard aggregates information from disparate programs. For example, the Scorecard would include together the following types of programs:

---

releases/secretary-devos-delivers-promise-provide-students-relevant-actionable-information-needed-make-personalized-education-decisions.

[42]   *See* U.S. Dep't of Education, *Technical Documentation: College Scorecard Data by Field of Study* 1, 13 (Nov. 20, 2019), *available at*: https://collegescorecard.ed.gov/assets/FieldOfStudyDataDocumentation.pdf. Notably, although the Department sought to justify its use of four-digit CIP information in the Scorecard by claiming that it can provide "more information that is not privacy-suppressed," it recognized that the "trade-off" of using four-digit CIP, instead of six-digit CIP, was the "loss of granularity in describing individual program offerings by institutions." *Id.*

> A program that focuses on the principles and practice of administration in four-year colleges, universities and higher education systems, the study of higher education as an object of applied research, and which may prepare individuals to function as administrators in such settings. Includes instruction in higher education economics and finance; policy and planning studies; curriculum; faculty and labor relations; higher education law; college student services; research on higher education; institutional research; marketing and promotion; and issues of evaluation, accountability and philosophy.[43]

with the following:

> A program that focuses on early childhood educational program administration and prepares individuals to serve as a principal or director of an early childhood educational program. Includes instruction in early childhood education, program and facilities planning, budgeting and administration, public relations, human resources management, early childhood growth and development, counseling skills, applicable law and regulations, school safety, policy studies, and professional standards and ethics.[44]

331.    There is a meaningful difference in information and data regarding programs if the information is provided at a four-digit CIP code level as opposed to a six-digit CIP code level. *See supra* ¶¶ 91–95.

332.    As an example, according to the 2015 D/E rates measure data the Department released in 2017, a master's degree program at Capella University—a proprietary institution—corresponding to the six-digit CIP code for "Educational Leadership and Administration, General" (CIP Code 13.0401) had a median earnings value of $57,339, whereas a master's degree program at Capella University corresponding to the six-digit CIP code for "Higher Education/Higher Education Administration" (CIP Code 13.0406) had a median earnings value of $43,156. Because these programs share a four-digit CIP code, but not a six-digit CIP code, the College Scorecard does not differentiate between them. Therefore, a prospective student looking at the College Scorecard will not be able to differentiate

---

[43] Nat'l Ctr. for Educ. Statistics, *IPEDS Detail for CIP Code 13.0406*, https://nces.ed.gov/ipeds/cipcode/cipdetail.aspx?y=56&cipid=90420.

[44] Nat'l Ctr. for Educ. Statistics, *IPEDS Detail for CIP Code 13.0414*, https://nces.ed.gov/ipeds/cipcode/cipdetail.aspx?y=56&cipid=93060.

1    the programs or determine which program tends to lead to higher post-graduation

2    earnings.

3        333.    Similarly, according to that same data, a master's degree program at

4    Capella University corresponding to the six-digit CIP code for "Adult and

5    Continuing Education and Teaching" (CIP Code 13.1201) had a median earnings

6    value of $56,675, whereas a master's degree program at Capella University

7    corresponding to the six-digit CIP code for "Early Childhood Education and

8    Teaching" (CIP Code 13.1210) had a median earnings value of $40,022. Because

9    these programs share a four-digit CIP code, but not a six-digit CIP code, the College

10   Scorecard does not differentiate between them. Therefore, a prospective student

11   looking at the College Scorecard will not be able to differentiate the programs or

12   determine which program tends to lead to higher post-graduation earnings.

13       334.    Likewise, according to that same data, a master's degree program at

14   Grand Canyon University corresponding to the six-digit CIP Code for "Educational

15   Leadership and Administration, General" (CIP Code 1304.01) had a median

16   earnings value of $57,252, whereas a master's degree program at Grand Canyon

17   University corresponding to the six-digit CIP Code for "Educational, Instructional,

18   and Curriculum Supervision" (CIP Code 1304.04) had a median earnings value of

19   $45,838. Because these programs share a four-digit CIP code, but not a six-digit CIP

20   code, the College Scorecard does not differentiate between them. Therefore, a

21   prospective student looking at the College Scorecard will not be able to differentiate

22   the programs or determine which program tends to lead to higher post-graduation

23   earnings.

24       335.    Without information at the six-digit CIP code level, prospective and

25   enrolled students will not be able to make an accurate assessment of whether the

26   earnings they are likely to make post-graduation are worth the cost of tuition for a

27   given program.

28   / / /

336.   In addition, although the College Scorecard provides both earnings and debt information for some programs, albeit identified by four-digit CIP code, in no case does the Department provide the type of information necessary to compare earnings to debt, including no way for a student to determine whether median post-graduation debt is too high, given median post-graduation earnings. Moreover, even if the College Scorecard did compare earnings to debt, the earnings data comes from students graduating in 2015 and 2016. Debt data, on the other hand, was collected from students who graduated in 2016 and 2017.

337.   The College Scorecard does not inform students whether any program prepares students for gainful employment in a recognized occupation. Nor does the College Scorecard provide a warning to prospective and enrolled students that a program is at risk of losing Title IV eligibility due to a failure to prepare students for gainful employment in a recognized occupation.

## 9.   The Department Continues to Rely on 2014 GE Data and the Eligibility Metrics for Other Purposes

338.   Throughout the Repeal, the Department reiterated its apparent position that the Eligibility Metrics were "arbitrary," "lack[ed] an empirical basis," and were published without a "sufficient, objective, and reliable basis."

339.   Nevertheless, before, during, and even after publication of the Repeal, the Department incorporated the Eligibility Metrics and D/E rates measure into its administration of the "Borrower Defense" Rule and relied upon these very calculations to justify its actions as non-arbitrary.

340.   As relevant here, the 1995 Borrower Defense Rule is a regulation under which students can seek and obtain discharges of their federal student loan debt based on an act or omission of an institution of higher education that would give rise to a cause of action against the school under applicable state law. *See*

///

///

1   *generally* 34 C.F.R. § 685.206(c)(1) (applicable to loans issued between July 1, 1995
2   and July 1, 2017).[45]

3   341.   The regulation provides that "[i]f the borrower's defense against
4   repayment is successful, the Secretary notifies the borrower that the borrower is
5   relieved of the obligation to repay all or part of the loan and associated costs and
6   fees that the borrower would otherwise be obligated to pay." 34 C.F.R.
7   § 685.206(c)(2).

8   342.   Between 2015 and 2017, the Department fully discharged the loans of
9   students who attended particular programs at institutions owned by Corinthian
10  Colleges, Inc. ("CCI") pursuant to the 1995 Borrower Defense Rule. In 2017,
11  however, the Department changed its approach under the 1995 Borrower Defense
12  Rule and decided that, when a valid Borrower Defense claim had been brought by or
13  on behalf of a former CCI student, the amount of relief granted would be
14  determined by comparing the average 2014 earnings of a subset of CCI students
15  with the average 2014 earnings of students from "peer" institutions that offered
16  comparable programs and were considered to be passing the D/E rates measure
17  using information released in January 2017, *supra* ¶¶ 150–151 (the "Average
18  Earnings Rule").

