United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF TEACHERS, et al., | Case No.  5:20-cv-00455-EJD |
| Plaintiffs, | Re: Dkt. No. 26 |
| v. | |
| ELISABETH DEVOS, et al., | |
| Defendants. | |
| PEOPLE OF THE STATE OF CALIFORNIA, | Case No.  5:20-cv-01889-EJD |
| Plaintiff, | Re: Dkt. No. 18 |
| v. | |
| ELISABETH DEVOS, et al., | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS** |
| Defendants. | |

Under Title IV of the Higher Education Act of 1965 ("HEA"), see 20 U.S.C. § 1070 *et seq.* (1988), students may receive "Guaranteed Student Loans" ("GSLs") to pay for their postsecondary tuition and expenses.  However, in order for the postsecondary institutions to be eligible to accept these GSLs, the institutions must "prepare students for *gainful employment* in a recognized occupation."  20 U.S.C. §§ 1001(b)(1), 1002(b)(1)(A)(i), (c)(1)(A) (emphasis added).  The Secretary of the Department of Education ("the Secretary") has broad authority to prescribe any rules and regulations that she deems necessary or appropriate to administer the HEA.  *See* 20 U.S.C. § 1221e-3; *see also id.* § 3474.

United States District Court
Northern District of California

For nearly 45 years after the HEA's enactment, the regulations promulgated pursuant to this broad authority did not specifically address the meaning of "gainful employment" or impose any obligations on postsecondary institutions in connection with this language.  This changed in 2010 when the DOE issued a series of new Title IV disclosure and eligibility requirements aimed at ensuring certain educational programs actually "prepared students for gainful employment." *See Program Integrity Issues*, 75 Fed. Reg. 34,806 (June 18, 2020); *Program Integrity Issues*, 75 Fed. Reg. 66,832 (Oct. 29, 2010).  Most of these regulations were struck down in 2012.  *See Ass'n of Private Sector Colls. & Univs. v. Duncan ("APSCU III")*, 110 F. Supp. 3d 176, 182 (D.D.C. 2015) (finding that the DOE could interpret the term "gainful employment," but striking down the regulations because the DOE failed to provide adequate explanations).

In 2014, the DOE promulgated a series of revised regulations, which were designed to counteract the deceptive marketing practices that certain for-profit postsecondary institutions used to entice students to take on large amounts of debt to pursue worthless degrees or credentials.  *See Program Integrity: Gainful Employment*, 79 Fed. Reg. 64,890 (Oct. 31, 2014).  These regulations became effective on July 1, 2015, but were not immediately implemented.  Following the 2016 presidential election, the DOE further delayed implementing the regulations.  Then, on June 16, 2017, the DOE announced its intent to initiate a new negotiated rulemaking committee to reconsider the Gainful Employment regulations.  *Intent to Establish Negotiated Rulemaking Committees*, 82 Fed. Reg. 27,640 (June 16, 2017).  After the committee failed to reach a consensus, the DOE issued a notice of proposed rulemaking.  *Program Integrity: Gainful Employment*, 83 Fed. Reg. 40,167 (August 14, 2018).  Thereafter, the DOE issued a final rule that rescinded the 2014 rule.  *Program Integrity: Gainful Employment*, 84 Fed. Reg. 31,392 (July 1, 2019) (hereinafter "the 2019 Rescission Rule").

The 2019 Rescission Rule forms the basis of the two above-captioned actions.  Plaintiffs in each action challenge the lawfulness of the repeal, both substantively and procedurally.  The DOE and its Secretary, Elisabeth DeVos (collectively "Defendants") argue that Plaintiffs in each action

Case Nos.: 5:20-cv-00455-EJD; 5:20-cv-01889-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS

2

United States District Court
Northern District of California

lack standing.  Having considered the Parties' briefs and having had the benefit of oral argument on August 27, 2020, the Court agrees and **GRANTS in part and DENIES in part** Defendants' motions to dismiss the respective complaints.

I.        BACKGROUND

    **A.  Factual Background**

        **1.  The Gainful Employment Rule**

The HEA authorizes the federal government to provide financial aid to students at postsecondary institutions.  Under this program, more than $150 billion in federal aid is provided annually to students at postsecondary schools.  *See Ass'n of Private Sector Colls. & Univs. v. Duncan ("APSCU I")*, 681 F.3d 427, 425 (D.C. Cir. 2012).  That money supports students who attend a wide array of institutions, including "private for-profit institutions, public institutions, and private nonprofit institutions."  *Id.*  Loan recipients must eventually repay their debt to the federal government, otherwise taxpayers bear the burden of student tuition.  *Id.*  Of course, the institutions receive their tuition dollars regardless of whether a loan recipient repays their debt—the money is "fronted" by the federal government.  To "guard against abuse by schools[,]" various statutory requirements exist to discourage postsecondary institutions from taking federal monies without providing students with quality education.  *Id.*  The basic idea is simple: if students receive quality education, they will be better able to repay their loans in the future as they will have a higher likelihood of increased earning potential.

One of these statutory protections is the Gainful Employment ("GE") provision, which limits institutions that can receive federal loans to those that provide "an eligible program of training to prepare students for *gainful employment* in a recognized occupation[.]"  20 U.S.C. § 1002(b)(1)(A)(i), (c)(1)(A) (emphasis added).  The statute does not define "gainful employment."  Instead, it vests the Secretary with the authority to "make, promulgate, issue, rescind, and amend rules and regulations governing" Title IV programs.  *See id.* § 1221e-3.  This includes the authority to define "gainful employment" by regulation.  *Ass'n of Private Sector*

United States District Court
Northern District of California

1    *Colls. & Univs. v. Duncan ("APSCU IV")*, 110 F. Supp. 3d 176, 182 (D.D.C. 2015).

2              **2.  The 2014 Gainful Employment Rule**

3              In 2014, the DOE announced its intention to define "gainful employment."  *Program*

4    *Integrity: Gainful Employment*, 79 Fed. Reg. 16,426, 16,433 (Mar. 25, 2014).  The proposed

5    regulations were intended to address growing concerns about postsecondary programs that leave

6    "students with unaffordable levels of loan debt in relation to their earnings, or leading to default."

