Eileen M. Connor (State Bar No. 248856)
**LEGAL SERVICES CENTER OF HARVARD LAW SCHOOL**
122 Boylston Street
Jamaica Plain, MA 02130
(617) 522-0715
*econnor@law.harvard.edu*

Jennifer Bennett (State Bar No. 296726)
**GUPTA WESSLER PLLC**
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 573-0336
*jennifer@guptawessler.com*

*Attorneys for Amici Curiae*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ISAI BALTEZAR & JULIE CHO, *et al.* <br><br> *Plaintiffs*, <br><br> v. <br><br> MIGUEL CARDONA, *in his official capacity as Secretary of Education*, & UNITED STATES DEPARTMENT OF EDUCATION, <br><br> *Defendants*. | Case No. 20-cv-00455-EJD <br><br> **[PROPOSED] BRIEF OF AMICI CURIAE HOUSING AND ECONOMIC RIGHTS ADVOCATES AND THE PROJECT ON PREDATORY STUDENT LENDING IN SUPPORT OF PLAINTIFFS' OPPOSITION IN PART AND NON-OPPOSTION IN PART TO DEFENDANTS' MOTION FOR REMAND** <br><br> Date:   March 24, 2022 <br> Time:   9:00 am <br> Place:  Courtroom 4, 5th Floor <br> Judge:  Hon. Edward J. Davila |

**INTERESTS OF AMICI CURIAE**[1]

Housing and Economic Rights Advocates (HERA) is a California not-for-profit legal service and advocacy organization that provides legal advice, advocacy, and representation to low- and moderate-income consumers on a wide range of economic justice issues. A significant portion of HERA's work focuses on unmanageable student loan debt, and in particular debt incurred while attending abusive for-profit education institutions. In addition to public workshops, HERA directly helps students victimized by predatory for-profit schools file administrative complaints and applications for discharge based on school misconduct. HERA is also co-counsel in two class actions in federal court on behalf of debt-burdened former students who are seeking to enforce their right to loan cancellation under the borrower defense to repayment discharge program: *Calvillo Manriquez v. Cardona*, No. 3:17-cv-07210-SK (N.D. Cal. filed Dec. 20, 2017) (borrower defense applicants who attended certain programs at the failed for-profit Corinthian Colleges, Inc.), and *Sweet v. Cardona*, No. 19-cv-3674-WH (N.D. Cal. filed June 25, 2019) (borrower defense applicants who attended other programs).

The Project on Predatory Student Lending is the leading legal organization representing students against the predatory for-profit college industry and the policies that enable the industry to exploit the promise of higher education to cheat student borrowers and taxpayers. The Project has been helping students fight for justice since 2012. It has represented over a million former students across the country, winning landmark cases to protect borrower rights, recover money owed, and cancel fraudulent debt. Its ongoing cases hold predatory colleges accountable and force the Department of Education to act on behalf of students rather than protecting industry, and, along

---

[1] No counsel for any party authored it in whole or in part. Apart from the amici curiae, no person, party, or party's counsel contributed money intended to fund the brief's preparation and submission.

-1-

with HERA, it is co-counsel in *Calvillo Manriquez v. Cardona*, No. 3:17-cv-07210-SK, and *Sweet v. Cardona*, No. 19-cv-3674-WH.

A number of the Project's clients have incurred debt from attending institutions that sell low-value, high-cost programs of the kind that the gainful employment regulation is meant to preclude. Absent accountability regulations like gainful employment, and the disclosures it mandates, individuals will continue to be made worse off because they pursue training and education.

## INTRODUCTION

This case concerns the Department of Education's unlawful repeal of a 2014 rule intended to protect students from high-cost, low-quality education programs that promise students a pathway to a better life only to leave them mired in crushing debt with no useful education to show for it—and leave taxpayers ultimately to foot the bill. The Gainful Employment Rule (GE Rule) was promulgated in accordance with the Higher Education Act's mandate that all career programs receiving federal tax dollars "prepare students for gainful employment in a recognized occupation." 20 U.S.C. § 1002(b)(1)(A)(i), (c)(1)(A). Among other things, it required schools receiving federal funding to certify they were accredited and to disclose essential information to potential students like the cost of attendance and the likelihood that students would find employment in their field of study. *See* Program Integrity: Gainful Employment, 79 Fed. Reg. 64,890, 64,890–91 (Oct. 31, 2014) (to be codified at 34 CFR Parts 600 and 668).