19  343.   On December 20, 2017, a class of students filed suit to challenge the
20  Department's new approach. *See generally* Compl., *Calvillo Manriquez v. DeVos*,
21  345 F. Supp. 3d 1077 (N.D. Cal. 2018) (No. 3:17-cv-07210-SK).

22

23

24  [45]   The 1995 Borrower Defense Rule was modified by the Department in 2016
    (effective July 1, 2017) and again in 2019 (effective July 1, 2020). *See* Student
25  Assistance General Provisions, Federal Perkins Loan Program, Federal Family
    Education Loan Program, William D. Ford Federal Direct Loan Program, and
26  Teacher Education Assistance for College and Higher Education Grant Program, 81
    Fed. Reg. 75,926 (Nov. 1, 2016); Student Assistance General Provisions, Federal
27  Family Education Loan Program, and William D. Ford Federal Direct Loan
    Program, 84 Fed. Reg. 49,788 (Sept. 23, 2019).
28

344.   On May 25, 2018, the District Court enjoined the Department from using the "Average Earnings Rule" because the plaintiffs had shown a likelihood of success on the merits that the Department had violated the Privacy Act. *Calvillo Manriquez*, 345 F. Supp. 3d at 1099.

345.   The Department appealed. Following the submission of written briefs and oral argument, the United States Court of Appeals for the Ninth Circuit ordered the parties to submit supplemental briefing on whether the "Average Earnings Rule" was arbitrary and capricious.

346.   In its supplemental brief, the Department repeatedly relied upon the Gainful Employment Rule to argue that the "Average Earnings Rule" was not arbitrary and capricious because, in part, a comparison between *passing* GE programs and CCI programs is a non-arbitrary component to calculating the amount of loan discharge afforded to former CCI students. *See generally* Supplemental Br. of Defs.-Appellees, *Calvillo Manriquez v. DeVos*, No. 18-16375 (9th Cir. Mar. 5, 2019). For example, the Department noted how "limiting the comparator programs to those with passing Gainful Employment scores *helped* Corinthian borrowers." *Id.* at 13 (emphasis in original). The Department also asserted that "[a]verage earnings for the subset of programs with passing Gainful Employment scores are, as might be expected, 'higher' than the average earnings for schools generally." *Id.* Finally, the Department argued that "limiting the comparison to schools with passing Gainful Employment scores made the earnings of Corinthian borrowers seem comparatively lower and had the effect of increasing the amount of loan forgiveness Corinthian borrowers received." *Id.*

347.   On December 10, 2019, the Department announced a new methodology for determining the amount of relief it would provide borrowers who stated a valid Borrower Defense claim under the 1995 Borrower Defense Rule. For students who stated valid claims with respect to schools that were both "non-operational" and "for which there is 2014 GE earnings data," the Department's stated policy is to use the

1    2014 data "to establish the borrower defense applicant's program earnings, and the

2    earnings for the comparison group." *See* U.S. Dep't of Educ., *Policy Statement Re:*

3    *Tired Relief Methodology to Adjudicate Certain Borrower Defense Claims* 1, 7 (Dec.

4    10, 2019) ("2019 Borrower Defense Policy Statement").[46]

5         348.    In the 2019 Borrower Defense Policy Statement, the Department

6    stated that "the use of GE earnings data for determining [a borrower's] harm is

7    appropriate." *Id.* at 8. But, the Department did not mention or distinguish how it

8    had repeatedly criticized the very same earnings data in the Repeal. *See, e.g.*, 84

9    Fed. Reg. at 31,410 (describing how the "SSA data may be inaccurate"); 84 Fed. Reg.

10   at 31,409 (noting that the "earnings portion of the D/E calculation [is] subject to

11   significant errors").

12        349.    Despite representing in the Repeal that using the SSA earnings data

13   could lead to "significant errors," 84 Fed. Reg. at 31,409, the Department has used

14   that very same data to deny full debt relief to defrauded students. The fact that the

15   Department relies on the SSA earnings data to serve one policy goal (effectuating

16   incomplete loan relief), while claiming that using the same data could lead to

17   "significant errors" to serve another policy goal (repealing the Gainful Employment

18   Rule) demonstrates that the Repeal was not based on any legitimate position that

19   such data was unreliable.

20                           **CAUSES OF ACTION**

21                                **COUNT 1**

22            **Agency Action that is Arbitrary, Capricious, and**
23       **Not in Accordance with Law Due to Failures to Properly**
                  **Interpret the Statutory Mandate**

24        350.    Plaintiffs repeat and incorporate by reference each of the foregoing

25   allegations as if fully set forth herein.

26

27   ───────────────

     [46]  The 2019 Borrower Defense Policy Statement is available online at:
28   https://www.ed.gov/sites/default/files/documents/borrower-defense-relief.pdf.

351.   The APA requires courts to "set aside agency action, findings, and conclusions found to be[] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

352.   The Repeal is a "final agency action for which there is no other adequate remedy in a court" and is "subject to judicial review." 5 U.S.C. § 704; *see id.* § 702.

353.   During the course of multiple lawsuits, courts have uniformly concluded that the gainful employment provision of the HEA is ambiguous, leaving a regulatory gap for the Department to fill. *APSCU I*, 870 F. Supp. 2d at 145–46; *APC v. Duncan*, 107 F. Supp. 3d at 358–60; *APSCU III*, 110 F. Supp. 3d at 184–89, *aff'd, APSCU Appeal*, 640 F. App'x at 7. *See supra* ¶¶ 77–80, 142–149.

354.   Despite these holdings, in issuing the Repeal, the Department asserted that the statute is *unambiguous* and that, by repealing the Gainful Employment Rule in its entirety, "it, in fact, *is* enforcing the law as written and as intended." 84 Fed. Reg. at 31,401 (emphasis in original). The Department also stated, without acknowledging these holdings, that "[t]he Department does not agree that it needs to define the term 'gainful employment' beyond what appears in statute. Since it was added to the HEA in 1968, the term 'gainful employment' has been widely understood to be a descriptive term that differentiates between programs that prepare students for named occupations and those that educate students more generally in the liberal arts and humanities." 84 Fed. Reg. at 31,401. *See supra* ¶ 189.

355.   By contradicting numerous federal courts that have held otherwise, without acknowledging or explaining its divergence from these judgments, the Department has acted in a manner that is arbitrary, capricious, and otherwise not in accordance with law.

356.   Because the Department had previously, and repeatedly, asserted that the relevant statutory language was ambiguous, the Department also acted

1    arbitrarily, capriciously, and not in accordance with law by failing to provide a

2    sufficient justification for its changed interpretation of the statute. *Supra* ¶¶ 190–

3    193.

4        357.   Insofar as the Department asserts that leaving an ambiguous term

5    undefined is simply "enforcing the law as written," *supra* ¶ 189, and by failing to

6    elucidate that provision by regulation, the Department has acted in a manner that

7    is arbitrary, capricious, and otherwise not in accordance with law within the

8    meaning of the APA, 5 U.S.C. § 706.