7    *Id.* (discussing how a number of programs do not adequately train students, provide expensive

8    training in low-wage occupations such that the costs of training are unjustified, and produce only a

9    few number of graduates, despite high enrollment numbers).  The DOE found that

10   underperforming GE Programs charged "excessive costs;" possessed "low completion rates;"

11   "fail[ed] to satisfy requirements that are necessary for students to obtain higher paying jobs in a

12   field;" exhibited a "lack of transparency regarding program outcomes;" and engaged in

13   "aggressive or deceptive marketing practices."  *Id.*

14             In its March 2014 notice of proposed rulemaking, the DOE included statistics that showed

15   that students who complete certain GE programs often had low incomes, despite their significant

16   investment into postsecondary education.  *Id.* at 16,433–34.  Of particular concern to the DOE was

17   the lack of information available about these poor-performing GE programs.  Thus, in the March

18   2014 notice of proposed rulemaking, the DOE noticed its intent to make rules about access to

19   information.  *Id.* at 16,435 ("[S]tudents seeking to enroll in these programs do not have access to

20   reliable information that will enable them to compare programs in order to make informed

21   decisions about where to invest their time and limited educational funding."); *see also id.* at

22   16,436 ("[W]ithout accurate and comparable information, the public, taxpayers, and the

23   Government are in the dark as to the performance of these programs and the return on the Federal

24   investment in these programs.").  The DOE was particularly concerned by the mounting evidence

25   of "high-pressure and deceptive recruiting practices at some for-profit institutions."  *Id.* at 16,435.

26

27   Case Nos.: 5:20-cv-00455-EJD; 5:20-cv-01889-EJD

28   ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO
     DISMISS

United States District Court
Northern District of California

1    To address the lack of transparency and inadequacy of certain GE Programs, the DOE

2    proposed the Gainful Employment Rule ("the GE Rule").[1]  The final version of the GE Rule was

3    published in October 2014.  79 Fed. Reg. 64,890.  The final GE Rule subjects all GE Programs to

4    (1) an affirmative disclosure duty ("the Disclosure Requirements") and (2) punishes those GE

5    Programs that regularly leave low-income graduates with overwhelming debt loads ("the

6    Eligibility Framework").  *See APSCU IV*, 110 F. Supp. 3d at 182–83.

7    The affirmative disclosure duty requires the DOE to design a "disclosure template" that

8    GE Programs must complete.  34 C.F.R. § 668.412(a)–(b) (2014).  The Rule also tasks the

9    Secretary with "identif[ying] the information that must be included in the template in a notice

10   published in the Federal Register[,]" and specifies that, among other things, the Secretary can

11   require: "[t]he primary occupations . . . that the program prepares students to enter"; "the

12   program's completion rates"; and/or "[t]he length of the program in calendar time."  *Id.*  Each

13   institution that offers GE Programs must: post the completed disclosure template on the GE

14   Program's web page, include the template in any promotional materials for the program, and

15   require students to sign an enrollment agreement or make a financial commitment that includes the

16   GE Program's disclosures.  *Id.* § 668.412(c), (d), (e) (2014).

17   The debt-load punishment rule is more complex.  To prevent GE Programs from selling

18   students a low-return education at a high price, the DOE enacted a series of punitive measures to

19   weed out poor-performing programs.  The rule relies on a "debt-to-earnings rate," which

20   determines whether a GE program remains eligible for Title IV program funds.  *See* 79 Fed. Reg.

21   at 64,891.  Debt-to-earning rates measure (1) how much of a GE Program graduate's annual

22   income is spent on student loans and (2) how much (if any) of a graduate's discretionary income

23   goes towards paying off the loans.  Under the GE Rule, a GE Program provides its students with

24

---

25   [1] As noted above, the agency first attempted to promulgate this rule in 2011, but it never went into effect because the district court concluded that the DOE failed to engage in reasoned

26   decisionmaking.  *See Ass'n of Private Sector Colls. & Univs. v. Duncan ("APSCU II")*, 870 F. Supp. 2d 133, 149–55 (D.D.C. 2012).  The 2014 GE Rule was also challenged, but it survived

27   judicial review.  *APSCU IV*, 110 F. Supp. 3d at 204, *aff'd* 640 F. App'x 5 (D.C. Cir. 2016).
     Case Nos.: 5:20-cv-00455-EJD; 5:20-cv-01889-EJD

28   ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS

"sufficiently gainful employment" if the student's "discretionary income rate [is] less than or equal to 20 percent" or their "annual earnings rate [is] less than or equal to 8 percent." *Id.* ("GE programs with a discretionary income rate over 30 percent and an annual earnings rate over 12 percent will fail the [debt-to-earnings] rates measure.").

To calculate the debt-to-earnings rate for a given GE Program, the DOE used data from the Social Security Administration ("SSA").  The regulation worked as follows, the DOE would: (1) collect information from GE Program graduates who received Title IV funds; (2) create a list of the students who competed the Program during the relevant cohort period, (3) allow Programs the chance to correct information about students on the list, (4) obtain from the SSA the mean and median annual earnings of the students on the list, (5) calculate draft debt-to-earnings rates, (6) allow Programs a chance to challenge the median loan debt used to calculate these rates, (7) calculate final debt-to-earnings rates, and (8) allow the institution to appeal the final debt-to-earnings rates.  34 C.F.R. §§ 668.404–668.405 (2014).

Based on these rates, Programs received a "passing," "in the zone," or "failing" score. *Id.* § 668.403(c) (2014).  If a Program "failed" the debt-to-earnings rates measure for two out of three consecutive years or had a combination "in the zone" and "failing" rates for four consecutive years, the Program could not receive Title IV funds. *Id.*  Any Program at risk of becoming ineligible the next award year had to (1) warn prospective students and (2) inform students that they may be unable to use federal funding to pay for the school the next year and that other, less-risky programs exist. *Id.* § 668.410(a)(1), (2)(i) (2014).  Practically, "ineligibility" would have limited the number of students enrolled in failing postsecondary programs and would have indicated to other students that a Program did not offer "gainful employment." *Id.* § 668.410(b)(1) (2014).

### 3.  The DOE's Implementation of the 2014 GE Rule

Once the DOE successfully defended these 2014 regulations in court, see *supra* n.1, it began to implement the disclosure requirement and calculate the debt-to-earnings rates for GE

United States District Court
Northern District of California

United States District Court
Northern District of California

Programs.  On January 9, 2017, the DOE posted the final debt-to-earnings rates for 2015.  *Gainful Employment Electronic Announcement #100 — Upcoming Release of Final Gainful Employment Debt-to-Earnings (D/E) Rates*, Federal Student Aid (Jan. 9, 2017), https://ifap.ed.gov/electronic-announcements/01-06-2017-general-subject-gainful-employment-electronic-announcement-100.  On January 19, 2017, the DOE released its disclosure template.  *See Gainful Employment Electronic Announcement #103 – Release of the 2017 GE Disclosure Template*, Federal Student Aid (Jan. 19, 2017), https://ifap.ed.gov/electronic-announcements/01-19-2017-general-subject-gainful-employment-electronic-announcement-103.[2]