The idea was simple: Graduates need jobs where they earn enough to repay their loans. If a program's graduates earn less than the federal poverty line—or its students don't graduate at all—at the very least, prospective students should know about that. And, ideally, failing programs should no longer receive federal student aid dollars. The GE Rule's protections were particularly important for low-income students, service members, and veterans—groups specifically targeted by unscrupulous education programs. *See, e.g.*, 79 Fed. Reg. at 65,034–35; S. Comm. on Health, Educ., S. Rep. No.

-2-

112–37, Labor and Pensions, For-Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success (2012) (detailing abuses and investigations).

The GE Rule represented the culmination of nearly nine years of research and analysis, the consideration of almost 190,000 public comments, and a negotiated rulemaking process involving a broad array of stakeholders. *See, e.g.*, 79 Fed. Reg. at 64,892; Comments to Negotiated Rulemaking for Higher Education 2009-10, https://perma.cc/LDX2-4PH8. It was upheld by two federal district courts and unanimously affirmed by the D.C. Circuit. *See Ass'n of Private Sector Colleges and Univs. v. Duncan*, 681 F.3d 427 (D.C. Cir. 2012). But in 2019, the Department changed course and rescinded the GE Rule. *See* Program Integrity: Gainful Employment, 84 Fed. Reg. 31,392 (July 1, 2019). As the plaintiffs in this case explain, the Repeal Rule violated bedrock principles of the Administrative Procedure Act. Pls.' Opp'n at 5–11.

Here, the Department makes no effort to defend its flawed Repeal Rule. Instead, it seeks to remand the rule back to the agency so that it may consider new rulemaking on gainful employment. While amici do not oppose remand, any decision to remand should also vacate the Repeal Rule. If the Repeal Rule remains in effect during the remand period—which could potentially last for years, *see* Pls.' Opp'n at 16–17—the harm to students, their families, and, ultimately, taxpayers and the federal budget will continue unchecked. Because of the Department's improper repeal of the gainful employment rule, students now no longer receive critical information about graduation and employment rates *before* enrolling in a school and taking on potentially unsustainable debt burdens. And the resulting harm to these students and their families is immediate and irreparable, measurable not just in lost dollars but in lost years, as they pursue education that turns out to be worthless—or worse. This Court should vacate the Repeal Rule and restore the status quo that protected students from predatory education programs while the Department engages in its new rulemaking.

-3-

[Proposed] Brief of Amici Curiae in Support of Plaintiffs' Opposition in Part and Non-Opposition in Part to Defendants' Motion for Remand (Case No. 20-cv-455-EJD)

**ARGUMENT**

**I.    The Repeal Rule should be vacated on remand.**

When a court remands a challenged agency action, vacatur is the "standard remedy." *State v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106, 1125 (N.D. Cal. 2017) (collecting cases). Courts in the Ninth Circuit remand without vacatur only in exceedingly limited circumstances—when vacatur would cause "serious and irremediable" real-world disruptions. *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.*, 109 F. Supp. 3d 1238, 1242 (N.D. Cal. 2015); *see also Humane Soc'y v. Locke*, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010). But disruptions warranting this extraordinary approach are the "rare exception." *U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d at 1125–26. The real-world harm of vacating the rule must be "dire," *GOV. C.L. "Butch" Otter v. Salazar*, No. 11-cv-358-CWD, 2012 WL 12517198, at *3 (D. Idaho Dec. 4, 2012), "severe," *AquAlliance v. U.S. Bureau of Reclamation*, 312 F. Supp. 3d 878, 881 (E.D. Cal. 2018), or "economically disastrous," *Cal. Communities Against Toxics v. U.S. Env't Prot. Agency*, 688 F.3d 989, 994 (9th Cir. 2012). Absent clear evidence that vacatur would cause "severe disruptive consequences," remanding without vacatur would give agencies a "free pass" to "exceed their statutory authority and ignore their legal obligations under the APA, making a mockery of the statute," *U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d at 1126.[2]

Courts within the Ninth Circuit have rigorously adhered to this stringent standard. In those cases where remand without vacatur was found appropriate, record evidence demonstrated that