9        358.   In addition, by taking this position, the Department specifically limited

10   its interpretation to "two words in the HEA," "gainful employment," 84 Fed. Reg. at

11   31,411, but did not consider the entire statutory command. For example, in a

12   section entitled "Is there a need to define gainful employment?" the Department

13   notes that a commenter "stated that the Department must establish a definition for

14   the term 'gainful employment in a recognized occupation.'" 84 Fed. Reg. at 31,401.

15   But in responding to that comment, the Department's entire discussion focuses on

16   the need to "define the term 'gainful employment,'" stating that "[t]he Department

17   does not agree that it needs to define the term 'gainful employment' beyond what

18   appears in statute." 84 Fed. Reg. at 31,401.

19       359.   By limiting its statutory interpretation to the narrow phrase "gainful

20   employment," instead of the more complete phrase "prepare students for gainful

21   employment in a recognized occupation," the Department interpreted the statutory

22   language in a manner that is contrary to the holdings of numerous federal courts

23   recognizing that the "relevant statutory command" for the purposes of determining

24   eligibility for certain institutions and programs under Title IV is that programs

25   "prepare students for gainful employment in a recognized occupation." *See, e.g.*,

26   *APSCU I*, 870 F. Supp. 2d at 146 (noting that, "importantly[,] . . . the relevant

27   statutory command is that a given program 'prepare students for gainful

28   employment in a recognized occupation,'" and contrasting that language with the

1  more narrow phrase, "gainful employment"); *APC v. Duncan*, 107 F. Supp. 3d at 359

2  (agreeing with and incorporating the holding of *APSCU I*); *APSCU III*, 110 F. Supp.

3  3d at 185 (analyzing the complete version of the statutory language, including the

4  meaning of the word "prepare"), *aff'd*, *APSCU Appeal*, 640 F. App'x 5 (D.C. Cir.

5  2016). *See supra* ¶¶ 82, 150–51.

6      360.    By failing to consider the complete portion of the statutory language,

7  and limiting its interpretation to an incomplete portion, the Department has acted

8  in a manner that is arbitrary, capricious, and otherwise not in accordance with law

9  within the meaning of the APA, 5 U.S.C. § 706.

10                            **COUNT 2**

11          **Agency Action that is Arbitrary, Capricious, and Not in**
           **Accordance with Law Due to its Disregard for, and**
12          **Refusal to Interpret and Apply, a Statutory Mandate**

13      361.    Plaintiffs repeat and incorporate by reference each of the foregoing

14  allegations as if fully set forth herein.

15      362.    In order for certain institutions to participate in Title IV, HEA

16  programs with respect to certain postsecondary programs, those programs must

17  prepare students for gainful employment in a recognized occupation. *Supra* ¶¶ 69–

18  70.

19      363.    In the Repeal, the Department acknowledged and admitted that it has

20  a stated policy of ignoring this Congressional mandate. For example, the

21  Department stated that "programs with non-passing results will benefit from

22  avoiding ineligibility." 84 Fed. Reg. at 31,446. The Department also highlighted the

23  extent to which "non-passing programs remain accessible with the rescission of the

24  2014 Rule." 84 Fed. Reg. at 31,445.

25      364.    Insofar as the Department has adopted a regulation that completely

26  disregards and refuses to interpret and apply a statutory mandate, the Department

27  has acted in a manner that is arbitrary, capricious, and otherwise not in accordance

28  with law within the meaning of the APA, 5 U.S.C. § 706.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 5:20-cv-455                    98

1

## COUNT 3

2
3

### Agency Action that is Arbitrary, Capricious, and
### Not in Accordance with Law Due to its Reliance on
### Impermissible Factors

4
5

365.   Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

6
7
8

366.   An agency decision will normally be deemed arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider[.]" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

9
10
11
12
13
14
15
16
17

367.   In the HEA, Congress created a statutory distinction between degree programs offered by public and non-profit institutions, on the one hand, and programs offered by proprietary and postsecondary vocational institutions (and non-degree programs at public and non-profit institutions), on the other, whereby public and non-profit institution degree programs that are not required to prepare students for gainful employment can be Title IV eligible, whereas proprietary and postsecondary vocational institutions are only Title IV eligible with respect to programs that prepare students for gainful employment in a recognized occupation. *See supra* ¶¶ 69–70.

18
19

368.   In the Repeal, the Department relied on factors that Congress, as demonstrated by this statutory scheme, did not intend for it to consider.

20
21
22
23
24
25
26
27
28

369.   The Department based the Repeal on its view that the Gainful Employment Rule disproportionately impacted proprietary institutions. *See, e.g.*, 84 Fed. Reg. at 31,392 ("[T]he GE regulations have a disparate impact on proprietary institutions and the students these institutions serve."); *id.* at 31,394 (justifying the Repeal on the basis that "there was no way to expand the GE regulations to apply to all institutions"); 84 Fed. Reg. at 31,396 (asserting that the "limited applicability of the 2014 Rule to some, but not all, higher education programs makes it an inadequate solution for informing consumer choice and addressing loan default issues"). *See supra* ¶ 194.

370.   The Department also asserted that the Gainful Employment Rule created an "uneven playing field" between public institutions and for-profit institutions, given that public institutions "benefit from direct appropriations" from states in the form of "taxpayer subsidies." 84 Fed. Reg. at 34,397. *See supra* ¶ 195.

371.   The Department further asserted that there is a "need for an accountability and transparency framework that applies to all [T]itle IV programs and institutions," 84 Fed. Reg. at 31,394, and that the Gainful Employment Rule did not adequately solve the problems that extended beyond proprietary institutions. *See supra* ¶¶ 196–197.

372.   The Department's reliance on its view that: (i) the Gainful Employment Rule disproportionally affects proprietary institutions; (ii) the Gainful Employment Rule created an "uneven playing field" between proprietary and public institutions; and (iii) there is a need for accountability for *all* institutions and programs, not merely gainful employment programs, constitutes a policy disagreement with Congress over the distinction Congress created between programs that must "prepare students for gainful employment in a recognized occupation" in order to be eligible to receive Title IV funds and those that do not need to meet that standard to be eligible. *See supra* ¶¶ 198–199.

373.   To the extent the Gainful Employment Rule had a larger effect on proprietary institutions than other types of institutions, such an effect was consistent with the clear intent of Congress that the Department consider one type of program and institution differently than other programs and institutions. *See supra* ¶¶ 194–202. Rather than acknowledge and accept that statutory scheme, the Department relied on an effect of that statutory distinction as a basis for the Repeal. In this regard, the Department has relied on factors that Congress has not intended for it to consider and has therefore acted in a manner that is arbitrary, capricious, and otherwise not in accordance with law within the meaning of the APA, 5 U.S.C. § 706.

# COUNT 4

### Agency Action that is Arbitrary, Capricious, and Not in Accordance with Law Due to its Elimination of the Disclosure Requirements

374. Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

375. In the Gainful Employment Rule, as part of the Transparency Framework, the Department established a series of disclosure requirements wherein an institution "must use" a Secretary-developed "disclosure template . . . to disclose information about each of its GE programs to enrolled and prospective students." 34 C.F.R. § 668.412(a). *See supra* ¶¶ 134, 137–138.