However, in March 2017, DOE changed course.  Under new leadership, the agency decided to postpone the deadlines for implementing the disclosure requirements.  *Gainful Employment Electronic Announcement #105 — Additional Time for Submission of an Alternate Earnings Appeal and to Comply with Gainful Employment (GE) Disclosure Requirements*, Federal Student Aid (Mar. 6, 2017), https://ifap.ed.gov/electronic-announcements/03-06-2017-gainful-employment-subject-gainful-employment-electronic.  Then, on June 30, 2017, the DOE again delayed the deadlines.  *See Program Integrity: Gainful Employment: Announcement of Applicable Dates, Request for Comments*, 82 Fed. Reg. 30,975 (July 5, 2017) (delaying deadlines until July 1, 2018).  And, on June 18, 2018, the DOE announced a further delay of the deadline for GE Programs to include disclosure information in promotional materials and in direct distributions to prospective students.  *Program Integrity: Gainful Employment*, 83 Fed. Reg. 28,177 (June 18, 2018) (giving GE Programs until July 1, 2019).

### 4.  The 2019 Rescission Rule

Ultimately, the DOE published a notice of proposed rulemaking that indicated the DOE's intent to rescind the 2014 GE Rule.  *See Program Integrity: Gainful Employment*, 83 Fed. Reg.

---

[2] Defendants requests that the Court take judicial notice of this website.  The Court can take judicial notice of the "undisputed and publicly available information displayed on government websites."  *King v. Cty. of L.A.*, 885 F.3d 548, 555 (9th Cir. 2018).  The Court thus **GRANTS** Defendants' request for judicial notice.

40,167 (Aug. 14, 2018).  The rescission was promulgated as a rule on July 1, 2019, with an effective date of July 1, 2020.  *See* 84 Fed. Reg. at 31,392.  The 2019 Rescission Rule eliminated the debt-to-earnings rates measure and the need for schools to publish disclosures and issue warnings to students about possible ineligibility.  *Id.* at 31,395.  The Secretary exercised her discretion to designate nearly all of the rescission rule for early implementation, which allowed institutions to stop complying with the 2014 GE Rule immediately.  *See id.* at 31,395–96.

### 5.  Plaintiffs' Claims

#### a.  The AFT, CFT, and Individual Plaintiffs

The American Federation of Teachers ("AFT"), California Federation of Teachers ("CFT"), and Individual Plaintiffs Isai Baltezar and Julie Cho (collectively "AFT Plaintiffs") filed an action alleging that the Rescission Rule harmed them.  *See* Complaint for Declaratory and Injunctive Relief ("AFT Compl."), Dkt. 1.

Plaintiff Baltezar is a fifth-grade teacher and plans to apply to and enroll in a certificate program in K-12 School Administration (*i.e.*, a GE Program) to boost his earning potential.  *Id.* ¶ 28.  He is researching programs and plans to borrow federal student loans to finance his postsecondary education.  *Id.*  He is a member of AFT and CFT.  *Id.* ¶ 27.

Plaintiff Cho is a part-time university lecturer, but is planning to change careers into either disability services counseling or teaching students with special needs.  *Id.* ¶¶ 35–36.  To facilitate this program, she intends to pursue a Special Education postsecondary program and plans to use federal student loans to finance her attendance.  *Id.* ¶ 36.  Plaintiff Cho is also a member of AFT and CFT.  *Id.* ¶ 35.

AFT has filed claims on behalf of itself and on behalf of its members.  *Id.* ¶¶ 22, 53.  AFT maintains that the rescission has impaired its ability to fight for the financial rights of its members because its members (including Individual Plaintiffs) are at a substantially higher risk of incurring debt that they cannot replay.  *Id.* ¶¶ 57–64.  AFT has been forced to divert resources to protect members from incurring "bad" debt.  *Id.*

United States District Court
Northern District of California

1    CFT has filed claims on behalf of its members. *Id.* ¶ 25. CFT is a labor organization that

2    is affiliated with AFT that also fights for the financial rights of its members. *Id.* ¶ 24.

3    Plaintiffs bring their action pursuant to the APA and raise eleven separate challenges to

4    various aspects of the Rescission Rule. *Id.* ¶¶ 350–446. They seek declaratory and injunctive

5    relief, including an order setting aside and prohibiting implementation of the 2019 Rescission

6    Rule. *Id.*, Prayer for Relief at 121–22.

### b. California State Claims

8    California brings this action on behalf of its citizens. *See* Complaint for Declaratory and

9    Injunctive Relief ("Cal. Compl."), Dkt. 1. California argues that the 2019 Rescission Rule will

10   incentivize predatory behavior by underperforming GE Programs, raise tuition of those programs,

11   and allow programs to deliver low-quality instruction. *Id.* ¶ 1. California argues the rescission

12   violates the Administrative Procedure Act ("APA") and must be set aside. *Id.* California sets

13   forth four categories of alleged injuries that it seeks to attribute to the rescission: (1) harm to its

14   public colleges and universities, *id.* ¶¶ 78–94; (2) harm to the State's fisc, *id.* ¶¶ 95–105; (3) harm

15   to its residents, *id.* ¶¶ 106–14; and (4) harm to California's "quasi-sovereign" interests in the

16   "health and well-being—both physical and economic—of its residents," *id.* ¶¶ 115–28. California

17   asserts only one claim under the APA. It argues that the rescission was arbitrary, capricious, and

18   not in accordance with law. *Id.* ¶¶ 130–43. California asks the Court to set aside the rescission

19   and issue an order that requires the DOE to "implement and enforce the 2014 GE Rule." *Id.* at 25.

### B. Procedural History

21   In each action, Defendants filed motions to dismiss for lack of standing. *See* Defendants'

22   Motion to Dismiss ("AFT MTD"), Dkt. 26; Defendants' Motion to Dismiss ("Cal. MTD"), Dkt.

23   18. In each action, Plaintiffs have filed opposition briefs. *See* Plaintiffs' Brief in Opposition to

24   Defendants' Motion to Dismiss ("AFT Opp."), Dkt. 27; California's Opposition to Defendants'

25   Motion to Dismiss ("Cal. Opp."), Dkt. 22. Thereafter, Defendants filed reply briefs. *See*

26   Defendants' Reply in Support of Motion to Dismiss ("AFT Reply"), Dkt. 28; Defendants' Reply

27

28   Case Nos.: 5:20-cv-00455-EJD; 5:20-cv-01889-EJD
     ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO
     DISMISS

United States District Court
Northern District of California

1    in Support of Motion to Dismiss ("Cal. Reply"), Dkt. 24.