---

[2] The same standards apply to an agency's request for remand even if it comes before a merits determination of the challenged rule. *Ctr. For Native Ecosystems v. Salazar*, 795 F. Supp. 2d 1236, 1241–42 (D. Colo. 2011) (noting that it "is well within the bounds of traditional equity jurisdiction" for courts to vacate an agency action on remand without a determination on the merits). Although the Ninth Circuit has not yet expressly considered vacatur prior to a merits determination, district courts have consistently acknowledged the appropriateness of such a remedy and have followed the standard approach in determining when it is warranted. *See, e.g.*, *In re Clean Water Act Rulemaking*, --- F. Supp. 3d ---, 2021 WL 4924844, at *4 (N.D. Cal. Oct. 21, 2021); *Pascua Yaqui Tribe v. U.S. Env't Prot. Agency*, No. 20-cv-266-TUC-RM, 2021 WL 3855977, at *4 (D. Ariz. Aug. 30, 2021); *All. for Wild Rockies v. Marten*, No. 17-cv-21-M-DLC, 2018 WL 2943251, at *2–3 (D. Mont. June 12, 2018); *N. Coast Rivers All. v. Dep't of the Interior*, No. 16-cv-307-LJO-MJS, 2016 WL 8673038, at *6 (E.D. Cal. Dec. 16, 2016).

-4-

vacatur could, for instance, result in the extinction of an already endangered species, *see Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405–06 (9th Cir. 1995), or trigger rolling blackouts affecting thousands, if not millions of people, more air pollution, and disastrous economic effects, *see Cal. Communities*, 688 F.3d at 994. So, too, where evidence established that vacatur would be "severely disruptive in terms of cost, safety, and potential environmental consequences" to the flight procedures at a major international airport, *City of L.A. v. Dickson*, No. 19-71581, 2021 WL 2850586, at *3 (9th Cir. July 8, 2021), or "cause immediate economic harm and . . . threaten the health of the forest ecosystem," including increasing the likelihood and severity of wildfires. *All. for the Wild Rockies v. Savage*, 375 F. Supp. 3d 1152, 1157 (D. Mont. 2019).

But where the only claimed harm is additional delay or increased costs for an agency, courts have uniformly refused to remand without also vacating the rule. In *Se. Alaska Conservation Council v. U.S. Forest Service*, for example, the court found that purported disruption to the agency—"requir[ing] it to begin the NEPA process again from scratch"—was plainly insufficient to warrant remand without vacatur. 468 F. Supp. 3d 1148, 1154 (D. Alaska 2020); *see also Salazar*, 2012 WL 12517198, at *8 (rejecting agency's claim that it "may need to re-do the critical habitat designation" as insufficient basis to justify exception to default rule); *Ctr. for Native Ecosystems*, 795 F. Supp. 2d at 1243 (same, for alleged harms associated with delay and cost).

Nor does the Department's intent to undertake a new rulemaking justify departure from the presumptive rule. For instance, in *In re Clean Water Act Rulemaking*, ---F. Supp. 3d---, 2021 WL 4924844, at *3 (N.D. Cal. Oct. 21, 2021)—a case that, just like this one, involved a challenge to a rule that repealed a pre-existing regulation—the court refused to remand without vacatur, despite the agency's announcement that it would undertake a new rulemaking. The agency argued that the plaintiffs could simply voice any concerns in a comment to the new rule. And industry intervenors argued that the regulation that had been (allegedly unlawfully) repealed had negative economic

-5-

effects, and therefore, vacating the repeal would reimpose those effects. *Id.* at \*9. The agency's and the intervenors' reasons, the court held, were insufficient to justify departure from the standard rule that vacatur must accompany remand. The court explained that the disruptive environmental effects that would occur without vacatur far outweighed any economic consequences or agency inconvenience vacatur might cause. *Id.* And that was especially true because—just as in this case—the agency's abrupt change in repealing the previous rule meant that there had been "insufficient time for institutional reliance to build up around the current rule, which ha[d] been under attack since before day one." *Id.* at \*8.

The agency's request for remand without vacatur here is even weaker than in *Clean Water*. At least in that case, the EPA had firmly stated its intent to promulgate a new certification rule in a notice of proposed rulemaking, with the new rule expected Spring 2023. *Id.* at \*3. Here, by contrast, the Department has identified no timeline for any new gainful employment rule—indeed, the federal register notices a proposed *negotiated rulemaking* identifying over a dozen different major priorities, with gainful employment being one of seven topics that "*may* be considered by a separate rulemaking committee(s) formed at a later date." Negotiated Rulemaking Comm.; Negotiator Nominations and Schedule of Comm. Meetings, 86 Fed. Reg. 43,609, 44,611 (emphasis added). If remand without vacatur were granted, it could leave the Repeal Rule in place for years despite serious concerns over its legality and the ongoing harms it causes student borrowers.