376. In enacting the Disclosure Requirements in 2014, the Department stated that "[t]he disclosure requirements will help ensure students, prospective, students, and their families, the public, taxpayers, and the Government, and institutions have access to meaningful and comparable information about student outcomes and the overall performance of GE programs." 79 Fed. Reg. at 64,891. The "helpful[ness] and importan[ce]" of the Disclosure Requirements were confirmed in the Focus Group Report. *See supra* ¶¶ 316–317.

377. By repealing the Disclosure Requirements without a reasonable explanation, the Department is depriving both prospective and enrolled students, including Individual Plaintiffs, of critical information about the programs they are attending or considering attending, which is required to be disclosed under the Gainful Employment Rule. Individual Plaintiffs are deprived of information necessary to make an informed decision regarding enrollment, and, as a result, may choose programs that will lead them to incur debt that they will be unable to afford to repay. *See supra* ¶¶ 44–52.

378. The repeal of the Disclosure Requirements is arbitrary and capricious in at least five ways.

/ / /

379.    First, the Department eliminated the Disclosure Requirements in their entirety, without actual consideration of regulatory alternatives. *See supra* ¶¶ 311–320. For example, the Department stated in the Repeal—but not in the 2018 NPRM—that a justification for rescinding the Disclosure Requirements is that "[c]onsumer testing has revealed that students mostly want to know how students like them have done in the program." 84 Fed. Reg. at 31,419. But the Department failed to consider that the Disclosure Requirements require institutions to disclose those kinds of facts and, to the extent the Department disagrees that the existing disclosure requirements accomplish this goal, the Department also failed to consider that the Gainful Employment Rule affords the Department the ability to modify the precise topics as part of the disclosure template.

380.    The Department's proposals during the negotiated rulemaking process, the Department's consideration of regulatory alternatives in prior rulemakings, and comments submitted in response to the 2018 NPRM all demonstrate that the Department was aware of regulatory alternatives. *See, e.g.*, *supra* ¶ 313. Nevertheless, the Department did not seek comment on those alternatives during the comment period, nor did it provide a sufficient explanation for its rejection of those alternatives in the Repeal. *See supra* ¶ 315.

381.    Second, throughout the preamble to the Repeal, the Department indicates that it intends to "address concerns" with the repeal of the Disclosure Requirements by expanding the College Scorecard. *See, e.g.*, 84 Fed. Reg. at 31,394 ("However, to address concerns that by rescinding the 2014 Rule some students would be more likely to make poor educational investments, the Department describes in this document our preliminary plans for the expansion of the College Scorecard."). *See supra* ¶¶ 301–302. Later, the Department refers to information that "will be provided through the expanded College Scorecard or other consumer information tools, such as College Navigator." 84 Fed. Reg. at 31,395; *see also* 84 Fed. Reg. at 31,406 ("This is another reason why we are rescinding the GE

1  regulations and proposing to expand the College Scorecard."); *id.* at 31,408

2  (referring to the "expanded College Scorecard"); 84 Fed. Reg. at 31,411 ("We think

3  consumers should make those decisions for themselves, aided by information the

4  Department plans to make available through the College Scorecard."); 84 Fed. Reg.

5  at 31,419 ("The Department will now provide outcomes data to all students using

6  the College Scorecard, or its successor, which has the advantage of reducing the

7  burden on institutions and allowing students to more easily compare outcomes

8  among the institutions and programs available to them.").

9      382.   In relying on the College Scorecard as a substitute for the Disclosure

10  Requirements, the Department also states that, "[s]ince we are still developing the

11  tool and are not required to publish regulations in order to produce the College

12  Scorecard, we will not commit to all of the particulars of its content in this final

13  regulation." 84 Fed. Reg. at 31,424.

14     383.   The plans the Department does reveal in Appendix A, *see supra* ¶ 303,

15  demonstrate that even an "Expanded [S]corecard" is not an adequate substitute for

16  the Disclosure Requirements. For example, under the 2017 disclosure template,

17  institutions were required to disclose the "[p]ercent of students graduating on time

18  for each program." 84 Fed. Reg. at 31,435. The Department's plans for expanding

19  the scorecard with respect to completion rates asserts that an expanded College

20  Scorecard "*could include*" program-level information, not that it would. 84 Fed. Reg.

21  at 31,435 (emphasis added). Similarly, the 2017 disclosure requirement included

22  information about costs of the program, but under the current and expanded

23  Scorecard, cost information would be at the "institution level." 84 Fed. Reg. at

24  31,435. Institution-level information (rather than program-level information) does

25  not provide sufficiently detailed information for prospective and enrolled students to

26  make informed decisions.

27     384.   The Department's replacement of existing disclosure requirements

28  with vague, undeveloped, and "preliminary plans for the expansion of the College

1   Scorecard"—that it is under no compulsion to implement or maintain—is arbitrary

2   and capricious, insofar as preliminary, non-binding plans to take future action do

3   not mitigate the harm that students will be "more likely to make poor educational

4   investments" as a result of the Repeal. 84 Fed. Reg. at 31,394. Moreover, the

5   Department has failed to adequately justify the departure from its 2014 conclusion

6   that direct distribution of disclosures to students was "more effective in ensuring

7   that students obtain critical information about program-level student outcomes"

8   than making information available on the Department's website. 79 Fed. Reg. at

9   64,978. *See supra* ¶¶ 305–307.

10      385.   The Department's non-binding update to the College Scorecard in

11   November 2019 is not a substitute for the Gainful Employment Rule, nor does it

12   ameliorate the Department's failures to comply with the APA in the Repeal. For

13   example, not only is the College Scorecard not provided directly to prospective and

14   enrolled students by direct distribution, but also it provides data at the four-digit

15   CIP code level, rather than the six-digit level and, thus, is not as specific and

16   precise as the information provided under the Gainful Employment Rule. *See supra*

17   ¶¶ 91–95, 138, 329–337. Nor does the College Scorecard provide a warning to

18   prospective and enrolled students that a program is at risk of losing Title IV

19   eligibility due to a failure to prepare students for gainful employment in a

20   recognized occupation. *See supra* ¶¶ 113–114, 309, 337.

21      386.   Third, as part of its justification for the Repeal, the Department

22   asserted in the 2018 NPRM that it "underestimated" the "burden" that the

23   disclosure aspects of the regulations would have on institutions. *See, e.g.*, 83 Fed.

24   Reg. at 40,173 ("The Department also believes that it underestimated the burden

25   associated with distributing the disclosures directly to prospective students."); 83

26   Fed. Reg. at 40,177 ("Furthermore, when developing the GE regulations, the

27   Department, as noted in feedback received from multiple institutions,

28   underestimated the burden on institutions associated with the use of a

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** – 5:20-cv-455          104

1  standardized disclosure template in publishing program outcomes and distributing

2  notifications directly to prospective and current students."). *See supra* ¶ 294. But

3  these and other statements regarding administrative burden lacked evidence, *see*

4  *supra* ¶¶ 295–298, and were inconsistent with its prior statements regarding the

5  extent of that burden, *id.* ¶¶ 299–300.