2    **II.**      **LEGAL STANDARD**

3       To contest a plaintiff's showing of subject-matter jurisdiction, a defendant may file a Rule

4    12(b)(1) motion. Fed. R. Civ. P. 12(b)(1). A defendant may either challenge jurisdiction

5    "facially" by arguing the complaint "on its face" lacks jurisdiction or "factually" by presenting

6    extrinsic evidence (affidavits, etc.) demonstrating the lack of jurisdiction on the facts of the case.

7    *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004); *Safe Air for Everyone v. Meyer*, 373 F.3d

8    1035, 1039 (9th Cir. 2004).

9       "In a facial attack, the challenger asserts that the allegations contained in a complaint are

10    insufficient on their face to invoke federal jurisdiction." *Safe Air*, 373 F.3d at 1039. During a

11    facial attack, the court examines the complaint as a whole to determine if the plaintiff has "alleged

12    a proper basis of jurisdiction." *Watson v. Chessman*, 362 F. Supp. 2d 1190, 1194 (S.D. Cal.

13    2005). When evaluating a facial attack, the court assumes the complaint's allegations truth and

14    draws all reasonable inferences in the plaintiff's favor. *Wolfe*, 392 F.3d at 362. The court may not

15    consider evidence outside the pleadings when deciding a facial attack. *See, e.g.*, *MVP Asset*

16    *Mgmt. (USA) LLC v. Vestbirk*, 2011 WL 1457424, at *1 (E.D. Cal. Apr. 14, 2011). By contrast, in

17    a factual attack, the challenger disputes the truth of the allegations that, by themselves, would

18    otherwise invoke federal jurisdiction. *Safe Air*, 373 F.3d at 1039.

19       Federal courts are courts of limited jurisdiction; they are authorized only to exercise

20    jurisdiction pursuant to Article III of the U.S. Constitution and federal laws enacted thereunder.

21    *Gregory Vill. Partners, L.P. v. Chevron U.S.A., Inc.*, 805 F. Supp. 2d 888, 896 (N.D. Cal. 2011);

22    *see also Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011) ("[F]ederal courts

23    have an independent obligation to ensure that they do not exceed the scope of their jurisdiction,

24    and therefore they must raise and decide jurisdictional questions that the parties either overlook or

25    elect not to press."). Hence, an Article III federal court must ask whether a plaintiff has suffered

26    sufficient injury to satisfy the "case or controversy" requirement of Article III of the U.S.

*United States District Court*
*Northern District of California*

27

28

United States District Court
Northern District of California

Constitution.  *In re LinkedIn User Privacy Litig.*, 932 F. Supp. 2d 1089, 1092 (N.D. Cal. 2013).

To satisfy Article III standing, a plaintiff must allege: (1) an injury in fact that is concrete and particularized, as well as actual or imminent; (2) that the injury is fairly traceable to the challenged action of the defendant; and (3) that it is likely (not merely speculative) that injury will be redressed by a favorable decision.  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561–62 (1992). To establish an injury in fact, a plaintiff must show that he or she suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quotation marks and citation omitted).  To establish a traceable injury, there must be "a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."  *Lujan*, 504 U.S. at 560 (quotation marks and citation omitted) (alteration omitted).  Finally, it must be "likely" as opposed to merely "speculative" that the injury will be "redressed by a favorable decision."  *Id.* at 561 (quotation marks and citation omitted).  If a plaintiff is seeking injunctive or declaratory relief, the plaintiff must demonstrate "a sufficient likelihood that [they] will again be wronged in a similar way."  *City of L.A. v. Lyons*, 461 U.S. 95, 111 (1983).

If a plaintiff cannot allege Article III standing, then the federal court lacks jurisdiction over the case and must dismiss the action pursuant to Federal Rule of Civil Procedure 12(b)(1). *Spencer Enters., Inc. v. United States*, 345 F.3d 683, 687 (9th Cir. 2003); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101, 109–10 (1998).  Indeed, "[a]t the pleading stage, the plaintiff must clearly allege facts demonstrating each element." *In re Apple Processor Litig.*, 366 F. Supp. 3d 1103, 1107 (N.D. Cal. 2019) (quoting *Spokeo*, 136 S. Ct. at 1547).  "When '[s]peculative inferences' are necessary . . . to establish either injury or the connection between the alleged injury and the act challenged, standing will not be found."  *Johnson v. Weinberger*, 851 F.2d 233, 235

1    (9th Cir. 1988) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 45 (1976)).

2    **III.    DISCUSSION**

3        **A.  Defendants' Motion to Dismiss AFT Plaintiffs' Complaint**

4        AFT Plaintiffs assert eleven separate challenges to the 2019 Rescission Rule.  The Court

5    must first decide whether Plaintiffs need to allege standing for each claim.  In Plaintiffs' view,

6    because their claims (and injuries) all flow from the 2019 Rescission Rule, they need not

7    separately allege standing as to each claim.  AFT Opp. at 7.  Plaintiffs maintain that their three

8    alleged injuries—(1) the substantial risk of making poor educational investments/having resultant

9    economic harms; (2) loss of information due to the loss of student warnings and disclosures; and

10   (3) an increased burden of seeking out information that interests them—provide standing to

11   address the entire Rescission Rule.

12       The Court disagrees.  "A plaintiff must establish standing for every claim it wishes to

13   challenge, even where a plaintiff raises the same legal challenge to multiple sections of the same

14   statute."  *Ctr. For Biological Diversity v. Bernhardt*, 946 F.3d 553, 560 (9th Cir. 2019).  Despite

15   recognizing this rule, Plaintiffs contend that because they challenge various aspects of the

16   Rescission Rule, *any* harm caused by *any* aspect of the rule confers standing.  Not so.  "Standing is

17   not dispensed in gross."  Rather, it must be proven for each claim and each form of relief sought.

18   *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996).  A federal court's ability to grant a remedy is

19   limited to the scope of a plaintiff's injury.  *See United Food & Commercial Workers Union, Local

20   No. 663 v. USDA*, 2020 WL 2603501, at *6 (D. Minn. Apr. 1, 2020).  "If the right to complain

21   of one administrative deficiency automatically conferred the right to complain of all administrative

22   deficiencies, any citizen aggrieved in one respect could bring the whole structure of state

23   administration before the courts for review."  *Lewis*, 518 U.S. at 358 n.6; *see also Davis v. Fed.

24   Election Comm'n*, 554 U.S. 724, 734 (2008) (noting that a plaintiff with standing to challenge one

25   statutory subsection may not have standing to challenge the rest of the statute).