Bottom line: Judicial review is the primary mechanism to stop agencies from evading the procedural safeguards and legal constraints that ensure the functional and constitutional soundness of agency action. Remand without vacatur is appropriate only in the rarest of cases where vacatur would cause severe and irreparable real-world harm. Were it otherwise, agencies could shield a potentially illegal rule from judicial review indefinitely. Here, the agency has failed to identify, let alone substantiate, any real-world harms that would flow from vacating the Repeal Rule. So its

request for remand without vacatur is unwarranted. And that is all the more true because, as discussed below, the harm to student borrowers if the Repeal Rule remains in place will be concrete, ongoing, and, in many ways, irremediable.

### II. Permitting the Repeal Rule to remain in place indefinitely during remand will do serious, immediate, and concrete harm to student borrowers.

The harm caused to student borrowers if the Repeal Rule is left in place is far from hypothetical. In fact, it is directly quantifiable through the Department's own records. The Department's collected data illustrates with stunning clarity how many students have been, and will continue to be, harmed by failing education programs without the GE Rule's protections. For the 2010-11 and 2011-12 school years in California alone, 56,129 students were enrolled at failing programs or programs close to failing. *See* The Institute for College Access & Success, *How Much Did Students Borrow to Attend The Worst-Performing Career Education Programs?*, https://perma.cc/9B4Y-F45Q (Aug. 2018) (TICAS Fact Sheet). Those 56,129 students borrowed well over $934 million to attend failing or near-failing programs—and because that money may never be paid back, the cost will fall on the shoulders of taxpayers instead. *Id*. That is just one state. In the U.S. as a whole, the number was 354,002 students at over $7.4 billion. *Id.*

If the Repeal Rule remains in place, these failing and near-failing programs will be left unregulated—and potential students will be left in the dark about the (lack of) job prospects after attending these schools. At best, the programs will simply neglect to inform potential students about their graduates' outcomes. But all too often, it's far worse. Many of these programs outright deceive students about the employment prospects available to them after they graduate. *See, e.g.*, Order Granting in Part and Denying in Part Preliminary Injunction, *Manriquez v. DeVos*, Case No. 17-cv-07210-SK, slip op. (Dkt. 60) at 12 (discussing stories of students who suffered significant financial harm because they were deceived into borrowing money for a worthless education). Absent vacatur of the Repeal Rule, this deception will go unchecked.

Amici's members and clients see this firsthand. Kareem Britt, a named plaintiff in the Project's class-action lawsuit against for-profit college chain Florida Career College (FCC), is a prototypical example. Kareem, then a cook working two jobs to support his family, was drawn to the Heating, Ventilation and Air Condition ("HVAC") program FCC offered. *See Compl.* at 28, ¶¶ 164, 173, *Britt et al. v. IEC Corp. et al.*, No. 60814-cv-ALTMAN/HUNT (S.D. Fla. April 20, 2020). Although Kareem could not afford the $20,000 tuition, the FCC representative promised him that the degree would transform his future and that FCC would help him find a job. *See id.* at ¶¶ 169–71. Kareem received a $6,000 federal Pell grant along with a "scholarship loan" of $3,000. *Id.* at 29, ¶ 176. But the program was a sham—the equipment needed to learn about HVAC systems was "at best limited, and at worst, nonexistent," and the instructors lacked the experience and knowledge to teach his classes. *Id.* at ¶¶ 180–81. And after completing the coursework, Kareem found that FCC's career services would not help him find a permanent placement. *Id.* at ¶ 187. He is currently working to pay back thousands of dollars in loans as a hotel cook—the same job he had before he started at FCC. *Id.* at 30, ¶ 188.