6      387.   Fourth, the Department's elimination of the Disclosure Requirements

7  based on concerns regarding the precise disclosures to be required is also arbitrary

8  and capricious insofar as the Gainful Employment Rule already afforded the

9  Secretary discretion to identify, with greater specificity, the information that must

10  be included in the template and to design an appropriate template for the

11  disclosures. 34 C.F.R. § 668.412.

12     388.   Fifth, to the extent the Department's elimination of the Disclosure

13  Requirements was premised on the fact that it was too narrowly targeted towards

14  gainful employment programs (*i.e.*, that it "fails to provide transparency regarding

15  program-level debt and earnings outcomes for all academic programs," 84 Fed. Reg.

16  at 31,392), the Department acted arbitrarily and capriciously by failing to consider

17  how its broad statutory authority to impose disclosure requirements could be used

18  with respect to programs other than those that purport to prepare students for

19  gainful employment in a recognized occupation. *See* 81 Fed. Reg. at 76,017 ("The

20  HEA authorizes the Department to adopt disclosure regulations as does the general

21  authority of the Secretary in 20 U.S.C. § 1221e–3 and 20 U.S.C. § 3474.").

22     389.   Given that the Department has: (i) failed to consider or justify its

23  rejection of known alternatives to a repeal of the Disclosure Requirements;

24  (ii) based the Repeal on a non-binding policy that the agency will disclose additional

25  information in the future; (iii) asserted that it underestimated the burden created

26  by the Gainful Employment Rule without evidence or data to substantiate that

27  claim, while simultaneously estimating that the reduction in burden via repeal is

28  equivalent to the burden created; (iv) failed to recognize that the Gainful

Employment Rule already afforded the Department the discretion to identify appropriate disclosures; and (v) failed to consider how its statutory authorities could be used to remedy problems the Department identified with the Gainful Employment Rule, the Department has acted in a manner that is arbitrary, capricious, and otherwise not in accordance with law within the meaning of the APA, 5 U.S.C. § 706.

## COUNT 5

### Agency Action that is Arbitrary, Capricious, and Not in Accordance with Law Due to its Failure to Consider Alternative Continuing Eligibility Metrics & Thresholds

390.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

391.    In promulgating and repealing regulations, federal agencies are required to consider reasonably obvious alternatives to the chosen policy that could serve the agency's identified goals. In its consideration of those alternatives, the agency must give a reasoned explanation for its rejection of those alternatives. The agency's failure to do so constitutes arbitrary and capricious decision-making.

392.    To the extent the Department eliminated the D/E rates measure (and thus the thresholds) because it believed those metrics "lack[] sufficient accuracy and validity" or were published without a "sufficient, objective, and reliable basis," 84 Fed. Reg. at 31,407, the Department was obligated to consider known, common, and reasonable alternatives to those metrics and provide a reasoned explanation for its rejection of the same.

393.    The Department was aware of numerous obvious alternatives to the D/E rates measure formula and thresholds. *See supra* ¶¶ 253–261 (alternative metrics); *id.* ¶¶ 262–270 (alternative thresholds).

394.    For example, the Department was aware of, but failed to consider, numerous obvious alternatives to the formula for calculating the D/E rates

1  measure, including, but not limited to, alternative formulas or mechanisms to
2  calculate the discretionary income rate and the annual earnings rate, such as
3  changes to the formula for calculating the annual loan payment and/or the
4  amortization period. The Department previously considered such alternatives in the
5  2011 GE Rule, proposed them itself in the 2014 NPRM, discussed them during the
6  2017–2018 negotiated rulemaking, and received public comments raising those
7  alternatives in response to the 2018 NPRM. *See supra* ¶¶ 252–261.

8       395.    The Department was also aware of numerous obvious alternatives to
9  the threshold for considering a program passing, failing, or in the "zone" with
10 respect to the D/E rates measure, insofar as the Department used such alternatives
11 in the 2011 GE Rule, proposed such alternatives in the 2014 NPRM, discussed such
12 alternatives during the 2017–2018 negotiated rulemaking, and received such
13 alternatives via public comments in response to the 2018 NPRM. *See supra* ¶¶ 263–
14 269.

15      396.    Yet the Repeal failed to consider reasonable alternatives to the D/E
16 rates measure or thresholds that were less drastic than the chosen policy of
17 complete repeal and that were neither unknown nor uncommon. To the extent the
18 Department did consider such alternatives, the Department failed to identify those
19 alternatives or give a reasoned explanation for the rejection of the alternatives.

20      397.    By failing to consider reasonable alternatives and failing to give a
21 reasoned explanation justifying the rejection of those alternatives, but nevertheless
22 publishing the Repeal, the Department has acted in a manner that is arbitrary,
23 capricious, and contrary to law within the meaning of the APA, 5 U.S.C. § 706.
24 / / /
25 / / /
26 / / /
27 / / /
28 / / /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNT 6

### Agency Action that is Arbitrary, Capricious, and Not in Accordance with Law Due to its Failure to Explain a Change in Position on Continuing Eligibility Metrics and Thresholds

398.   Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

399.   Agencies may change their existing policies if they provide a reasoned explanation for the change. When an agency changes its existing position, policy, or factual findings, it must display both an awareness that it is changing its position and that there are good reasons for the new policy. An unexplained inconsistency in an agency policy is a proper basis for holding an interpretation to be arbitrary and capricious.

400.   In promulgating the Gainful Employment Rule in 2014, the Department established the D/E rates measure as a means of determining whether a given program is preparing students for gainful employment in a recognized occupation. In the Repeal, however, the Department has departed from its prior statements and policies regarding the continuing eligibility metrics and thresholds without adequate explanation or justification.

401.   First, the Department has failed to provide a reasoned explanation for its change in position regarding the use of SSA earnings data. Although the Department has previously asserted that it "found no sources superior to the SSA [earnings data]," *see supra* ¶ 141, and although numerous courts (*e.g.*, *APSCU III* and *AACS*) have held that the use of SSA earnings data was rational, *id.* ¶¶ 148, 276, the Department now claims that SSA earnings data "may be inaccurate" in light of the issues with underreported tip income. *Id.* ¶ 348.

402.   Moreover, without justification or explanation, the Department continues to rely on the use of SSA earnings data for purposes of Borrower Defense relief determinations. *See supra* ¶ 347.

403. Second, the Repeal failed to provide a reasoned explanation for why the alternate earnings appeals process was insufficient to overcome any limitations created by the SSA earnings data. *See supra* ¶¶ 133, 165, 279–292.