26

27

28

*United States District Court*
*Northern District of California*

1    At issue in this action is the rescission of two distinct regulatory frameworks.  First,

2    Plaintiffs challenge the rescission of the "Disclosure Requirements."  *See* AFT Compl. ¶¶ 374–89

3    ("the Disclosure Claims"); 34 C.F.R. § 668.412.  Second, Plaintiffs challenge the rescission of the

4    Eligibility Framework.  *See* AFT Compl. ¶¶ 390–441 ("the Eligibility Claims"); 34 C.F.R.

5    §§ 403–10.  Plaintiffs' Disclosure and Eligibility Claims are legally distinct; nothing in the 2014

6    GE Rule's Disclosure Requirements impacts the Eligibility Framework, or vice versa.  Indeed, a

7    violation of one does not result in a violation of the other.  To the contrary, under the 2014 GE

8    Rule, programs were obligated to disclose information *outside of* debt-to-earnings metrics.  And,

9    only if a GE Program was found to be ineligible was it obligated to make *separate* disclosures.

10   These frameworks are thus not derivative of each other.  *Cf. Mozilla Corp. v. FCC*, 940 F.3d 1,

11   46–47 (D.C. Cir. 2019) (allowing the plaintiffs to challenge an aspect of an agency rule that

12   "derivatively support[ed] other rules" that caused them injury).

13   The case law that Plaintiffs rely on does not change this analysis.  Plaintiffs cite to

14   *WildEarth Guardians v. Jewell*, 738 F.3d 298 (D.C. Cir. 2013) for the proposition that standing

15   can be premised on *any* harm flowing from the 2019 Rescission Rule.  *See* AFT Opp. at 8.

16   However, the facts of *WildEarth* are markedly different.  There, the plaintiffs claimed that the

17   Bureau of Land Management committed procedural error when it failed to adequately consider

18   environmental concerns.  *WildEarth*, 738 F.3d at 305.  The plaintiffs argued that the agency's

19   action should be vacated.  The plaintiffs advanced several arguments in support of vacatur.  The

20   defendants argued that the plaintiffs had to establish standing as to each argument.  The court

21   disagreed.  Vacating the Bureau's action would remedy each harm.  Thus, the plaintiffs were not

22   seeking various forms of relief.  Rather, the plaintiffs sought one remedy and advanced reasons to

23   support their *one* claim.  *Id.* at 305–308 & n.3.

24   Here, Plaintiffs are not advancing several arguments in support of *one* claim.  To the

25   contrary, Plaintiffs are advancing arguments in support of *two* distinct claims.  Unlike *WildEarth*,

26   where any ground would have remedied each harm, if the Court vacated the 2019 Rescission Rule

United States District Court
Northern District of California

United States District Court
Northern District of California

based on Plaintiffs' Disclosure Claims, Plaintiffs' Eligibility Claims would not be redressed.  This confirms that Plaintiffs are pursuing separate <u>claims</u> and must allege standing as to each claim. *Cf. WildEarth*, 738 F.3d at 305–08 & n.3 (noting that the plaintiffs advanced several arguments in support of *one* claim).

### 1.  Disclosure Claims

Plaintiffs allege that the repeal of GE Programs' disclosure obligations resulted in three distinct injuries that satisfy Article III: (1) the substantial risk of making poor educational investments, along with the resultant economic harms; (2) an informational injury due to the loss of required disclosures; and (3) an increased burden of seeking out information that would have been disclosed but-for the rescission.  AFT Opp. at 9.  Defendant argues that Disclosure Claims contained in the Complaint are insufficient on their face to invoke federal jurisdiction.  *See Safe Air for Everyone*, 373 F.3d at 1039.  The Court first focuses on Plaintiffs' second alleged injury— their purported informational injury.

Plaintiffs claim an "informational injury-in-fact" on the grounds that the 2019 Rescission Rule deprived them of information that they would otherwise have received: namely, disclosures from GE Programs with information about the Program's length, success-rate, and costs.  According to the Complaint, "[b]y repealing the Disclosure Requirements without a reasonable explanation, the Department is depriving prospective and enrolled students, including Individual Plaintiffs, of critical information about the programs they are attending or considering attending, which is required to be disclosed under the Gainful Employment Rule."  AFT Compl. ¶ 377.

Where a plaintiff's claimed injury-in-fact is based on the deprivation of information, a plaintiff must allege that: "(1) it has been deprived of information that, on its interpretation, a statute [or regulation] requires the government or a third party to disclose," and "(2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure."  *Marino v. Nat'l Oceanic & Atmospheric Admin.*, 2020 WL 1479515, at *4 (D.D.C. 2020) (quotation marks and citation omitted); *see also Nat'l Educ. Ass'n v. DeVos*, 345 F. Supp.

United States District Court
Northern District of California

1    3d 1127, 1142 (N.D. Cal. 2018) ("The D.C. Circuit has recognized that the deprivation of

2    information to which plaintiffs have a regulatory right (as opposed to a statutory right) can

3    constitute an injury in fact for the purposes of standing." (citing *Action Alliance of Senior Citizens*

4    *v. Heckler*, 789 F.2d 931 (D.C. Cir. 1986))).

5         Some examples are helpful.  In *Friends of Animals v. Jewell*, the plaintiff sought to compel

6    the Secretary of the Interior to comply with a section of the Endangered Species Act that the

7    plaintiff alleged mandated the Secretary to make various findings within a 12-month period.  828

8    F.3d 989, 990, 993 (D.C. Cir. 2016).  Once the Secretary made a specific finding, various

9    disclosure requirements ensued.  *Id.* at 992.  The D.C. Circuit found that the plaintiff did not *yet*

10   have a right to information.  Pursuant to the statute, only *after* the Secretary made certain findings

11   did the right to information form.  *Id.* at 993.  Because the Secretary had not made any findings,

12   the plaintiff did not *yet* have a right to information.  *Id.*

13        Likewise, in *American Society for the Prevention of Cruelty to Animals v. Feld*

14   *Entertainment, Inc.*, the D.C. Circuit again rejected the plaintiff's claim for information.  659 F.3d

15   13 (D.C. Cir. 2011).  There, the plaintiff argued that the defendant's treatment of elephants

16   constituted a "take" under section 9 of the Endangered Species Act.  *Id.* at 17.  Because the

17   defendant's conduct violated section 9, the plaintiff contended that the defendant had to apply for

18   and obtain a permit.  *Id.* at 22.  Information contained in permit applications is public.  *Id.*  The

19   plaintiff argued that this possible right to information conferred informational standing.  The D.C.