Eric Luongo, a Navy veteran who testified about his experiences with DeVry University at a Congressional committee hearing, tells a similar story. *See Oversight of For-Profit Colleges: Protecting Students and Taxpayer Dollars from Predatory Practices*: *Hearing Before Subcomm. on Dep'ts of Labor, Health, and Human Servs., Ed. and Related Agencies,* 116th Cong. (2019) (statement of Eric Luongo, Former For-Profit College Student). After being honorably discharged following his naval service, Eric decided to earn an associate's degree so he could pursue a career in web design. *Id.* Eric considered a number of schools, but he settled on DeVry because DeVry representatives told him that their graduates were making over $80,000 a year in web graphic design. *Id.* Although Eric's education should have been paid for through the GI Bill and grants, a DeVry representative deceived him into taking out additional federal loans. *Id.* It was only after Eric graduated that he learned that he had over $100,000

-8-

in loans from the associate's degree. *Id.* And he was never able to get a job in graphic design. *Id.*

Over and over, amici have seen how these education programs sell students on false promises of high-paying jobs and state-of-the-art training, only to shackle them to crippling debt and a useless—and often detrimental—education. Unable to pay their loans, former students frequently find themselves with ruined credit and even fewer opportunities moving forward. Amici represent many such students in a class action lawsuit against the Department of Education, *Sweet, et al. v. Cardona, et al.*, No. 19-cv-3674 (N.D. Cal. filed June 25, 2019). For example, Mallory Peek, a former student at the Art Institutes International of Minnesota, stated that she has nearly $40,000 in outstanding student loans for a degree that is "useless." Exhibit B, Part 3, to Pls.' Mot. for Class Certification, at 304, *Sweet et al. v. Cardona*, No. 19-cv-3674, ECF No. 21 (compilation of class member affidavits).[3] "I can't get a position in the industry I studied for because professionals in that field already know that the degree is useless and I am not worth hiring," she explained. *Id.* Nor can she pursue a degree that would be worthwhile because she cannot afford to add to her existing debt—already, she can't "afford to move into a safer home and neighborhood," or pay household, medical, and vehicle bills. *Id.* at 303, 304.

Michael Rideout, an ITT Technical student, testified that he's tried to go to another school, but none will take his transfer credits, telling him he would have to restart his entire education. *Id.* at 265. "My life was dedicated to ITT for 4 years," he said. *Id.* "I lived and breathed school to get the grades I did and it was all for a piece of paper that is worthless in my employer's eyes. *Id.* Having worked so hard to be told your degree is worthless is extremely depressing." *Id.* Kyle Roth, a former student at Jones International University, has over $130,000 in outstanding loans. *Id.* at 89. He finds it difficult to "plan for [his] financial future because bad credit"—caused by the loans he took out for

---

[3] Available at https://perma.cc/G35M-R39H.

-9-

[Proposed] Brief of Amici Curiae in Support of Plaintiffs' Opposition in Part and Non-Opposition in Part to Defendants' Motion for Remand (Case No. 20-cv-455-EJD)

an "education" that turned out to be worthless—means that he "can't get home loans, car loans," and he has even been denied jobs because of a credit check. *Id.* at 89.

The mental health toll caused by the stress of this unmanageable debt is severe. Mary Koster, a student at Art Institute Online, has almost $60,000 in outstanding debt "for worthless schools and degree programs that didn't help [her] find a job in [her] field." *Id.* at 246. "We can't do anything but pay our bills day to day," she testified. *Id.* "[T]hat is no way to live." *Id*. Like many student borrowers, Mary described feelings of shame and anxiety. "I wish I had never gone. I was the first in my family to go [to] a 4-year university so no one was able to guide me or warn me that this could happen." *Id*. at 247. "I have thought of suicide often and it has had a huge impact on my mental health." *Id.* at 246. Karli Cannon, another ITT Tech student, expressed the same despairing refrain: "I go to bed each night wondering if I will make enough to not be homeless next month. Sometimes I cry myself to sleep over it." *Id.* at 21. Karli works 13 to 14 hours a day, and yet she "can barely afford to live." *Id.* She cannot secure financing for a car or an apartment because of her "ruined" credit score—she could not even afford to pay for her father's tombstone after he passed away suddenly in May 2019. *Id.* at 20–21. "I was told that an education would bring me a brighter future," she stated. *Id.* at 21. "[I]nstead it has ruined me." *Id.*