404. Third, the Department failed to establish good reasons for deviating from the eight percent annual earnings threshold. For example, although the Department states in the Repeal that there was "no empirical basis for the 8 percent threshold and [the Department] will, therefore, no longer use it to determine [T]itle IV program eligibility," 84 Fed. Reg. at 31,407, the Department entirely failed to acknowledge the following sources, *see supra* ¶ 115, or provide a reasoned explanation for why its prior consideration of, and reliance on, these sources was no longer correct:

- Keith Greiner, *How Much Student Loan Debt Is Too Much?*, 26 J. of Student Fin. Aid 1*,* 7–19 (1996) (cited at 79 Fed. Reg. at 64,919 n.100);

- Patricia M. Scherschel, *Student Indebtedness: Are Borrowers Pushing the Limits?* USA Group Found. (Nov. 1998) (cited at 79 Fed. Reg. at 64,919 n.101);

- Steven A. Harrast, *Undergraduate Borrowing: A Study of Debtor Students and their Ability to Retire Undergraduate Loans*, 34 J. of Student Fin. Aid 1*,* 21–37 (2004) (cited at 79 Fed. Reg. at 64,919 n.102); *and*

- Tracey King & Ivan Frishberg, *Big Loans, Bigger Problems: A Report on the Sticker Shock of Student Loans*, The State PIRG's Higher Education Project (Mar. 2001), *available at:* www.pirg.org/highered/highered.asp?id2=7973 (cited at 79 Fed. Reg. at 64,919 n.103).

405. Fourth, the Department failed to provide a reasoned explanation for why its prior consideration of the Federal Housing Administration's underwriting standards regarding total debt levels, which the Consumer Financial Protection

1   Bureau also adopted, was no longer correct, nor did it display awareness that it had

2   previously relied on this source. *See supra* ¶ 119.

3       406.   Nor did the Department provide a reasoned explanation why its prior

4   consideration of the 1986 study by the National Association of Student Financial

5   Aid Administrators, *see supra* ¶ 116, or the study by Sandy Baum and Marie

6   O'Malley, *id.* ¶ 117, were no longer correct, nor did it display awareness that it had

7   previously relied on these sources.

8       407.   Fifth, the Department asserted that because it "used a different set of

9   thresholds that included 12 percent as the passing rate [in 2011]," rather than the

10  eight percent used in 2014, there was an "absence of a reasoned methodology for

11  distinguishing between passing and failing programs." 84 Fed. Reg. at 31,407. But

12  the Department failed to provide a reasoned explanation for why the Department's

13  2014 justification for this difference was inadequate or insufficient and failed to

14  even display awareness that the Department had previously explained this

15  distinction. *See* 79 Fed. Reg at 64,920.

16      408.   Sixth, the Department failed to provide a reasoned explanation for why

17  its prior conclusion that the twenty percent discretionary earnings threshold was a

18  reasonable way of ascertaining whether a program prepares students for gainful

19  employment in a recognized occupation was no longer correct. *See supra* ¶¶ 121–

20  122. The Department failed to provide a reasoned explanation and good reason why

21  it now believes that, "[i]n the 2014 Rule, the Department failed to provide a

22  sufficient, objective, and reliable basis for the 20 percent threshold for the debt-to-

23  discretionary income standard." 84 Fed. Reg. at 31,407.

24      409.   The sole justification that the Department provided for why the twenty

25  percent discretionary earnings threshold lacked a reasonable basis in 2014 and

26  lacks that same basis today is that a new income-driven repayment plan (REPAYE)

27  was introduced in 2015. According to the Department, REPAYE "renders the 20

28  percent debt-to-discretionary income threshold in the 2014 Rule obsolete since no

1    borrower would ever be required to pay more than 10 percent of their discretionary
2    income." 84 Fed. Reg. at 31,408. *See supra* ¶ 231.

3    410.    The Department's reliance on the REPAYE monthly payment amount
4    to counter the D/E rates measure does not constitute a reasoned explanation
5    because, *inter alia*: (i) the "discretionary income" used for purposes of REPAYE is
6    not the same as the "discretionary income rate" for purposes of the D/E rates
7    measure, *compare* 34 C.F.R. § 685.209(b)(1)(iii)(A) *with* 34 C.F.R. § 668.404(a)(1);
8    (ii) the Department's failed to distinguish between the debt-to-earnings rates,
9    which measure the average total debt compared to earnings of an identified group of
10   program completers, with the option of individual students to make lower monthly
11   payments on their student loans; and (iii) the Department failed to recognize that
12   the lower monthly payment option available to an individual student is not an
13   indication of, or replacement for, whether the program prepared that student for
14   gainful employment in a recognized occupation.

15   411.    Seventh, in issuing the Repeal, the Department failed to provide a
16   reasoned explanation for why its prior conclusion, that the four-year "zone" makes it
17   unlikely that fluctuations in labor market conditions could cause a passing program
18   to become ineligible, was incorrect. *See supra* ¶¶ 233–240.

19   412.    By failing to provide a good reason for its changes and ignoring or
20   countermanding its prior factual findings without reasoned explanation, but
21   nevertheless publishing the Repeal, the Department has acted in a manner that is
22   arbitrary, capricious, and contrary to law within the meaning of the APA, 5 U.S.C
23   § 706.

24                                    **COUNT 7**

25   **Agency Action that is Arbitrary, Capricious, and Not in**
     **Accordance with Law Due to its Failure to Consider**
26   **Alternative Certification Requirements**

27   413.    Plaintiffs repeat and incorporate by reference each of the foregoing
28   allegations as if fully set forth herein.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 5:20-cv-455          111

414. In the Gainful Employment Rule, the Department included the Certification Requirement, whereby an institution would establish a GE program's initial eligibility to participate in Title IV, HEA programs, as well as a process by which the Department determines whether a program remains eligible. *See supra* ¶¶ 98–100.

415. The Certification Requirement, set forth in 34 C.F.R. § 668.414, ensured "that a program eligible for [T]itle IV, HEA program funds meets certain basic minimum requirements necessary for students to obtain gainful employment in the occupation for which the program provides training." 79 Fed. Reg. at 64,911.

416. The Repeal eliminates, in its entirety, the Certification Requirement and *any process* by which the Department establishes a GE program's eligibility.

417. The Department did not consider any alternative certification requirement, despite obvious alternatives that were known and common. *See supra* ¶¶ 246–251. For example, in developing the Gainful Employment Rule in 2014, the Department heard from a commenter that it should require more expansive certification requirements. 79 Fed. Reg. at 64,990. *See supra* ¶ 248. At the time, the Department dismissed this consideration because it was "unnecessary in light of the requirements already provided by the regulation." 79 Fed. Reg. at 64,990. Given that the Repeal removed these requirements, the Department should have considered these known alternatives.

418. Alternative certification requirements were also presented during the 2017–2018 negotiated rulemaking. *See supra* ¶ 249 & n.27.

419. For example, prior to the second and third negotiated rulemaking sessions, the Department released issue papers that proposed revisions to 34 C.F.R. § 668.414. *See supra* ¶¶ 250–251. The Department did not consider these alternatives publishing the Repeal, and if they were considered, the Department did not give a reasoned explanation for their rejection.

/ / /

420.   By failing to consider reasonable alternatives, but nevertheless repealing the Certification Requirement, the Department has acted in a manner that is arbitrary, capricious, and contrary to law within the meaning of the APA, 5 U.S.C. § 706.