20   Circuit disagreed.  If the plaintiff won, the defendant would only be obligated to cease its

21   practices.  *Id.*  It would not be obligated to disclose any information to the plaintiff.  The

22   possibility that the defendant *might* disclose information in the future was too speculative.  *Id.*

23        Finally, in *Marino*, the court rejected the plaintiffs' asserted informational injury.  2020

24   WL 1479515, at *4.  The relevant statute vested the agency with discretion to decide what

25   information should be disclosed.  *Id.* ("The . . . Provisions that the plaintiffs identify as the source

26   of their alleged injuries are not creatures of statute, but instead consequences of [the defendant's]

27
28   Case Nos.: 5:20-cv-00455-EJD; 5:20-cv-01889-EJD
     ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO
     DISMISS

1    discretionary decision to include those provisions in the permits it issued, as well as its

2    discretionary decision to issue those permits in the first place."). Because the agency controlled

3    the decision about what information it had to disclose in the first place, the plaintiffs could not

4    show that the agency had a "duty" to disclose the information that the plaintiffs sought. Thus, the

5    plaintiffs had no cognizable informational injury. *Id.*

6         *National Education Association v. Devos*, 345 F. Supp. 3d 1127 (N.D. Cal. 2018) stands in

7    contrast. There, the court found that the plaintiffs had a right to the information that they sought

8    because the regulation at issue "required" certain "public and individualized disclosures" to be

9    made. *National Education Association*, 345 F. Supp. 3d at 1133. This contrast is informative:

10   absent a specific disclosure requirement, a plaintiff cannot have an informational injury.

11        The Court need only consider the first prong of the informational injury test to conclude

12   that Plaintiffs' allegations fall short. None of the plaintiffs have alleged that they have "been

13   deprived of information" that "a statute requires the government or a third party to disclose" to

14   them. *Elec. Privacy Info. Ctr. v. U.S. Dep't of Commerce*, 928 F.3d 95, 103 (D.C. Cir. 2019). Nor

15   could they. Nothing in 34 C.F.R. § 668.412 (the 2014 GE Rule's Disclosure Requirements)

16   requires the DOE or Secretary DeVos to collect specific information. To the contrary, the

17   regulation is clear that "the Secretary identifies the information that must be included in the

18   template." Thus, the type of information collected is within the Secretary's discretion. *See* 34

19   C.F.R. § 668.412(a) ("That information *may* include, *but is not limited to*:" (emphasis added)).

20   Much like *Marino*, the information required to be disclosed by GE Programs rests within

21   Secretary DeVos's discretion. That the DOE required certain disclosures in the past does not

22   obligate the DOE to require those disclosures in the future. *See Marino*, 2020 WL 1479515, at *4

23   (finding that even while certain disclosures were required in the past, because the defendant had

24   discretion over those disclosures in the first place, the plaintiffs did not have a right to continued

25   disclosures).

26

27   Case Nos.: 5:20-cv-00455-EJD; 5:20-cv-01889-EJD

28   ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO
     DISMISS

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Moreover, to the extent 34 C.F.R. § 668.412 requires the DOE to issue a disclosure

2    template, there is no information about how often or even when the template has to be issued.

3    And, even if the Court ordered the DOE to issue a template, the Court has no power to mandate

4    that the template include specific information—that decision has been placed with the Secretary.

5    Any order mandating the Secretary to exercise her discretion in a specific way implicates obvious

6    separation of powers issues.  This is to say, Plaintiffs also have a redressability problem.  Because

7    the Court cannot order the Secretary to provide specific information, the Court cannot remedy the

8    harm caused by the deprivation of information.  *See* AFT Compl. ¶ 377.  For these reasons, AFT

9    Plaintiffs lack standing to pursue their disclosure claims.

10    Plaintiffs resist this conclusion by pointing to their other two alleged harms.  They argue

11    that these harms are "distinct."  Not so.  Injury one and three are premised on injury two.

12    Plaintiffs maintain that because they no longer have access to GE Programs' disclosures, they are

13    at risk of making poor educational decisions and have the increased burden of seeking out

14    information.  Injuries one and three are thus derivative Plaintiffs' informational injury.  These

15    harms are "inextricably linked" to and "second-order consequences" of the above informational

16    injury.  *See Marino*, 2020 WL 1479515, at *5.  Because Plaintiffs' first and third injuries are

17    "unavoidably informational in nature," Plaintiffs cannot establish standing without meeting the

18    informational injury standard.  *Id.* (collecting cases).  Plaintiffs cannot meet the requirements of

19    this test and thus lack standing to pursue their Disclosure Claims.[3]  Accordingly, the Court

20    **GRANTS** Defendants' motion to dismiss the disclosure claims.

21

22

23

24    _____

[3] Because AFT and CFT Plaintiffs have not shown that their members would have standing in

25    their own right, AFT and CFT Plaintiffs cannot pursue associational standing.  *See Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977) ("[A]n association has standing to bring

26    suit on behalf of its members when: (a) its members would otherwise have standing in their own right . . . .").  For clarity, the above analysis also bars AFT from pursuing the Disclosure Claims in

27    its own right.  *See* AFT Opp. at 23.

Case Nos.: 5:20-cv-00455-EJD; 5:20-cv-01889-EJD

28    ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS

17

1

## 2. Eligibility Claims

As discussed above, the 2014 GE Rule also has a provision designed to target poor-performing programs.  The Rule used a "debt-to-earnings" rate that measured how much of GE Program graduate's earnings go towards servicing student loans.  Based on that rate, the DOE determined whether a Program "gainfully employed" graduates.

To calculate the debt-to-earnings rates for a given GE Program, the regulation required the DOE to use aggregate data obtained from the SSA.  Only after receiving this data does the DOE publish information about final debt-to-earnings rates for the various GE Programs.  *See* 34 C.F.R. § 668.404(c)(1).  The DOE does not have access to individual earnings information for students who complete postsecondary educational programs.  This is why the 2014 GE Rule contemplated that the DOE would secure information from the SSA.  *See* 79 Fed. Reg. at 65,009.

In order to obtain the aggregate earnings information needed to support the 2014 GE Rule, the DOE entered into a Memorandum of Understanding ("MOU") with the SSA that would allow the SSA to provide GE Program graduates' earnings data.  The MOU expired on May 24, 2018.  In order for the DOE to continue to receive earnings data past this date, it would have to renew the MOU with the SSA.

In March 2018, an action was filed in this district that claimed the DOE's use of income data from the SSA violated the Privacy Act of 1974 (5 U.S.C. § 552(a)).  *Manriquez v. DeVos*, Case No. 3:17-cv-07210 (N.D. Cal.) (ECF No. 33); *see also Manriquez v. DeVos*, 345 F. Supp. 3d 1077, 1099 (N.D. Cal. 2018) ("Plaintiffs have met their burden to show that they are likely to succeed on the merits of their argument that the Privacy Act bars the [DOE's] disclosure of information about applicants to the Social Security Administration *and the receipt and use of information from the Social Security Administration*." (emphasis added)).  News reports also indicated that at least one member of Congress called for an Inspector General investigation into the DOE's use of earnings data.  *See* Danielle Douglas-Gabriel, *Elizabeth Warren Wants the Education Earnings Data Investigated*, WASH. POST (Jan 2, 2018), https://www.washingtonpost.