What's more, the harms caused by unsustainable debt loads often ripple beyond the individual student. Students' families bear the burden, too. Andrea Smith, another Project client, is a single mother living in Decatur, Michigan with three teenage children and a 5-month-old granddaughter. *See* Project on Predatory Student Lending, *My Student Loan Truth: Andrea's Story*, (Dec. 19, 2019), https://perma.cc/5674-35RC. Like many victims of predatory education programs, Andrea came from a family that always struggled financially. *Id.* She saw a college degree as a path to a better life. *Id.* She enrolled in the medical assisting program at Everest Institute, part of Corinthian Colleges, because it guaranteed job placement and a good career. *Id.* But six years later,

she was left with "nothing to show for [her] education and a lot of wasted time." *Id.* Worse still, her inability to pay her student loans "crippled [her] with terrible credit," and the Department of Education twice garnished her tax refund. *Id.* The first time it did so, Andrea had been counting on the refund to help her leave an abusive relationship, but "without that $5,000 refund, I couldn't leave," she recalled. *Id.* The second time, Andrea was unemployed and needed the $9,000 tax return to pay rent and defray the costs of a grandchild on the way. *Id.* But instead, Andrea had to fight off eviction, and she, her grandchildren, and her pregnant daughter were forced to relocate back to Michigan. *Id.* Perhaps unsurprisingly, Andrea's granddaughter was born seven weeks premature—just after the family relocated—and required weeks of hospitalization. *Id.*

Amici's clients have explained that, had they known what employment outcomes they could expect from these failing for-profit schools, they would have made different choices. In the words of one *Sweet* class member, "Had I known then what I know now I would have never gone to that school. I could have finished my actual college degree and possibly provide a better life for myself and my husband where we could afford to pay off out student loans before we die." Project on Predatory Student Lending, *Sweet v. DeVos: Student Loan Truth*, https://perma.cc/LA9Q-MBC8. These stories are not one-offs. They are all too common, but each one is uniquely devastating to the students and families involved.

The GE Rule was promulgated to prevent these exact harms. Among other things, the Rule required that, to be eligible for government funding, schools must certify that they are accredited—a requirement that protected students from "enrolling in programs that do not meet all State or Federal accrediting standards and licensing or certification requirements necessary to secure the jobs associated with the training." 79 Fed. Reg. at 64,891; *see* 34 C.F.R. §§ 668.414, 668.410, 668.403(c)(5). The Rule also required programs to disclose "how long it takes to complete a program, how much the program costs, the likelihood that students would find employment in their field of

[Proposed] Brief of Amici Curiae in Support of Plaintiffs' Opposition in Part and Non-Opposition in Part to Defendants' Motion for Remand (Case No. 20-cv-455-EJD)

study, and their likely earnings in that field." 79 Fed. Reg. at 64,976. These disclosures prevented schools from deceiving students about the cost of the program or the likelihood that students could actually obtain employment in their chosen field.

The unlawfully-enacted Repeal Rule removed these critical protections. Absent vacatur, therefore, the harms that led the Department to promulgate the GE Rule in the first place will continue indefinitely. Students will continue to be deceived into attending schools that promise to improve their employment prospects, but leave them with nothing but debt. The possibility that the Department may someday conduct a new rulemaking on this issue does nothing to remedy this harm—or ease the need for vacatur now. To the contrary, this case exemplifies why the ordinary rule requiring vacatur on remand exists in the first place: to ensure that agencies cannot unlawfully impose or repeal rules and then evade judicial scrutiny by asking for remand, thereby allowing the harm caused by their unlawful actions to continue.

If the repeal of the GE Rule remains in place, serious harm to current and potential students will continue unabated, with more new students and more families—as many as 354,000 every year, *see* TICAS Fact Sheet—ensnared in life-ruining cycles of debt. The equities in this case could not be clearer: This Court should vacate the Repeal Rule, reinstate the status quo, and help to ensure that countless students are able to make informed decisions about their futures.

## CONCLUSION

This Court should deny the Department's request to remand without vacatur.

Dated: November 19, 2021                                            Respectfully submitted,

*/s/ Jennifer Bennett*
Jennifer Bennett

**GUPTA WESSLER PLLC**
Jennifer Bennett, SBN 296726
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 573-0336

-12-

*jennifer@guptawessler.com*

Eileen M. Connor
(State Bar No. 248856)
**LEGAL SERVICES CENTER OF HARVARD LAW SCHOOL**
122 Boylston Street
Jamaica Plain, MA 02130
(617) 522-0715
*econnor@law.harvard.edu*

*Attorneys for Amici Curiae*

-13-

[Proposed] Brief of Amici Curiae in Support of Plaintiffs' Opposition in Part and Non-Opposition in Part to Defendants' Motion for Remand (Case No. 20-cv-455-EJD)