## COUNT 8

**Agency Action that is Arbitrary, Capricious, and Not in Accordance with Law Due to its Failure to Adequately Explain its Change in Position Regarding Certification Requirements**

421.   Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

422.   In 2014, the Department recognized that the Certification Requirement, in addition to requiring institutions to provide certain information to the Department, "creat[ed] an enforcement mechanism for the Department to take action if a required approval has been lost, or if a certification that was provided was false." 79 Fed. Reg. at 64,989. The Department also noted that the Certification Requirement had "minimal" burden on institutions and that "any burden [would be] outweighed by the benefits of the requirements[,] which . . . will help ensure that programs meet minimum standards for students to obtain employment in the occupations for which they receive training." 79 Fed. Reg. at 64,989. *See supra* ¶ 99.

423.   The Department also referred to the Certification Requirement as an "independent pillar of the accountability framework . . . that complement[s] the metrics-based standards." 79 Fed. Reg. at 64,990. *See supra* ¶ 100.

424.   The Repeal eliminates, in its entirety, the Certification Requirement and any process by which the Department establishes a GE program's eligibility to participate in Title IV.

425.   In the Repeal, the Department did not provide a reasoned explanation for why the Certification Requirement was no longer sound policy or any good reason to support having no certification requirement. *See supra* ¶¶ 246–251.

426.   The only arguable justification it provided came in response to a comment that "institutions of higher education should be required to certify [that] programs that lead to careers with State licensure requirements actually meet those State licensure standards." 84 Fed. Reg. at 31,424. In response to that comment, the Department asserted that it "considered disclosures related to licensure and certification" as part of a separate rulemaking process. 84 Fed. Reg. at 31,424. *See supra* ¶ 247.

427.   The Certification Requirement is different than the Disclosure Requirements, insofar as certifications are made to the Department and used by the Department for determinations of programmatic eligibility for Title IV participation. In contrast, disclosures are public-facing materials that both prospective and enrolled students, including Individual Plaintiffs, can readily access.

428.   Insofar as the Department has eliminated the Certification Requirement without sufficient acknowledgment, justification, explanation, or good reason, the Department has acted in a manner that is arbitrary, capricious, and otherwise not in accordance with law within the meaning of the APA, 5 U.S.C. § 706.

## COUNT 9

### Agency Action that is Arbitrary, Capricious, and Not in Accordance with Law Insofar as it is Unsupported by Substantial Evidence

429.   Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

430.   In issuing and repealing regulations, federal agencies are required to base their decisions on adequate factual support, meaning that agencies must have and rely upon enough relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1072 (9th Cir. 2015) (recognizing that the "arbitrary and capricious standard

1    incorporates the substantial evidence test" in the case of informal agency
2    proceedings).

3    431.   In issuing the Repeal, the Department failed to base its decision on
4    adequate factual support because the evidence before the agency established that
5    institutions of higher education are offering programs that do not prepare students
6    for gainful employment in a recognized occupation. Despite these facts, the
7    Department eliminated regulations designed to ensure implementation of the
8    HEA's statutory guardrails.

9    432.   In the Repeal, the Department has not considered substantial evidence
10   to justify its findings or changes in position. For example, in asserting that the D/E
11   rates measure is "scientifically invalid" because it fails to control for demographic
12   factors as part of the calculation, the Department failed to sufficiently consider or
13   explain the overwhelming evidence from its 2014 analysis that "student
14   characteristics of programs do not overly influence the performance of programs on
15   the D/E rates measure." 79 Fed. Reg. at 64,910; *see also, e.g.*, 79 Fed. Reg. at 64,923
16   ("[T]he Department has examined the effects of student demographic characteristics
17   on results under the annual earnings rate measure and does not find evidence to
18   indicate that the composition of a GE program's students is determinative of
19   outcomes."); 79 Fed. Reg. at 64,908 ("[W]e do not expect student demographics to
20   overly influence the performance of programs on the D/E rates measure. "). *See*
21   *supra* ¶¶ 132, 220–226.

22   433.   Even further, in changing its position about the effects of macro-
23   economic and labor market conditions on a program's likelihood of passing the D/E
24   rates measures, the Department has failed to analyze data within its possession, as
25   one commenter suggested. *See supra* ¶¶ 233–241.

26   434.   Compounding the Department's errors, the Repeal is also premised on
27   numerous misstatements regarding the limited research it does cite. For example:
28   / / /

a. The Department asserted in the Executive Summary that "research published in 2014—and discussed throughout [the Repeal]"—shows how the Gainful Employment Rule was insufficiently justified. 84 Fed. Reg. at 31,393. But the Department's only citation is to a working paper, the Lochner Paper, that was not peer-reviewed or published in final form, used a decades-old and small sample of bachelor's degree recipients, and admitted to shortcomings that render it unable to "statistically distinguish" between graduates of proprietary institutions and non-profit institutions. Yet the Department cited this paper for numerous propositions. *See* 84 Fed. Reg. at 31,393 nn. 5–6, 31,415 n.125, 31,423 n.164. *See also supra* ¶¶ 208–211.

b. The Department stated in the 2018 NPRM that "[r]esearch published subsequent to the promulgation of the GE regulations adds to the Department's concern about the validity of using D/E rates as to [sic] determine whether or not a program should be allowed to continue to participate in [T]itle IV programs." 83 Fed. Reg. at 40,171. But the Department did not indicate to what sources it was referring. When challenged on this statement under the Information Quality Act, the Department's response was, without citation or reference, that it "used well-respected, peer-reviewed references to substantiate its reasons throughout these final regulations for believing that D/E rates could be influenced by a number of factors other than program quality." 84 Fed. Reg. at 31,427. *See supra* ¶ 216.

c. The Department repeatedly cited its own "analysis" without description, discussion, or indication of that analysis's methodology or specific findings. *See, e.g.*, 84 Fed. Reg. at 31,398 n.27 & accompanying text (asserting that the Department's analysis of enrollment data suggests that students who enroll in proprietary institutions "are well

aware that other, lower cost options exist"); 84 Fed. Reg. at 31,405 (asserting, without a description of data or methodology, that the Department's "analysis of the outstanding student loan portfolio demonstrates that poor outcomes are not limited to [proprietary] institutions or the small number, relative to total postsecondary enrollment, of students who attend them"); 84 Fed. Reg. at 31,425 (asserting, in response to comments about the lack of analysis, that "[t]he Department has provided a more than rigorous review of data that was not considered in connection with the 2014 Rule," without describing that review or its underlying data). *See supra* ¶¶ 216–217.

d. The Department asserts that the Cellini & Darolia Paper shows that "differences in characteristics" (*e.g.*, financial independence, minority group status, single-parent status) "may explain disparities in student outcomes, including higher borrowing levels and student loan defaults among students who enroll at proprietary institutions." 84 Fed. Reg. at 31,393. In reality, the Cellini & Darolia Paper does the *opposite*, stating that "the relatively high for-profit cost (mostly tuition) is by far the largest predictor of this explained variation" in borrowing rates between for-profit and public two-year college students. *See supra* ¶¶ 205–206.

e. The Department makes numerous statements regarding the Cellini & Turner Paper that misconstrue its findings and methodology, including that it: (i) was not peer-reviewed, when it was; (ii) compared what employees earn in different fields, when the study compared earnings in the same fields; and (iii) failed to consider demographically-matched comparison groups beyond zip codes and birthdates, when it considered a wide array of demographic indicators. *See supra* ¶¶ 210–215.