United States District Court
Northern District of California

1    com/news/grade-point/wp/2018/01/02/elizabeth-warren-wants-the-education-dept-s-use-of-

2    earnings-data-investigated.

3          After these events, the SSA decided not to renew the MOU.  *See* Declaration of Diane

4    Auer Jones ("Jones Decl.") ¶ 6, Dkt. 26-1.  Accordingly, the MOU expired in May 2018.  The

5    DOE requested that the SSA agree to renew the MOU, but the SSA declined to do so.  *Id.*

6    Because the MOU expired, the DOE was unable to complete the debt-to-earnings rate calculations

7    for a second year.  *Id.* ¶ 7.

8          The 2019 Rule explained that because the SSA had not signed a new MOU, the DOE could

9    not calculate new debt-to-earnings rates.  *See* 84 Fed. Reg. at 31,392.  The use of SSA data was

10   essential to the debt-to-earnings calculations, and the 2014 GE Rule did not allow the Secretary to

11   replace the SSA data with information from other sources.  *See* 34 C.F.R. §§ 668.404(c)(1).  Once

12   the MOU terminated, the DEO had no way to identify which GE Programs would qualify as

13   "failing" or "in the zone" for a second year under the 2014 GE Rule.  Hence, even if the Court

14   were to set aside the 2019 Rescission Rule (as Plaintiffs request), the DOE could not calculate

15   debt-to-earnings rates as prescribed by the 2014 GE Rule.  Further, Plaintiffs cite no authority that

16   would allow this Court to compel the SSA, a non-party to this suit, to disclose information

17   (particularly information found by another court to violate the Privacy Act).  Therefore, even if the

18   Court granted Plaintiffs' request to set aside the 2019 Rescission Rule, it would not redress

19   Plaintiffs' alleged informational injury[4] because reinstatement of the 2014 GE Rule would not

20   result in new debt-to-earnings rate calculations.  Without these calculations, Plaintiffs would not

21   gain any new information about GE Program's eligibility.  *See* Jones Decl. ¶ 7.

22         In response, Plaintiffs argue that the 2014 GE Rule can still function without SSA data.

23   AFT Opp. at 20.  They maintain that if the Court reinstated the 2014 GE Rule, GE Programs

24   would (1) maintain the same status as the previous year, (2) be obligated to warn prospective and

25   enrolled students about their failure to meet DOE standards, and (3) still be at risk of possible

26

27   [4] Plaintiffs rely on the same three injuries identified above.  *See* III.A.
     Case Nos.: 5:20-cv-00455-EJD; 5:20-cv-01889-EJD

28   ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO
     DISMISS

United States District Court
Northern District of California

United States District Court
Northern District of California

ineligibility.  But, the requirement to provide students with <u>already-known</u> information neither redresses Plaintiffs' informational injury nor lessens the risk that Plaintiffs or their members might make poor educational decisions.[5]  Accordingly, Plaintiffs' have not shown that their Eligibility Claims are "likely" to be redressed by a favorable outcome.

Plaintiffs last suggest that Ms. Jones' declaration should be ignored because she provides "new facts" regarding the SSA's decision not to renew the MOU and attempts to "buttress the Repeal in ways not set forth in the Repeal itself."  AFT Opp. at 21 n.15.  The Court disagrees; the DOE informed the public in its 2019 Rescission Rule that it was unable to enter into an updated MOU agreement with the SSA. 84 Fed. Reg. At 31,392.  Ms. Jones' statements are consistent with publicly available information and are entitled to a presumption of good faith.  *See also Am. Cargo Transport, Inc. v. U.S.*, 625 F.3d 1176, 1180 (9th Cir. 2010) ("[W]e presume the government is acting in good faith.") (collecting cases).

Plaintiffs further suggest that the Court should permit Plaintiffs leave to conduct discovery into Ms. Jones' declaration.  AFT Opp. at 21 n.15.  Discovery should be granted when "the jurisdictional facts are contested or more facts are needed."  *Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1093 (9th Cir. 2003).  To obtain jurisdictional discovery, a defendant must show more than a "hunch" that discovery might yield jurisdictionally relevant facts.  *See Kellman v. Whole Foods Market, Inc.*, 2018 WL 5014191, at *1 (N.D. Cal. Oct. 16, 2018).  Plaintiffs provide no reason to believe that the SSA might again provide the DOE with data.  Thus, Plaintiffs have not cleared the "hunch" threshold and are not entitled to jurisdictional discovery.  *Id.*

For these reasons, the Court finds that Plaintiffs have failed to show that their Eligibility Claims are likely to be redressed by a favorable outcome and the Court **GRANTS** Defendants' motion to dismiss these claims.

---

[5] Plaintiffs further suggest that redress would be provided by reinstating the certification in 34 C.F.R. § 668.414.  Certifications contemplated by that regulation only informed the DOE that eligible GE Programs are properly licensed and accredited.  Nothing in this section contemplated the dissemination of information to individuals.

Case Nos.: 5:20-cv-00455-EJD; 5:20-cv-01889-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS

United States District Court
Northern District of California

### 3.  Count 11 Procedural Claim

In Count 11, Plaintiffs allege a procedural injury.  Specifically, Plaintiffs maintain that Defendants deprived them of an adequate opportunity to comment on parts of the 2019 Rescission Rule.  *See* AFT Compl. ¶ 445; *see also id.* ¶ 446 ("By failing to provide adequate notice and comment, the Department has violated the APA's procedural requirements, 5 U.S.C. § 553, and, as a result, has acted in a manner that is arbitrary, capricious, and contrary to law within the meaning of APA, 5 U.S.C. ¶ 706.").  Defendants do not argue that this claim should be dismissed on standing grounds.  Rather, they argue that Plaintiffs have failed to state a claim upon which relief can be granted.