///

435.   By failing to base its decision on the facts and evidence before it and nevertheless publishing the Repeal without adequate factual support or substantial evidence, the Department has acted in a manner that is arbitrary, capricious, and contrary to law within the meaning of APA, 5 U.S.C. § 706.

## COUNT 10

**Agency Action that is Arbitrary, Capricious, and Not in Accordance with Law Due to Defendants' Continued Reliance on the Gainful Employment Rule to Defend its Other Decisions**

436.   Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

437.   Throughout the Repeal, the Department asserted that the D/E rates measure "lack[ed] sufficient accuracy and validity" or was published without a "sufficient, objective, and reliable basis." *See supra* ¶ 231. The Department also asserted that the D/E rates measure was "scientifically invalid." *See supra* ¶¶ 219, 230. Yet the Department failed to provide a reasonable explanation for its use of, and continued reliance on, the D/E rate measure as part of its "Average Earnings Rule" to calculate the amount of Borrower Defense debt relief that should be provided to former CCI students. *See supra* ¶¶ 338–346.

438.   Both before and after the comment period, the Department argued in court that a comparison between passing GE programs and CCI programs was a non-arbitrary component of its calculations of the amount of loan discharges afforded to former CCI students. *See supra* at ¶ 346. For example, the Department noted how "limiting the comparator programs to those with passing Gainful Employment scores *helped* Corinthian borrowers" because "limiting the comparison to schools with passing Gainful Employment scores made the earnings of Corinthian borrowers seem comparatively lower and had the effect of increasing the amount of loan forgiveness Corinthian borrowers received." *See supra* at ¶ 346.

/ / /

439.   In publishing the Repeal, the Department has not explained the inconsistencies between its positions that: (i) limiting the Borrower Defense comparison to CCI programs, on the one hand, and comparable, passing GE programs on the other, supported the Department's position that the "Average Earnings Rule" was non-arbitrary; with its position that: (ii) the metrics used to determine whether a program was passing "had no empirical basis" (for the eight percent annual earnings threshold) and were without a "sufficient, objective, and reliable basis" (for the twenty percent discretionary income threshold).

440.   In publishing the Repeal, the Department has not explained why the SSA earnings data used in the Gainful Employment Rule is "subject to significant errors" and "inaccurate" when used to "penaliz[e] programs" under the Gainful Employment, but is nevertheless sufficient to serve as the basis for determining the amount of debt relief provided to student loan borrowers who have stated a valid Borrower Defense claim. *See supra* ¶¶ 347–349.

441.   Insofar as the Department, in publishing the Repeal, acted on concerns that it wholly ignored when justifying its schemes for determining Borrower Defense relief, the Department has acted in a manner that is arbitrary, capricious, and otherwise not in accordance with law within the meaning of the APA, 5 U.S.C. § 706.

## COUNT 11

### Agency Action that is Arbitrary, Capricious, and Not in Accordance with Law Due to the Use of an Inadequate Comment Period

442.   Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

443.   The APA requires an agency to publish "notice" of "either the terms or substance of the proposed rule or a description of the subjects and issues involved" in order to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments" and then, "[a]fter

1  consideration of the relevant matter presented, the agency shall incorporate in the
2  rules adopted a concise general statement of their basis and purpose." 5 U.S.C.
3  § 553(b)–(c).

4       444.    Under the APA's notice and comment requirements, among the
5  information that must be revealed for public evaluation are the technical studies
6  and data upon which the agency relies. *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d
7  1072, 1076 (9th Cir. 2006). Although an agency is permitted to add supporting
8  documentation in response to comments submitted during a comment period, such
9  documentation is limited to materials that supplement or confirm existing data. An
10 agency is not permitted to introduce in a final rule the *only* evidence that it claims
11 supports a proposition.

12      445.    The Department has deprived the public of an adequate opportunity to
13 comment by repeatedly citing to unnamed sources and vague, undisclosed
14 references to its own "analysis," including, for example and without limitation, by:

15          a. Basing its concern regarding the "validity" of the D/E rates measure in
16             part on the Department's "analysis" of the D/E rates issued in 2017
17             without disclosing that analysis or providing the opportunity to
18             comment on that analysis. *See supra* ¶¶ 216–217.

19          b. Basing its concern regarding the "validity" of the D/E rates measure in
20             part on "[r]esearch published subsequent to the promulgation of the
21             GE regulations," without identifying that research in the 2018 NPRM
22             or providing the opportunity to comment. *See supra* ¶ 216.

23          c. Basing its concern about prior findings on outcomes on its "analysis of
24             the outstanding student loan portfolio," 84 Fed. Reg. at 31,405, without
25             identifying that analysis in the 2018 NPRM or providing the
26             opportunity to comment. *See supra* ¶ 217.

27          d. Stating in the 2018 NPRM that "[o]ther research findings suggest that
28             D/E rates-based eligibility creates unnecessary barriers for certain

demographic groups," 79 Fed. Reg. at 40,171, while failing to identify

such findings. Although the Department included a reference to a 2016

study from the College Board in the 2018 NPRM, the Department

conceded in the Repeal that the cited research "did not address GE

programs specifically" and therefore could not have been about "D/E

rates-based eligibility." 84 Fed. Reg. at 31,427. *See supra* ¶ 218.

e.  Asserting in the 2018 NPRM and Repeal that administering the

alternate earnings appeals process has been more burdensome to the

Department than was originally anticipated, without providing

commenters with an opportunity to review the underlying information

regarding alternate earnings appeals, despite requests for that

information. *See supra* ¶¶ 284–292.

446.  By failing to provide adequate notice and comment, the Department

has violated the APA's procedural requirements, 5 U.S.C. § 553, and, as a result,

has acted in a manner that is arbitrary, capricious, and contrary to law within the

meaning of APA, 5 U.S.C. § 706.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.  Declare that Defendants have violated the APA by issuing the Repeal

in a manner that is arbitrary, capricious, and otherwise contrary to law;

B.  Hold unlawful, vacate, and set aside the Repeal;

C.  Enjoin the Defendants from implementing the Repeal;

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – 5:20-cv-455          121

1      D.     Award Plaintiffs their costs and reasonable attorneys' fees; *and*

2      E.     Grant such other relief as the Court deems just and proper.

3

4 Dated: January 22, 2020         Respectfully submitted,

5                        Glenn Rothner

                       ROTHNER SEGALL & GREENSTONE

6

7                        Daniel A. Zibel (*pro hac vice forthcoming*)

                       Aaron S. Ament (*pro hac vice forthcoming*)

8                        Robyn K. Bitner (*pro hac vice forthcoming*)

                       NATIONAL STUDENT LEGAL DEFENSE

                       NETWORK

9

10                      By   */s/ Glenn Rothner*

                            GLENN ROTHNER

11                        *Counsel for Plaintiffs*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** – 5:20-cv-455      122