Pursuant to the APA, a final agency action must be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," or if it is taken "without observance of procedure required by law."  5 U.S.C. § 706.  While the arbitrary and capricious standard is "highly deferential," and requires courts to "presume the agency action [is] valid," the review of an agency's procedural compliance is more limited.  *See Kern Cty. Farm Bureau v. Allen*, 450 F.3d 1072, 1075–76 (9th Cir. 2006).  Integral to an agency's notice requirement is its duty to "identify and make available technical studies and data that it has employed in reaching the decisions to propose particular rules.  An agency commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary."  *Solite Corp. v. EPA*, 952 F.2d 473, 484 (D.C. Cir. 1991).  Of course, "[n]othing prohibits [an a]gency from adding supporting documentation for a final rule in response to public comments."  *Rybachek v. EPA*, 904 F.2d 1276, 1286 (9th Cir. 1990); *see also BASF Wyandotte Corp. v. Costle*, 598 F.2d 637, 644–45 (1st Cir. 1979) ("It is perfectly predictable that new data will come in during the comment period . . . . The agency should be encouraged to use such information in its final calculations without thereby risking the requirement of a new comment period.").  The public is not entitled to review and comment on every piece of information used during rule making.  *Kern Cty.*, 450 F.3d at 1076.

Count 11 alleges that Defendants failed to afford Plaintiffs an adequate opportunity to comment on the 2019 Rescission Rule.  Plaintiffs point to the proposed and final Rule's repeated citations to unnamed sources and unclarified "analyses."  AFT Compl. ¶ 445; *see also id.* ¶¶ 217, 218.  For instance, in the 2018 notice of proposed rulemaking, Defendants asserted that "[r]esearch published subsequent to the promulgation of the GE regulations adds to the Department's concern about the validity of using [debt-to-earnings] rates as to determine whether or not a program should be allowed to continue to participate in title IV programs.  83 Fed. Reg. at 40,171.  The research supporting this conclusion was not cited.  The failure to provide a citation was challenged under the Information Quality Act.  *See* 84 Fed. Reg. at 31,426.  The DOE maintained that it used "well-respected, peer-reviewed references to substantiate its reasons throughout these final regulations for believing that [debt-to-earnings] rates could be influenced by a number of factors other than program quality."  *Id.* at 31,427.  Of course, these references were not identified.  In other places, the DOE cites to its own "analysis," but never clarifies what that analysis entails.  *See e.g.*, *id.* at 31,398 & n.27.

Defendants maintain that the 2019 Rescission Rule disclosed the relevant analysis and research.  They point the Court toward footnote 14 of the final regulation.  This footnote takes the Court to a speech by Secretary DeVos.  Yet, nowhere in this speech can the Court locate an analysis explaining the rescission.  Moreover, Defendants do not identify *any* specific references in the proposed or final rule that support their contention that the DOE disclosed the relevant research.  *See Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) ("As other courts have noted, [i]t is not our task, or that of the district court, to scour the record in search of a genuine issue of triable fact." (quotation marks and citation omitted)).

Accordingly, because Plaintiffs have plead facts showing that Defendants did not disclose the research and analysis that the DOE relied on in rescinding the 2014 GE Rule, Plaintiffs have stated a claim for relief and the Court **DENIES** Defendants' motion to dismiss this procedural claim.

### B.  Defendants' Motion to Dismiss California's Complaint

California establishes four categories of alleged injuries that it seeks to attribute to the 2019 Rescission Rule: (1) alleged harms to its public colleges and universities, Cal. Compl. ¶¶ 78–94; (2) alleged harms to the State's fisc, *id.* ¶¶ 95–105; (3) alleged harm to the State's residents, *id.* ¶¶ 106–14; and (4) alleged harms to the State's "quasi-sovereign" interests in "the health and well-being—both physical and economic—of its residents, *id.* ¶¶ 115–28.

California attempts to establish an injury-in-fact through (1) *parens patriae* standing; (2) its propriety interests as the operator of a public higher education system; and (3) an alleged financial injury.  The Court declines to assess these alleged harms—even if the State could establish *parens patriae* standing or an injury based on the two other asserted-harms, the State cannot establish redressability.[6]

California also bases its claim on the 2014 GE Rule's disclosure obligations and eligibility requirements.  As established, the 2014 Rule did not require the disclosure of any specific information.  While schools had to use a specific template, the information contained therein was decided by the Secretary.  Thus, any decision regarding what the template must include is within the Secretary's discretion.  This is to say, even if the Court set aside the rescission of Section 668.412, the Secretary would still have full discretion to determine what information should be included in GE Program's disclosures.  Accordingly, the Court cannot redress California's harm; only the Secretary can by again mandating specific disclosures.  Likewise, because the DOE can no longer obtain information necessary to calculate debt-to-earnings rates, California cannot establish redressability as to its Eligibility Claims.  For these reasons, the Court **GRANTS in part** Defendants' motion to dismiss California's Complaint.

California also asserts a procedural harm.  *See* Cal. Compl. ¶¶ 134–43.  They allege that the DOE rescinded the 2014 GE Rule without adequate reasoning.  *See supra* III.A.3.  This claim

---

[6] While cases like *Massachusetts v. EPA*, 549 U.S. 497 (2007) may have relaxed the prohibition on generalized grievances for states, it did not eradicate the redressability standing requirement.

1   can proceed.  *See* Cal. Compl. ¶¶ 106–14 (premising standing on California citizens' loss of

2   information about GE programs' costs and eligibility).

3   **IV.    LEAVE TO AMEND**

4       In determining whether leave to amend is appropriate, the district court considers "the

5   presence of any of four factors: bad faith, undue delay, prejudice to the opposing party, and/or

6   futility."  *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001) (noting

7   amendments should be granted with "extreme liberality"); Fed. R. Civ. Pro. 15(a) (2) (court

8   should freely allow amendment when "justice so requires").  If leave to amend would be futile, the

9   court may deny leave.  *See Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296 (9th Cir. 1990) ("It is

10  not an abuse of discretion to deny leave to amend when any proposed amendment would be

11  futile.").

12      Here, the Court finds that leave to amend would be futile.  The 2014 GE Rule did not

13  prescribe mandatory disclosure obligations.  Thus, nothing in the regulation entitles AFT Plaintiffs

14  or California to specific information.  The Court thus cannot remedy the deprivation of that

15  information.  Likewise, the Rule's eligibility requirements are premised on the receipt of SSA

16  data.  Because the DOE can no longer access SSA data (and there is no indication that is subject to

17  change), this Court cannot provide Plaintiffs relief.  The Court's inability to remedy Plaintiffs'

18  alleged harm is prescribed by the regulation.  Thus, Plaintiffs cannot cure the standing deficiency

19  identified in this order.  For these reasons, leave to amend would be futile.

20  **V.    CONCLUSION**

21      For the foregoing reasons, the Court **GRANTS in part and DENIES in part** Defendants'

22  motions to dismiss.

23      **IT IS SO ORDERED.**

24  Dated: September 3, 2020

25

26  _____
    EDWARD J. DAVILA
    United States District Judge

27

28

United States District Court
Northern District of California